# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| QUESTEX MEDIA GROUP, INC., *et al.*,[1] | Case No. 09-1 3423 |
| Debtors. | Joint Administration Requested |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (C) AUTHORIZING THE USE OF CASH COLLATERAL; (D) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (E) SCHEDULING A FINAL HEARING

The above-captioned debtors and debtors in possession (the "Debtors") file this motion (this "Motion") for the entry of an interim order (the "Interim DIP Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final DIP Order," and, together with the Interim DIP Order, the "DIP Orders") (a) authorizing the Debtors' to obtain postpetition financing; (b) granting first priority liens and providing superpriority administrative expense status; (c) authorizing the Debtors' use of cash collateral; (d) granting adequate protection to prepetition secured parties; and (e) scheduling a final hearing (the "Final Hearing") on the Debtors' proposed debtor in possession financing. In support of this Motion, the Debtors respectfully state as follows.[2]

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Questex Media Group, Inc. (5500); FierceMarkets, Inc. (6826); InfoTrends, Inc. (0297); InfoTrends Research Group, Inc. (9131); Oxford Communication, Inc. (0786); Oxford Publishing, Inc. (6012); QMG Holdings, Inc. (3042); Questex Brazil, LLC (3187); and Show Events, Inc. (6352). The location of the corporate headquarters for Questex Media Group, Inc. and the service address for all of the Debtors is: 275 Grove Street, Suite 2-130, Newton, Massachusetts 02466.

[2] The facts and circumstances supporting this Motion are set forth in the Declaration of Thomas E. Caridi in Support of First Day Motions (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

## Jurisdiction

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Preliminary Statement

4.     As set forth in the First Day Declaration, the Debtors have approximately $242 million in total funded secured debt. The Debtors' prepetition secured indebtedness stems from two financing agreements:  (a) a first lien credit agreement made up of a $30 million first lien revolving credit facility and a $150 million first lien term loan, and (b) a second lien credit agreement made up of a $55 million second lien term loan (collectively, the "Senior Secured Credit Facilities").[3]  The Debtors' obligations under the Senior Secured Credit Facilities are secured by substantially all of the Debtors' assets (the "Prepetition Collateral"), including "cash collateral" as defined in section 361 of the Bankruptcy Code ("the "Cash Collateral").

5.     In addition, the Debtors have approximately $41 million outstanding on account of unsecured notes, and approximately $18.5 million in accrued outstanding and unpaid "earnout" payments owed to former principals of acquired entities.  The Debtors also incur

---

[3]     The Debtors total funded secured debt, consists of approximately $186 million of first lien debt and approximately $56 million of second lien debt.

regular trade debt and other obligations in the ordinary course of business, primarily during the second half of the year. Given the nature of the Debtors' business, the Debtors must generate sufficient revenue during the first half of the calendar year to service their funded debt and cover operating expenses as a result of the cyclical trough occurring in the second half of the year.

6.     The Debtors have commenced these chapter 11 cases (the "Chapter 11 Cases") in the midst of a liquidity crisis caused by, among other things, the substantial decline in advertising revenue, the gradual shift away from print media, and the accrual of substantial "earnout" payments. As a result of these factors, the Debtors have been unable to meet their total leverage covenants under their Senior Secured Credit Facilities since the first quarter of 2009. Although the Prepetition Secured Lenders (as defined below) have informally agreed to forebear from exercising their rights and remedies under the subject loan documents, the Debtors' liquidity profile is not projected to improve without a balance sheet restructuring.

7.     Accordingly, the Debtors bring this Motion on an expedited basis, seeking authorization to use the First Lien Lenders' Cash Collateral and to obtain debtor-in-possession financing ("DIP Financing") in light of the immediate and irreparable harm the Debtors' estates will suffer if they have insufficient liquidity to sustain their business as a going concern. The Debtors do not have any unencumbered cash with which to operate their business. Although the use of the Cash Collateral is necessary for the operation of the Debtors' business, the use of Cash Collateral alone, is insufficient to successfully maintain business operations while the Debtors operate in chapter 11. Thus, the Debtors have an urgent need for additional liquidity which can only be obtained by DIP financing. The DIP Financing will allow the Debtors to continue business operations in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, and satisfy other working capital and operational

3

needs—all of which are necessary to preserve and maintain the going-concern value of the Debtors' business as they finalize a going-concern sale for substantially of their assets.

8. To that end, the Debtors seek authorization to obtain a $15 million postpetition financing facility on a superpriority administrative claim and first priority priming lien basis (the "DIP Credit Facility") pursuant to that certain credit agreement dated as of [October 1], 2009, a copy of which is attached hereto as <u>Exhibit B</u>, (the "DIP Credit Agreement"), by and among Questex Media Group, Inc., as borrower, and certain other Debtors and non-Debtor affiliates, as guarantors (collectively, the "Loan Parties"), Credit Suisse (the "DIP Agent"), and certain First Lien Lenders from time to time party thereto (the "DIP Lenders"). The Debtors request authority to access up to $5.5 million of the DIP Credit Facility on an interim basis in accordance with the terms of the Interim DIP Order and the remaining $9.5 million balance, on a final basis.

9. In addition, the Debtors seek authorization to use Cash Collateral during the pendency of the Chapter 11 Cases. As adequate protection against any diminution in the value of the Cash Collateral securing the First Lien Credit Agreement (as defined below), arising from, among other things, the imposition of the automatic stay, the priming of the First Lien Lenders' liens, and the Debtors' use of such collateral, the Debtors propose to provide the First Lien Lenders with: (a) an administrative claim junior only to the Debtors' obligations arising from the DIP Credit Facility and the Carve-Out (as defined in the DIP Credit Agreement); (b) replacement liens subject to the DIP Liens (as defined in the DIP Credit Agreement) and the Carve-Out, and (c) an amount equal to the reasonable and documented fees and expenses of the attorneys and financial advisors to the First Lien Agent (as defined below).

DB02:8800970.1

068808.1001

## Background

10.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have filed a motion requesting joint administration of the Chapter 11 Cases. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases and no committees have been appointed.

11.     As described in the First Day Declaration, the Debtors are a global, diversified, business-to-business integrated media and information provider, headquartered in Newton, Massachusetts. The Debtors serve multiple industries including, technology, telecommunications, beauty, spa, travel, hospitality, leisure, home entertainment, landscape design, building services, and natural resources through a range of well-established, market-leading publications, tradeshows, events and conferences, interactive media, research, information, and integrated marketing services.

12.     The Debtors' media properties include over 150 print and digital media publications, 28 conferences, tradeshows, and events, as well as a range of research, data, and information products. The Debtors host a broad range of conferences, tradeshows, and educational events, many of which are the largest in their respective regional or national market segments. The Debtors' events generally serve markets where they also publish a companion magazine and are well attended by both advertisers and readers of those magazines. As a result, the Debtors' events have strong brand awareness and loyalty in their respective markets. For the fiscal year ending December 31, 2008, the Debtors generated approximately $129 million in revenues and approximately $30 million in EBITDA. However, the Debtors' EBITDA before

5

restructuring charges, is projected to be only approximately $15.9 million for 2009. As of the Petition Date, the Debtors have assets with a book value totaling approximately $299 million and liabilities totaling approximately $321 million.

13. Formed in May 2005, the Debtors have consistently grown revenues and margins through a combination of organic growth of existing properties, the successful launch of new events and publications, a significant expansion of online and digital initiatives, and the completion of various strategic acquisitions. Despite the success of various aspects of their business, the Debtors have been unable to service their highly leveraged capital structure. Given the Debtors' projected liquidity profile and the continued decline in advertising revenue as a result of the global economic crisis, the Debtors and their financial advisors have concluded that a full balance sheet restructuring is necessary. Accordingly, after evaluating various restructuring alternatives, the Debtors have commenced the Chapter 11 Cases with the purpose of initiating a process for a going-concern sale of substantially all the Debtors' assets pursuant to section 363 of the Bankruptcy Code. By effectuating a going-concern sale, the Debtors will be able to rationalize their capital structure and reduce their level of secured debt, thereby improving their competitive position and enhancing their prospects for continued growth and future profitability.

**The Debtors' Prepetition Secured Indebtedness**

14. The Debtors' capital structure was initially developed in connection with Audax's acquisition of select assets from Advanstar, Inc., which subsequently led to the formation of Questex Media Group, Inc. and its affiliated subsidiaries. In May 2007, the Debtors entered into the Senior Secured Credit Facilities. Since the end of the first quarter of 2009, the Debtors have been unable to meet their total leverage ratio covenants under their Senior Secured Credit Facilities, and consequently have been in default as of May 15, 2009.

6

## A. First Lien Credit Agreement

15. On May 4, 2007, the Debtors entered into that certain first lien credit agreement (the "First Lien Credit Agreement"), by and among QMG Holdings Inc. ("QMG Holdings") and Questex Media Group, Inc. ("QMG, Inc.") as borrowers (collectively, the "Borrowers"), Credit Suisse, as administrative agent and collateral agent (the "First Lien Agent"), and certain lenders from time to time party thereto (collectively, the "First Lien Lenders"). The First Lien Credit Agreement provides for a $180 million senior secured facility (the "First Lien Credit Facility") that matures on May 4, 2014, and is comprised of (a) a $30 million revolving credit facility and (b) a $150 million first lien term loan. As of the Petition Date, the Debtors have outstanding obligations under the First Lien Credit Facility of approximately $186 million.

## B. Second Lien Credit Agreement

16. On May 4, 2007, Questex also entered into that certain second lien credit agreement (the "Second Lien Credit Agreement"), by and among the Borrowers, the First Lien Agent, and certain lenders from time to time party thereto (collectively, the "Second Lien Lenders"). The Second Lien Credit Agreement provides for a $55 million senior secured facility (the "Second Lien Term Loan") that matures on November 14, 2014, and is comprised of a $55 million second lien term loan. As of the Petition Date, the Debtors have outstanding obligations under the Second Lien Credit Facility of approximately $56 million.

## C. Pledged Collateral and Intercreditor Agreement

17. On May 4, 2007, in connection with entering into the Senior Secured Credit Facilities, the Debtors entered into (a) the First Lien Guarantee and Collateral Agreement and (b) the Second Lien Guarantee and Collateral Agreement (collectively, the "Loan Security Agreements"), pursuant to which the Borrowers and each of the Debtors, as guarantors, pledged

substantially all of their assets as collateral to secure their obligations under the Senior Secured Credit Facilities (the "First Lien Obligations and the Second Lien Obligations").

18.     Also on May 4, 2007, the Borrowers entered into that certain intercreditor agreement (the "Intercreditor Agreement") with the First Lien Lenders and the Second Lien Lenders (collectively, the "Prepetition Secured Lenders") assigning priorities with respect to the liens granted to the Prepetition Secured Lenders pursuant to the terms of the Loan Security Documents. The Intercreditor Agreement grants (a) the First Lien Lenders a first priority lien on substantially all the assets of the Borrowers and (b) the Second Lien Lenders a second priority junior lien on substantially all the assets of the Borrowers.

### The Debtors Liquidity Needs[4]

19.     The Debtors have, with the assistance of their financial advisor and investment banker, Miller Buckfire, analyzed the Debtors' near-term liquidity position in an effort to determine what is necessary to maintain business operations during the Chapter 11 Cases. In undertaking this analysis, the Debtors and Miller Buckfire adopted a conservative approach while analyzing the Debtors' operating cash flows, working capital needs, and the impact of the current economic outlook on the Debtors' near-term financial performance. As part of the Debtors' financial analysis and projections, the Debtors and Miller Buckfire developed a 13-week cash flow forecast (the "Initial Cash Flow Budget"), which takes into account anticipated cash receipts and disbursements during that time.[5]

---

[4]    The facts and circumstances relating to the Debtors' liquidity needs and efforts to obtain the best possible terms for the DIP Credit Facility are discussed at length in the Declaration of Ronen Bojmel (the "Bojmel Declaration"), filed contemporaneously herewith.

[5]    A copy of the Initial Cash Flow Budget is attached as Exhibit 1 to the Bojmel Declaration.

20.　　Absent approval of the DIP Credit Facility, even a conservative Initial Cash Flow Budget indicates that the Debtors' current cash on hand and cash generated from their postpetition operations will be insufficient to continue operating their business during the Chapter 11 Cases. Thus, without immediate interim access to the DIP Credit Facility, the Debtors likely will have to severely curtail—if not terminate—their business operations which will severely impact the going-concern value of their business to the detriment of creditors, employees, and other parties in interest.

## The Debtors' Efforts to Obtain Postpetition Financing

21.　　The Debtors efforts to obtain postpetition financing were significantly hampered due to (a) adverse capital market conditions affecting the B2B industry overall; (b) the Debtors' deteriorating cash flows and overleveraged capital structure, and (c) the material impairment of the Prepetition Secured Lenders' collateral.　As noted in the First Day Declaration, the B2B industry is driven by the overall health of the economy and advertisement environment.　After a period of strong growth, B2B market revenues began to retreat in 2007 and declined considerably as a result of the global economic crisis.　The dislocation of credit markets impacted businesses in all industries, causing an unprecedented decline in advertising and marketing revenue.　In addition, the B2B industry underwent, and is still undergoing, a fundamental change driven by the enhanced functionality of online advertising and other digital tools.　This change has influenced traditional advertisers to reduce their allocation of resources to B2B publications in search of alternative, cheaper marketing platforms.　Moreover, the Debtors' events management business has also exhibited signs of weakness as revenues generated from tradeshows, conferences and events have declined.　Thus, although credit markets have stabilized in recent months, the credit market for a media company, such as the Debtors, with an overleveraged

DB02:8800970.1

068808.1001

capital structure and deteriorating cash flows is essentially nonexistent. In light of these challenging conditions, it was impossible for the Debtors' to secure postpetition financing to refinance its existing capital structure, particularly, because the Debtors do not have any tangible assets which can be collateralized.

22. Additionally, the weakened economy devalued the Debtors' enterprise value causing the Debtors' First Lien Lenders to be significantly undersecured in the Chapter 11 Cases. Because the Debtors do not have unencumbered assets and the value of their encumbered assets is substantially impaired, the Debtors do not believe that an outside lender would be willing or capable of providing DIP financing on either a junior or senior priming basis. It is unlikely that an outside lender would ever provide a chapter 11 debtor with DIP Financing on a junior lien basis when such debtor's prepetition secured creditors are already substantially undersecured. Moreover, in this case, the Debtors would be unable to provide their First Lien Lenders with sufficient adequate protection in the event a lender would be willing to provide DIP Financing and the First Lien Lenders would never consensually allow an outside lender to prime their existing liens. Thus, even if an outside lender were willing to provide DIP Financing, such a proposal would not benefit the Debtors' estates given the costs and risks associated with a priming fight. In fact, given the size of the Debtors' postpetition financing needs, the Debtors' lack of hard assets, and the competitive terms of the First Lien Lenders' DIP Credit Facility, it would not be economical for an outside lender to pursue a priming fight. Notwithstanding the significant unlikelihood of interest in such alternative financing, Miller Buckfire reached out to alternate lenders for potential interest, but was told that in light of the circumstances there was no interest in such a financing.

DB02:8800970.1 068808.1001

23.     Accordingly, the Debtors are fortunate to have received the support of, and a DIP proposal from, the First Lien Lenders.  Although this was the only proposal received, the Debtors, with the assistance of their advisors, engaged in substantive, arm's-length negotiations with the First Lien Lenders to secure the best terms possible for the Debtors' estates.  In the context of these arm's-length negotiations, the First Lien Lenders made several key concessions regarding the terms the DIP Credit Facility, namely, the interest rate and the unused commitment fee.  Ultimately, the Debtors' negotiations culminated in the execution of the DIP Credit Agreement for a DIP Credit Facility that will provide the Debtors with $15 million in new money loans.  Based on the Debtors' Initial Cash Flow Budget, the Debtors believe that the DIP Credit Facility will provide the Debtors' estates with sufficient liquidity to maintain business operations long enough to effectuate a going-concern sale of substantially all of their assets in the Chapter 11 Cases.

24.     Although the Debtors were unable to garner various proposals from outside lenders, the Debtors believe, based on their business judgment, that the DIP Credit Facility provided by the First Lien Lenders is their only viable option and, is in fact competitive considering the circumstances.  Notably, the Debtors and Miller Buckfire compared the terms of the proposed DIP Credit Facility with other recent DIP Financings obtained by media companies in bankruptcy, and determined that the terms of DIP Facility are in fact competitive.  As such, the DIP Credit Facility provides the Debtors and their estates with the most advantageous terms under the circumstances and in light of their immediate liquidity need.  Entering into the DIP Credit Agreement with the First Lien Lenders, also allows the Debtors to avoid the costs and risks associated with a priming fight.  For the foregoing reasons, and with no other available options, the Debtors have determined that the proposed DIP Financing is appropriate under the

11

circumstances, address the Debtors' working capital and liquidity needs, and should be approved by the Court.

## Relief Requested

25. By this Motion, the Debtors request that the Court grant the following relief as provided for in the Interim DIP Order and the Final DIP Order:

(a)     authorization for the Debtors to obtain postpetition loans, advances and other financial accommodations in the aggregate principal amount of up to $15 million under the DIP Credit Facility substantially on the terms provided by the DIP Credit Agreement, in amounts consistent with the Budget (as defined in the Interim DIP Order), and to access an aggregate amount not in excess of $5.5 million portion thereof on an interim basis subject to the terms and conditions in the Interim DIP Order and in accordance with, and subject to compliance with the Budget (as defined in the Interim DIP Order) and permitted variances thereto.

(b)     authorization to enter into and execute the DIP Credit Agreement, substantially in the form attached hereto as Exhibit B and incorporated by reference herein, together with any other agreements, documents or instruments related thereto, as each of the same may be amended, supplemented, or modified from time to time by the Debtors, the DIP Lenders, and the DIP Agent;

(c)     authorization to grant the DIP Lenders, pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim with respect of all loans made and obligations incurred by the Debtors on or after the Petition Date pursuant to the DIP Credit Agreement (the "DIP Obligations"), subject only to the Carve-Out (as defined herein);

(d)     authority to grant the DIP Lenders pursuant to sections 364(c)(2), (c)(3), and 364(d) of the Bankruptcy Code, as further security for the obligations arising under the DIP Credit Facility, first-priority and fully perfected security interest and priming lien on all of the Loan Parties' tangible and intangible assets, senior to any and all liens securing the First Lien Obligations and the Second Lien Obligations and subject only to (i) valid, perfected, and non-avoidable liens in existence as of the Petition Date or valid liens in existence on the Petition Date that are not primed pursuant to the DIP Orders and in each case listed on Schedule 2.22 of the DIP Credit Agreement (but excluding in all events liens that secure the First Lien Obligations or the Second Lien Obligations) and (ii) the Carve-Out;

(e)     authority to use Cash Collateral within the meaning of section 361 of the Bankruptcy Code, pursuant sections 361 and 363 of the Bankruptcy Code and

12

subject to the terms and conditions set forth in the DIP Orders and the DIP Credit Agreement;

(f)      approval of the form and manner of adequate protection to be provided to the DIP Lenders pursuant to sections 361(a) and 363(c) of the Bankruptcy Code; and

(g)      scheduling the Final Hearing to consider entry of the Final DIP Order authorizing and granting the relief requested herein, pursuant to Bankruptcy Rule 4001;

(h)      granting such other and further relief as the Court deems just and proper.

**Concise Statement of the Material Terms**
**Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2(i)**

26.    Subject to the Court's approval, the Debtors' have negotiated and reached an agreement to enter into the DIP Credit Agreement which provides for a $15 million DIP Credit Facility on a superpriority administrative claim and first priority priming lien basis. Accordingly, the DIP Obligations will be secured by a first priority priming lien on substantially all of the Loan Parties' assets, subject only to (a) valid, perfected, and non-avoidable liens in existence as of the Petition Date or valid liens in existence as of the Petition Date that are subsequently perfected pursuant to section 546(b) of the Bankruptcy Code and (b) the Carve-Out. The First Lien Lenders have consented to the use of their Cash Collateral and the granting of priming liens as provided herein, subject to the terms and conditions of the DIP Credit Agreement and the DIP Orders.

27.    Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2(a)(ii), the material provisions of the DIP Credit Agreement and Interim DIP Order are as follows:[6]

---

[6]   The summary provided herein is qualified in its entirety by reference to the Interim DIP Order and the DIP Credit Agreement, as applicable. In the event of any inconsistency between this summary, the Interim DIP Order, or the DIP Credit Agreement, the Interim DIP Order or the DIP Credit Agreement, as applicable, shall govern and control. Capitalized terms used but not defined herein shall have the meanings set forth in the Interim DIP Order or the DIP Credit Agreement, as applicable.

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| **Borrower:** | Questex Media Group, Inc. | Preamble |
| **Guarantors:** | QMG Holdings, Inc.; FierceMarkets, Inc.; Oxford Publishing, Inc.; InfoTrends, Inc.; McLean Events International Limited; Show Events, Inc.; InfoTrends Limited; InfoTrends Research Group, Inc.; and Pelican Events Limited. | § 1.01 |
| **Administrative Agent and Collateral Agent:** | Credit Suisse, Cayman Islands Branch | Preamble |
| **DIP Lenders:** | The lenders under the DIP Credit Facility will be certain lenders under the First Lien Credit Agreement. | Commitment Schedule |
| **Type, Amount, and Fund Availability** | A $15 million DIP Credit Facility available to the Borrower in two tranches: (a) $5.5 million upon entry of the Interim DIP Order; and (b) $9.5 million upon entry of the Final DIP Order. Advances will be made to the Borrower on a weekly basis in accordance with, and subject to compliance with, the Budget (as defined below). | § 2.01 |
| **Interest:** | The Alternate Base Rate + the Applicable Margin or the Adjusted LIBO Rate + the Applicable Margin.. <br><br> The Alternate Base Rate is, for any day, the greater of (a) 4.00% (b) the Prime Rate in effect on such; (c) the Federal Funds Rate in effect for such day plus .5%; and (d) the Adjusted Libo Rate for a one-month interest in effect on such day plus 1%. The Applicable Rate is (a) 9% for any ABR Loan and (b) 10% for any Eurodollar Loan. | § 1.01, 2.06 |
| **Default rate of interest:** | 2.00% per annum plus the rate otherwise applicable. | § 2.07 |
| **Fees:** | <u>Unused Commitment Fee</u>: 1.00% per annum will accrue on the daily average unused portion of the DIP Credit Facility (whether or not then available), payable monthly in arrears and on the Maturity Date. <br><br> <u>Closing Fee</u>: 3.00% of the Total Commitment payable on the date of the first drawdown and paid from the Loans. <br><br> <u>Administrative Agent Fee</u>: As set forth in a separate fee letter. <br><br> <u>Backstop Fee</u>: 2% of the difference between (i) the Total Commitments and (ii) the Initial Lenders Pre-Petition Claims Percentage of the Total Commitments payable on the Closing Date and allocated among the Initial Lenders. | § 2.05 |
| **Use of Proceeds:** | Amounts available under the DIP Credit Facility will be used by the Borrower for payment of (i) post-petition operating expenses and other working capital and financing requirements of the Debtors, and fees, costs and expenses of advisors, consultants, counsel and other professionals retained by the Debtors, (ii) certain fees, costs and expenses associated with the DIP Credit Facility , (iii) certain other costs and expenses of administration of the Chapter 11 Cases and (iv) amounts specified in the first day motions filed with the Bankruptcy Court, in each case (i - iv) to the extent specified in the Budget and included in permitted variances | § 3.13 |

DB02:8800970.1

068808.1001

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | therefrom. | |
| | No portion of the proceeds of the loans under the DIP Credit Facility may be used by the Debtors to challenge the validity, perfection, priority, extent, or enforceability of the First Lien Credit Agreement, or the liens or security interests securing the Obligations (as defined in the First Lien Credit Agreement). | |
| | In the event an official committee of unsecured creditors is appointed in the Bankruptcy Cases (the "Committee"), such Committee shall be permitted to use not more than $50,000 of the proceeds of the DIP Credit Facility to investigate validity, perfection, priority, extent, or enforceability of the Obligations, or the liens or security interests securing the Obligations but no such amounts shall be used to challenge any such liens or security interests. | |
| Maturity: | The earlier of (i) 180 days after the Petition Date, (ii) the effective date of a confirmed chapter 11 plan, (iii) the acceleration or termination of the DIP Credit Facility, and (iv) the consummation of a sale of substantially all of the Debtors' assets free and clear of all liens (except the liens of the DIP Lenders) pursuant to section 363 of the Bankruptcy Code (the "363 Sale"). | § 1.01 |
| Superpriority Claims: | All obligations with respect to the DIP Credit Facility incurred by the Debtors shall at all times constitute allowed super-priority administrative expense claims in the Chapter 11 Cases (the "DIP Financing Administrative Claims") under section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 or 1114 of the Bankruptcy Code subject only to the Carve-Out (as defined below). | § 2.22 |
| Liens and Priority: | The DIP Credit Facility will be secured by perfected first priority liens on substantially all assets, including, without limitation, substantially all personal, real, tangible and intangible assets of the Debtors wherever located, now or hereafter owned pursuant to sections 364(c)(2) and (d) of the Bankruptcy Code (collectively, the "DIP Liens"), subject: prior to the consummation of the 363 Sale, only to (i) existing valid, prepetition liens that are not primed (to be identified, mutually agreed and listed in a schedule to the DIP Credit Facility), but in any case senior to the liens securing the obligations owed in respect (1) the First Lien Credit Agreement and (2) the Second Lien Credit Agreement and (ii) certain specified ordinary course liens and (iii) the Carve-Out (as defined below). | § 6.02 |
| Adequate Protection: | The lenders under the First Lien Credit Agreement shall receive adequate protection in an amount equal to the accrued but unpaid reasonable and documented fees and expenses for the attorney and financial advisor to the Administrative Agent under the First Lien Credit Agreement which adequate protection shall be paid in cash for which an invoice was delivered to Debtors. | § 2.24 |
| | The lenders under the First Lien Credit Agreement shall also be granted a replacement liens in the Collateral junior to the DIP Liens. | |
| Professional Fee | Subject to the terms and conditions contained in paragraph 14 of the Interim | Interim |

DB02:8800970.1

068808.1001

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| **Carve-Out:** | DIP Order, all liens on and security interests in Collateral granted pursuant to this Order and all superpriority administrative claims granted pursuant to this Order shall be subordinate to the following: (i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) plus interest at the statutory rate (without regard to the notice set forth in (iv) below); (ii) fees payable to the Clerk of this Court; (iii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iv) below); (iv) to the extent allowed at any time, whether by interim order, procedural order or otherwise (subject in all respects to final allowance), all unpaid fees and expenses (the "Professional Fees") incurred or accrued by professionals or professional firms retained by the Debtors pursuant to section 327, 328, 331, 363 of the Bankruptcy Code and any statutory committee appointed in these cases under section 327 or 1103 of the Bankruptcy Code (the "Professional Persons") at any time before or on the first business day following delivery by the Postpetition Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (v) after the first Business Day following delivery by the Postpetition Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees of Professional Persons in an aggregate amount not to exceed $250,000 (the "Post-Carve Out Trigger Notice Cap") (which amount shall be in addition to any amounts paid or payable in items (i) through (iv) hereof); *provided, however,* that the Carve-Out shall not include, apply to or be available for (a) any success fee or similar payment to any professionals or other persons payable in connection with a restructuring or asset disposition with respect to the Debtors or otherwise, or (b) any fees or expenses incurred by any party, including any Debtors or the Committee, or their respective professionals in connection with, or relating to, the prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the administrative agents or lenders under the First Lien Credit Agreement or the Second Lien Credit Agreement (the "Carve-Out"). <br><br> For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the Postpetition Agent or Prepetition First Lien Agent to the Borrower and its counsel, the U.S. Trustee, and lead counsel to the Committee, which notice may be delivered only after the occurrence and continuation of an Event of Default (as defined in the Postpetition Credit Agreement) under the Postpetition Credit Agreement stating that the Post-Carve Out Trigger Notice Cap has been invoked. For the avoidance of doubt, the Carve-Out shall not include Professional Fees incurred after the earliest to occur of (i) the date that is 180 days after the Petition Date; (ii) the effective date of a confirmed chapter 11 plan for one or more of the Debtors; and (iii) the consummation of a sale of substantially all the assets of the Debtors. Nothing herein shall preclude any party from challenging or objecting to any fee request made by a Professional Person. | Order ¶ 14. |
| **Affirmative Covenants:** | The DIP Credit Agreement and other definitive documentation for the DIP Credit Facility will include such affirmative covenants as are usual and customary for financings of this kind (and with such exceptions and grace periods as shall be agreed) and include, but not limited to: | § 5.04, 5.12 |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | • the Debtors shall operate in material compliance with the terms of the Budget, subject to the permitted variances; | |
| | • the Debtors shall provide prompt notice of any of the following: (i) changes to [material] customer contracts; (ii) material change to any labor agreements; (iii) changes in personnel constituting executive management; and (iv) any event that has or could reasonably be expected to result in a material adverse effect with respect to any Debtor; | |
| | • the Borrower shall promptly provide any other information regarding (i) the operations, business affairs, or financial condition of either Borrower and any of its subsidiaries, (ii) compliance with the terms of any material contract entered into or assumed postpetition, and (iii) information and updates regarding the achievement or progress towards the Milestones as the Administrative Agent or any Lender (requesting through the Administrative Agent) may request; | |
| | • the Borrower shall provide all written materials and documents to which the purchaser under the 363 Sale is entitled to receive pursuant to the bidding procedures as approved by the Bankruptcy Court in connection with the Sales Procedures Motion; and | |
| | • the Borrower shall cooperate with and provide all information reasonably requested by the DIP Lenders' legal and financial advisors with respect to the Borrower and its subsidiaries and cause its financial advisors to meet in-person or telephonically with the DIP Lenders' financial advisors or DIP Lenders on no less than a weekly basis; | |
| | Notwithstanding anything contrary to the foregoing, the Debtors shall not be required to provide to Administrative Agent or the DIP Lenders any information relating to the ale of assets under section 363 of the Bankruptcy Code that the purchaser under the 363 Sale is not entitled to receive pursuant to the bidding procedures as approved by the Bankruptcy Court in connection with the Sales Procedures Motion. | |
| **Negative Covenants:** | The DIP Credit Agreement will include such negative covenants as are usual and customary for financings of this kind (and with such exceptions and grace periods as shall be agreed) and include, but not limited to: | § 6.01, 6.06, 6.09 |
| | • the Debtors shall not take any of the following actions without the prior written consent of the Required Lenders: enter into any contract, term sheet, letter of intent or similar agreement for the actual or proposed sale, lease or disposition of any or all assets, except in the ordinary course of business and consistent with past practices and to the extent the same would not violate the asset purchase agreement and confidentially and other agreements as necessary to conduct the auction contemplated by the Sales Procedures Motion; | |
| | • the Debtors shall not incur indebtedness (other than Indebtedness created under the Loan Documents or the Orders) (i) that does not exist as of the Petition Date or without the approval of the Required Lenders, (ii) that is not contemplated by the Budget | |

DB02:8800970.1

068808.1001

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | provided by the Debtors and approved, as set forth herein, by the Administrative Agent, (iii) other than performance bonds and or with respect to worker's compensation claims, in each case, incurred in the ordinary course of business;<br><br>• the Debtors shall not pay any management, consulting, or similar fees to or any salary expense for executives, directors, officers, or shareholders of the Debtors or any of their subsidiaries by direct payment or otherwise and shall not enter into any employment or consulting agreements with current management, shareholders, or directors of the Debtors or any of their subsidiaries that is (i) not contemplated by the Budget or (ii) without the prior written consent of the Required Lenders;<br><br>• the Debtors shall not (i) pay directly or indirectly any dividends or make any other distributions on capital stock or with respect to any other interest or participation in, or measured by, its profits, or pay any indebtedness owed to the Debtors or holders of their capital stock; (ii) make loans or advances to the Debtors or holders of their capital stock (other than a to-be-agreed upon basket of funds for investments by the Debtors in their foreign subsidiaries); or (iii) sell, lease, or transfer any of their properties or assets to the Debtors or holders of their capital stock (x) without the approval of the Required Lenders or (y) that are not contemplated by the Budget; and<br><br>• Monthly minimum liquidity requirements shall apply. | |
| Events of Default: | In addition to any events of default set forth herein, the DIP Credit Agreement and other definitive documentation for the DIP Credit Facility will include such events of default as are usual and customary for financings of this kind (and with such exceptions and grace periods as shall be agreed) and include, but not limited to:<br><br>• the Debtors fail to comply with or achieve the following on or prior to the date indicated for each such action or document below (each, a "Milestone"):<br><br>   o on the first day of the Chapter 11 Cases, or as soon as practicable thereafter but no later than the 5th day of the Chapter 11 Cases, the Debtors shall file with the Court motions, reasonably acceptable to counsel to the Administrative Agent, seeking (a) authority to conduct the 363 Sale pursuant to the Sale and Purchase Agreement and approval of sale procedures in connection therewith (the "Sale Procedures Motion") and (b) approval of the DIP Credit Facility;<br><br>   o on or prior to the 15th day of the Chapter 11 Cases, the Bankruptcy Court shall have entered orders, in form and substance reasonably acceptable to counsel to the Administrative Agent, approving on an interim basis the DIP Credit Facility, which order shall be in form and substance satisfactory to counsel to the DIP Agent;<br><br>   o on or prior to the 30th day of the Chapter 11 Cases, the | § 7.01 |

DB02:8800970.1

068808.1001

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | Court shall enter an order, in form and substance reasonably acceptable to counsel to the DIP Agent, approving the Sale Procedures Motion;<br><br>○  on or prior to the 30th day of the Chapter 11 Cases, the Court shall enter orders, in form and substance reasonably acceptable to counsel to the DIP Agent, approving the DIP Credit Facility on a final basis;<br><br>○  on or prior to the 45th day of the Chapter 11 Cases, the Debtors shall have conducted an auction for the 363 Sale;<br><br>○  on or prior to the 60th day of the Chapter 11 Cases, the Bankruptcy Court shall have entered an order, in form and substance substantially the same as that attached as an exhibit to the Purchase and Sale Agreement, in the case of the 363 Sale to the lenders under the DIP Credit Facility, and otherwise, reasonably acceptable to counsel to the Administrative Agent, approving the 363 Sale to any other person or entity selected as the highest and best bidder at the auction (the "Topping Bidder"); and<br><br>○  on or prior to the 75th day of the Chapter 11 Cases, the Debtors shall have consummated the transactions for the 363 Sale to the Prepetition Lenders or another sale to the Topping Bidder pursuant to section 363 of the Bankruptcy Code. | |
| Automatic Stay | The automatic stay shall be modified to the extent necessary to permit the Postpetition Secured Parties to exercise, upon the occurrence and during the continuation of any Event of Default (as defined in the DIP Credit Agreement), all rights and remedies provided for in the DIP Credit Agreement and all other financing documents related thereto. | Interim Order ¶ 18. |
| Challenge Periods | Any complaint filed pursuant to Bankruptcy Rule 7001 seeking to seeking to invalidate, avoid, subordinate or otherwise challenge the Prepetition Secured First Lien Obligations, Prepetition First Priority Liens, Prepetition Secured Second Lien Obligations or Prepetition Second Priority Liens; must be filed no later than the earlier of seventy-five (75) days from the Petition Date and sixty (60) days from the date of the appointment of such Committee (the "Challenge Periods").<br><br>As part of the Final Order, the Prepetition First Lien Agent will be seeking to have the Challenge Periods reduced to sixty (45) days and forty-five (30) days, respectively; *provided, however*, that the Challenge Periods may be extended either (i) by the Court pursuant to an order after a hearing and for cause shown, or (ii) as may be agreed to in writing by (a) the First Lien Agent with respect to the time to file any such complaint relating to the liens and claims arising under the First Lien Financing Documents; (b) the Second Lien Agent with respect to the time to file any such complaint relating to the liens and claims arising under the Second Lien Financing Documents. | Interim Order ¶ 32(c). |
| Waiver of § 506(c) | Subject to entry of the Final Order and except for the Carve-Out, no administrative claims, including fees and expenses of professionals, shall be assessed against or attributed to any of the Postpetition Secured Parties, | Interim Order ¶ 5. |

DB02:8800970.1

068808.1001

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | Prepetition Agents, or Prepetition Secured Lenders with respect to their respective interests in the Collateral, as applicable, pursuant to the provisions of section 506(c) of the Bankruptcy Code or otherwise by, through or on behalf of the Debtors, without the prior written consent of the Postpetition Secured Parties, Prepetition Agents and/or Prepetition Secured Lenders, as applicable, and no such consent shall be implied from any action, inaction or acquiescence by, either with or without notice to, the Postpetition Secured Parties, Prepetition Agents or Prepetition Secured Parties, or otherwise. | |

## Basis for Expedited Relief

28.     The Debtors bring this Motion on an expedited basis due to the immediate and irreparable harm that would be suffered by the Debtors' estates if the Debtors cannot obtain the financing and use of cash collateral needed to sustain their business as a going concern. The Debtors have an immediate need to obtain postpetition financing provided by the DIP Credit Facility and to use Cash Collateral to permit them to, among other things, continue to operate their businesses, to maintain business relationships with vendors, suppliers and customers, to pay employee wages in the ordinary course, to make necessary capital expenditures, and to satisfy other operational needs, all of which are necessary to preserve the Debtors' going-concern value and to effectuate the 363 sale process.

29.     Without access to the DIP Credit Facility and the use of Cash Collateral as provided herein, the Debtors may have to curtail or even terminate their business operations to the material detriment of creditors, employees, and other parties in interest. Moreover, the Debtors' ability to effectuate a going-concern sale of their assets could be adversely effected. The Debtors must ensure that working capital is available now, and the Debtors anticipate accessing funds available under the DIP Credit Facility almost immediately for certain requirements. Ultimately, the Debtors must demonstrate to their customers, suppliers, and

DB02:8800970.1                                                                                                    068808.1001

vendors that they have sufficient capital to maintain business operations in the ordinary course while they pursue a going-concern of the company's assets.

## I. The Debtors' Use of Cash Collateral Is Necessary and the Adequate Protection Is Appropriate.

30.      The Debtors have an urgent need for the immediate use of Cash Collateral pending the Final Hearing.  Accordingly, the Debtors seek to use all Cash Collateral existing on or after the Petition Date subject to the terms of the Interim DIP Order and the DIP Credit Agreement.  The Debtors require use of Cash Collateral to, among other things, pay present operating expenses, including payroll and vendors, to ensure a continued supply of goods and services essential to the Debtors' continued viability.  As set forth more fully, below, the Debtors respectfully submit that the First Lien Lenders and other parties with an interest in the Cash Collateral will be adequately protected, and such First Lien Lenders have consented to the use of such Cash Collateral on the terms described herein.

31.      The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).   Section 363(c)(2) of the Bankruptcy Code establishes special requirements with respect to "cash collateral," by providing that a debtor may not use, sell, or lease cash collateral unless each entity that has an interest in such collateral consents; or the

DB02:8800970.1

068808.1001

court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.[7] Moreover, the Court may authorize the Debtors to use Cash Collateral as long as the applicable secured creditors are adequately protected. *See* 11 U.S.C. § 363(c)(2)(B), (e); *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); *see also In re McCormick*, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006).

32. What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987). By requiring debtor to provide adequate protection, the Bankruptcy Code seeks to shield a secured creditor from the diminution in value of its interest in the particular collateral during the period of use. *See In re Continental Airlines, Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993); *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Adequate protection is not expressly defined by the Bankruptcy Code except through examples provided by section 361 of the Bankruptcy Code. The flexibility provided by section 361(3) of the Bankruptcy Code, in particular, provides the Court with discretion in fashioning the protection provided to a secured party. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994). Thus, adequate protection can come in various forms, including replacement liens and priority claims.

33. In this case, the First Lien Lenders are entitled to adequate protection of their interests in the Prepetition Collateral, pursuant to sections 361, 363(e), and 364(d)(1) of the

---

[7] "Cash collateral" means "cash, negotiable instruments, documents of title, securities, deposit accounts or other (Continued...)

Bankruptcy Code, in exchange for consenting to the Debtors' use of Cash Collateral securing their obligations under the First Lien Credit Agreement, to extent there is any diminution in value of the Cash Collateral, as a result of, among other things, the imposition of the automatic stay and the priming of the First Lien Lenders' prepetition liens. Accordingly, the Debtors propose to provide the First Lien Lenders with the following forms of adequate protection in accordance with the terms of the DIP Credit Agreement and the Interim DIP Order:

(a) the First Lien Lenders will receive a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code, junior to the DIP Obligations and the Carve-Out;

(b) the First Lien Lenders will granted replacement liens in the Prepetition Collateral, subject to the DIP Liens and the Carve-Out; and

(c) the First Lien Lenders will receive an amount equal to the reasonable and documented fees and expenses for the attorney and financial advisor to the First Lien Agent which will accrue (but not be paid cash) in arrears interest at the same rate of interest as an ABR Loan (as defined in the DIP Credit Agreement).

34. The Debtors believe that the proposed adequate protection is necessary and appropriate to ensure that the Debtors can continue to use the Cash Collateral. Moreover, the First Lien Lenders have agreed that the adequate protection provided by the DIP Orders is sufficient under the facts and circumstances of the Chapter 11 Cases. Accordingly, the Debtors believe that the adequate protection described above is sufficient to protect any diminution in the value of any party's interest in the relevant collateral during the brief period their collateral is used by the Debtors during the Chapter 11 Cases. As set forth in the Interim Order, consistent with their rights under the Intercreditor Agreement, the Second Lien Lenders shall receive

---

cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

DB02:8800970.1

068808.1001

replacement liens and administrative claims (in each case, if any) junior to those of the First Lien Lenders and DIP Lenders.

**II.     The Debtors Should be Authorized to Enter into the DIP Credit Facility on the Terms Provided Herein.**

35.     As described above, the Debtors' reorganization efforts hinge upon their use of Cash Collateral and access to DIP Financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, the Court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status and/or secured by a senior lien on unencumbered property, a junior lien on encumbered property or a combination of the foregoing. *See* 11 U.S.C. § 364(c); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to section 364(b)).

36.     The Court is also permitted to authorize the incurrence of debt secured by a senior or equal lien on all property of the estate where the Debtors cannot otherwise obtain credit and there is adequate protection for junior or equal lienholders. *See* 11 U.S.C. § 364(d); *see also In re Phoenix Steel Corp.*, 39 B.R. 218, 222 n.9 (D. Del. 1984) (noting that debtor must show "it is unable to obtain credit otherwise" in order to obtain debtor secured by liens provided under section 364(d) of the Bankruptcy Code).

DB02:8800970.1

068808.1001

37. In order to obtain credit or incur liens pursuant to section 364(c) or (d) of the Bankruptcy Code, a debtor need only demonstrate by a good faith effort that credit was not available without the protections afforded to potential lenders under sections 364(c) or (d), as applicable. *See In re Mosello*, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996). The statute "imposes no duty to seek credit from every possible lender" before the Court may conclude that that such credit is unavailable. *Ames*, 115 B.R. at 37 (construing *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986)). Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

38. For the reasons discussed below, the Debtors must be able to access postpetition financing on a secured basis pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code.

**A.      The Debtors Do Not Have a More Favorable Alternative to the DIP Credit Facility.**

39. As noted above, the Debtors' ability to obtain postpetition financing was significantly hampered due to (a) adverse capital market conditions affecting the B2B industry (b) the Debtors' deteriorating cash flows and overleveraged capital structure; and (c) the material impairment of the Prepetition Secured Lenders' collateral. Although credit markets have loosened in the last several months, there is essentially no financing available for a media company, such as the Debtors, with an overleveraged capital structure and deteriorating cash flows. In light of these challenges, it was impossible for the Debtors' to secure postpetition financing to refinance its existing capital structure, particularly, given that the Debtors do not have any tangible assets which can be collateralized. Moreover, because the value of their encumbered assets is substantially impaired, the Debtors do not believe an outside lender would

25

be willing or capable of providing DIP financing on either a junior or senior priming basis given the substantial risks involved. Indeed, as previously discussed, given the size of the Debtors' postpetition financing needs, their lack of hard assets, and the competitive terms negotiated with the First Lien Lenders, it would have been uneconomic for an outside lender to pursue a priming fight. Notwithstanding the unlikelihood of interest in providing alternative financing, Miller Buckfire reached out to lenders to gauge their potential interest, but was told that there was no interest in providing the Debtors with such financing in light of the circumstances described herein.

40. Although the DIP Credit Facility provided by the First Lien Lenders is the only DIP Financing proposal received, the Debtors believe based on their business judgment, that it is the only viable option and, is in fact competitive considering the circumstances. Although the Debtors were not able to negotiate with various potential lenders, the Debtors, with the assistance of their advisors, did engage in substantive negotiations with the First Lien Lenders to secure the best terms possible for the Debtors' estates. The Debtors and Miller Buckfire also compared the terms of the DIP Credit Facility with other recent DIP Financings obtained by media companies in bankruptcy, and determined that the terms of DIP Credit Facility are in fact competitive.

41. For these reasons, the Debtors believe that the proposed DIP Credit Facility provides the Debtors and their estates with the most advantageous terms under the circumstances and in light of their immediate liquidity need. Entering into the DIP Credit Agreement with the First Lien Lenders, also allows the Debtors to avoid the costs and risks associated with a priming fight, which in any case, no lender would be interested in engaging. Accordingly, with no other available options, the Debtors have determined that the proposed DIP Financing is appropriate

under the circumstances, addresses the Debtors' working capital and liquidity needs, and should be approved by the Court.

**B.    The DIP Credit Facility Is Necessary to Preserve the Assets of the Debtors' Estates**

42.    The Debtors must immediately instill their employees, vendors, service providers, and customers with confidence in the Debtors' ability to seamlessly transition their business to chapter 11, operate normally in that environment and ultimately to reorganize in a successful and expedient manner. The Debtors do not have sufficient cash on hand to operate in the ordinary course without access to the DIP Credit Facility as provided herein. The DIP Credit Facility will provide the working capital necessary to allow the Debtors to, among other things, continue operating their businesses in the ordinary course of business, thereby maintaining value for the benefit of all creditor constituencies.

43.    The initial success of the Chapter 11 Cases and the stabilization of the Debtors' operations at the outset thereof depend on the confidence of the Debtors' employees, vendors, service providers and customers, which in turn depends upon the Debtors' ability to minimize the disruption inherent to any bankruptcy filing. The Debtors are suffering severe liquidity constraints and cannot continue to operate without additional financing. If the relief sought in this Motion is delayed or denied, an immediate liquidation could ensue or, at the very least, the resulting business disruption could severely damage the Debtors' ability to reorganize. In contrast, approval of the DIP Credit Facility will assure the Debtors' continued operations and smooth transition into bankruptcy, allowing the Debtors to preserve the going concern value of their estates.

DB02:8800970.1

068808.1001

**C.     The Terms of the DIP Credit Facility Are Fair, Reasonable, and Appropriate.**

44.     After appropriate investigation and analysis, the Debtors' have determined that the DIP Credit Facility described herein presents the best alternative available under the circumstances. The terms and conditions of the DIP Credit Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's-length. In the reasonable exercise of their business judgment, the Debtors have concluded that the DIP Credit Facility is the best source of postpetition financing option available. As discussed above, the Debtors, with the assistance of their advisors, assessed their financing needs and rigorously analyzed the DIP Lenders' proposal in light of those needs. After fully considering the proposal, and whether other more advantageous financing alternatives would be available to the Debtors, the Debtors decided to enter into the DIP Credit Facility substantially on the terms set forth by the DIP Credit Agreement and as summarized herein. Due to the current state of the credit markets and the interest that the DIP Lenders have in maintaining the Debtors' post-sale equity value, the DIP Credit Facility will provide significant advantages that the Debtors believe would be unavailable through other lenders. The Debtors will further demonstrate the fairness and reasonableness of the terms of the DIP Credit Facility at the Final Hearing.

**D.     Application of the Business Judgment Standard.**

45.     After appropriate investigation and analysis, the Debtors have concluded that the DIP Credit Facility present the best financing alternative available under the circumstances. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (Walsh, J.) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under

the circumstances and in the best interests of [the debtor] and its creditors"). Indeed, "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

46. The Debtors have exercised sound business judgment in determining the appropriateness of the DIP Credit Facility and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Credit Agreement. The Debtors believe that the DIP Credit Agreement contains terms that are fair, reasonable, and in the best interests of the Debtors and their estates. Accordingly, pursuant to section 364(c) and (d), the Debtors respectfully submit that they should be granted authority to enter into the transactions provided by the DIP Credit Agreement and obtain funds from the DIP Lenders on the secured and administrative superpriority basis described herein.

### III. Modification of the Automatic Stay is Warranted.

47. The Interim DIP Order provides that the automatic stay shall be modified to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default (as defined in the DIP Credit Agreement), all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions described in the Interim DIP Order, without further order of or application to the Court. *See* Interim DIP Order ¶ 18. However, the DIP Lenders must provide the U.S. Trustee, counsel to the Debtors, counsel to the prepetition agents, and counsel to the creditors committee, with five (5) business day written notice, prior to exercising any enforcement rights or remedies in respect of the Cash Collateral. *Id.* The Debtors and any other parties in interest may seek, within the five (5)

business day notice period, an expedited hearing before the Court solely for the purpose of considering whether, in fact, an Event of Default has occurred and is continuing. *Id.* At the expiration of the five business day notice period, in the absence of a determination by the Court that an Event of Default has occurred or is not continuing, the DIP Lenders shall be entitled to pursue all remedies. *Id.* Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and are reasonable and appropriate in light of the circumstances of the Chapter 11 Cases. *See e.g., Source Interlink Companies*, No. 09-11424 (KG) (Bankr. D. Del. Apr. 29, 2009); *In re Norwood Promotional Products Holdings, Inc.*, No. 09-11547 (PJW) (Bankr. D. Del. May 7, 2009).

## IV.    Interim Approval of Access to the DIP Credit Facility Should Be Granted.

48.    The Debtors respectfully submit that interim approval of their use of the DIP Credit Facility, as provided by the Interim DIP Order, is appropriate under the circumstances of the Chapter 11 Cases. Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain postpetition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(c)(2).

49.    Indeed, courts in this District have granted similar relief in other chapter 11 cases. *See e.g.*, *In re Smurfit-Stone Container Corp.*, No. 09-10235 (BLS) (Bankr. D. Del. Jan. 27, 2009) (allowing the debtors to borrow $550 million of a proposed $750 million DIP facility on an interim basis); *In re Broadstripe, LLC*, No. 09-10006 (CSS) (Bankr. D. Del. Jan. 6, 2009) (allowing the debtors to borrow $6 million of a proposed $15 million DIP facility on an interim basis); *In re SemCrude, L.P.*, No. 08-11525 (BLS) (Bankr. D. Del. Aug. 8, 2008) (allowing the debtors to borrow $150 million of a proposed $250 million DIP facility on an interim basis); *In*

DB02:8800970.1

068808.1001

*re Pierre Foods, Inc.*, No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008) (allowing the debtors to borrow $29 million of a proposed $35 million DIP facility on an interim basis); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 7, 2008) (allowing the debtors to borrow $20 million of a proposed $67 million DIP facility on an interim basis); *In re Leiner Health Prods. Inc.*, No. 08-10446 (KJC) (Bankr. D. Del. March 12, 2008) (allowing the debtors to borrow $20 million of a proposed $74 million DIP facility on an interim basis); *In re Wickes Holdings, LLC*, No. 08-10212 (KJC) (Bankr. D. Del. Feb. 5, 2008) (allowing the debtors interim access to $30 million DIP facility).

50. As noted above, a key element of the Chapter 11 Cases is a going-concern sale of the substantially all of the Debtors' assets which requires the Debtors to maintain their business operations. Without immediate access to the DIP Credit Facility and the use of Cash Collateral on the terms provided by the Interim DIP Order, the Debtors would be unable to continue operating their business and maintain the ongoing confidence and support of their vendors, supplier, and employees. It is essential that the Debtors immediately stabilize their business operations and cash flow in order to facilitate and maximize the value of the 363 sale process. Accordingly, the Debtors require interim approval to the DIP Credit Facility as provided herein, pending a Final Hearing as scheduled by the Court, to prevent the immediate and irreparable harm to the Debtors estates likely will suffer otherwise.

## Request for Final Hearing

51. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 30 days following the entry of the Interim DIP Order. The Debtors request that they be authorized to serve a copy of the signed Interim DIP Order, which fixes the time and date for the

DB02:8800970.1

068808.1001

filing of objections, if any, by first class mail upon the notice parties listed below. The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

52.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

53.     Notice of this Motion has been given to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent for the Debtors' First Lien Lenders; (d) counsel to the agent for the Debtors' Second Lien Lenders; (e) the Internal Revenue Service; and (f) the Securities and Exchange Commission. The Debtors will serve copies of this Motion and any order entered respecting this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

54.     No prior request for the relief sought herein has been made to this or any other court.

DB02:8800970.1                                              068808.1001

WHEREFORE, the Debtors respectfully request entry of the Interim DIP Order, substantially in the form attached hereto as Exhibit A, (a) approving the Debtors' postpetition financing, (b) authorizing the Debtors' use of cash collateral, (c) granting priming and other liens and providing superpriority administrative expense status, (d) granting adequate protection to prepetition secured parties, (e) modifying the automatic stay, (f) scheduling the Final Hearing and (g) granting such other relief as is just and proper.

Dated: Wilmington, Delaware
October 5, 2009

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Michael R. Nestor (DE Bar No. 3526)
Donald J. Bowman, Jr. (DE Bar No. 4383)
Robert F. Poppiti, Jr. (DE Bar No. 5052)
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:          mnestor@ycst.com
                dbowman@ycst.com
                rpoppiti@ycst.com

- and -

**KIRKLAND & ELLIS LLP**
James A. Stempel (*pro hac vice* pending)
Erik W. Chalut (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.stempel@kirkland.com
                erik.chalut@kirkland.com

Proposed Co-Counsel to the Debtors
and Debtors in Possession