# Exhibit C

## DIP Credit Agreement

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
CREDIT AGREEMENT

dated as of October 5, 2009

among

QUESTEX MEDIA GROUP, INC.,
as Borrower

QMG HOLDINGS, INC., FIERCEMARKETS, INC.,
OXFORD PUBLISHING, INC., INFOTRENDS, INC.,
MCLEAN EVENTS INTERNATIONAL LIMITED,
INFOTRENDS LIMITED, INFOTRENDS RESEARCH GROUP, INC., PELICAN
EVENTS LIMITED, SHOW EVENTS, INC. AND
OXFORD COMMUNICATION, INC.
each a Guarantor

THE LENDERS PARTY HERETO

and

CREDIT SUISSE, CAYMAN ISLANDS BRANCH
as Administrative Agent and Collateral Agent

and

CREDIT SUISSE SECURITIES (USA) LLC
as Sole Lead Arranger

# TABLE OF CONTENTS

**Page**

ARTICLE 1       DEFINITIONS ................................................................ 2

    Section 1.01.    Defined Terms ........................................................... 2

    Section 1.02.    Terms Generally ...................................................... 26

    Section 1.03.    Classification of Loans and Borrowings ................ 26

ARTICLE 2       THE CREDITS ............................................................... 27

    Section 2.01.    Commitments ........................................................... 27

    Section 2.02.    Loans ....................................................................... 27

    Section 2.03.    Borrowing Procedure ............................................. 28

    Section 2.04.    Repayment of Loans; Evidence of Debt ................ 29

    Section 2.05.    Fees ......................................................................... 29

    Section 2.06.    Interest on Loans .................................................... 30

    Section 2.07.    Default Interest ....................................................... 30

    Section 2.08.    Alternate Rate of Interest ...................................... 30

    Section 2.09.    Termination and Reduction of Commitments ........ 31

    Section 2.10.    Conversion and Continuation of Borrowings ........ 31

    Section 2.11.    Reserved ................................................................. 32

    Section 2.12.    Prepayment ............................................................. 32

    Section 2.13.    Mandatory Prepayments ........................................ 33

    Section 2.14.    Reserve Requirements; Change in Circumstances ................ 34

    Section 2.15.    Change in Legality ................................................. 35

    Section 2.16.    Indemnity ................................................................ 36

    Section 2.17.    Pro Rata Treatment ................................................ 36

    Section 2.18.    Sharing of Setoffs .................................................. 37

    Section 2.19.    Payments ................................................................. 37

    Section 2.20.    Taxes ...................................................................... 38

    Section 2.21.    Assignment of Commitments under Certain Circumstances; Duty to Mitigate ......................................... 40

    Section 2.22.    Priority ................................................................... 42

    Section 2.23.    Payment of Obligations .......................................... 42

    Section 2.24.    Adequate Protection ............................................... 43

**TABLE OF CONTENTS**
**(continued)**

Page

| | | |
|---|---|---|
| ARTICLE 3 | REPRESENTATIONS AND WARRANTIES | 43 |
| Section 3.01. | Organization; Powers | 43 |
| Section 3.02. | Authorization; No Conflicts | 43 |
| Section 3.03. | Enforceability | 44 |
| Section 3.04. | Governmental Approvals | 44 |
| Section 3.05. | Financial Statements | 44 |
| Section 3.06. | No Material Adverse Change | 45 |
| Section 3.07. | Title to Properties; Possession Under Leases | 45 |
| Section 3.08. | Subsidiaries | 45 |
| Section 3.09. | Litigation; Compliance with Laws | 46 |
| Section 3.10. | Agreements | 46 |
| Section 3.11. | Federal Reserve Regulations | 46 |
| Section 3.12. | Investment Company Act | 47 |
| Section 3.13. | Use of Proceeds | 47 |
| Section 3.14. | Tax Returns | 47 |
| Section 3.15. | No Material Misstatements | 48 |
| Section 3.16. | Employee Benefit Plans | 48 |
| Section 3.17. | Environmental Matters | 49 |
| Section 3.18. | Insurance | 50 |
| Section 3.19. | Security Documents | 50 |
| Section 3.20. | Location of Real Property | 50 |
| Section 3.21. | Labor Matters | 50 |
| Section 3.22. | Liens | 51 |
| Section 3.23. | Intellectual Property | 51 |
| Section 3.24. | First Lien Obligations | 51 |
| Section 3.25. | Permits | 51 |
| Section 3.26. | Foreign Corrupt Practices Act | 52 |
| ARTICLE 4 | CONDITIONS OF LENDING | 52 |
| Section 4.01. | All Credit Events | 52 |

Section 4.02. First Credit Event ................................................................. 53

ARTICLE 5    AFFIRMATIVE COVENANTS ........................................................ 55

Section 5.01. Existence; Businesses and Properties ...................................... 55

Section 5.02. Insurance ................................................................................ 56

Section 5.03. Obligations and Taxes ............................................................ 56

Section 5.04. Financial Statements, Reports, Etc ......................................... 56

Section 5.05. Litigation and Other Notices .................................................. 59

Section 5.06. Information Regarding Collateral ........................................... 59

Section 5.07. Maintaining Records; Access to Properties and
Inspections; Environmental Assessments .............................. 59

Section 5.08. Use of Proceeds ..................................................................... 61

Section 5.09. Additional Collateral, Etc ...................................................... 61

Section 5.10. Further Assurances ................................................................. 62

Section 5.11. Accounts ................................................................................ 63

Section 5.12. Budget .................................................................................... 63

Section 5.13. Post-Closing Items ................................................................ 63

Section 5.14. Milestones .............................................................................. 64

ARTICLE 6    NEGATIVE COVENANTS ............................................................. 64

Section 6.01. Indebtedness .......................................................................... 64

Section 6.02. Liens ...................................................................................... 64

Section 6.03. Sale and Lease-Back Transactions ......................................... 66

Section 6.04. Investments, Loans and Advances ......................................... 66

Section 6.05. Mergers, Consolidations, Sales of Assets and
Acquisitions .......................................................................... 66

Section 6.06. Restricted Payments; Restrictive Agreements ........................ 66

Section 6.07. Transactions with Affiliates ................................................... 67

Section 6.08. Business of Parent, Borrower and the Subsidiaries;
Limitation on Hedging Agreements ....................................... 67

Section 6.09. Pre-Petition Payments ........................................................... 67

Section 6.10. Minimum Liquidity Covenant ............................................... 68

# TABLE OF CONTENTS
## (continued)

Section 6.11.    Case Matters.............................................................................. 68

ARTICLE 7      EVENTS OF DEFAULT..................................................................... 70

Section 7.01.    Events of Default ........................................................................ 70

ARTICLE 8      THE AGENTS ................................................................................ 73

ARTICLE 9      GUARANTY .................................................................................. 76

Section 9.01.    The Guaranty .............................................................................. 76

Section 9.02.    Nature of Liability...................................................................... 76

Section 9.03.    Independent Obligation............................................................... 76

Section 9.04.    Authorization ............................................................................. 77

ARTICLE 10    MISCELLANEOUS ......................................................................... 78

Section 10.01.    Notices ..................................................................................... 78

Section 10.02.    Survival of Agreement.............................................................. 80

Section 10.03.    Binding Effect........................................................................... 81

Section 10.04.    Successors and Assigns............................................................. 81

Section 10.05.    Expenses; Indemnity ................................................................ 85

Section 10.06.    Right of Setoff.......................................................................... 87

Section 10.07.    Applicable Law......................................................................... 87

Section 10.08.    Waivers; Amendment ............................................................... 87

Section 10.09.    Interest Rate Limitation ............................................................ 89

Section 10.10.    Entire Agreement ..................................................................... 89

Section 10.11.    WAIVER OF JURY TRIAL....................................................... 89

Section 10.12.    Severability .............................................................................. 90

Section 10.13.    Counterparts............................................................................. 90

Section 10.14.    Headings .................................................................................. 90

Section 10.15.    Jurisdiction; Consent to Service of Process.............................. 90

Section 10.16.    Confidentiality ......................................................................... 91

Section 10.17.    USA PATRIOT Act Notice ...................................................... 92

## Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Budget |
| Exhibit E | Interim Order |
| Exhibit F | Form of Non-Bank Certificate |
| Exhibit G | Form of Revolver Note |
| Exhibit H | Form of Joinder |

| | |
|---|---|
| Commitment Schedule | |
| Schedule 1.01(a) | Milestones |
| Schedule 1.01(b) | Initial Lenders |
| Schedule 2.22 | Liens on Petition Date |
| Schedule 3.08 | Subsidiaries |
| Schedule 3.09 | Litigation |
| Schedule 3.10 | Agreements |
| Schedule 3.16(i) | Employee Benefit Plans |
| Schedule 3.17 | Environmental Matters |
| Schedule 3.18 | Insurance |
| Schedule 3.20 | Owned and Leased Real Property |
| Schedule 5.13 | Post-Closing Items |
| Schedule 6.01 | Existing Indebtedness |
| Schedule 6.02 | Existing Liens |
| Schedule 6.04 | Existing Investments |
| Schedule 6.08 | Hedging Agreements |
| Schedule 6.09(d) | Pre-Petition Payments |

Senior Secured Super-Priority Debtor-in-Possession Credit Agreement dated as of October 5, 2009 (this "Agreement"), among Questex Media Group, Inc., as borrower (the "Borrower"), as debtor and debtor-in-possession, the Lenders from time to time party hereto, Credit Suisse, Cayman Islands Branch, as administrative agent (in such capacity and together with its successors, the "Administrative Agent") and as collateral agent (in such capacity and together with its successors, the "Collateral Agent") and each of the Guarantors party hereto.

## RECITALS

A. Borrower, QMG Holdings, Inc., a Delaware Corporation ("Parent"), the financial institutions from time to time party thereto (the "First Lien Lenders"), and Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent (the "First Lien Agent"), are parties to the First Lien Credit Agreement, dated as of May 4, 2007 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement");

B. The Borrowers and certain of its subsidiaries filed on October 5, 2009 (the "Petition Date") petitions for relief under chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court for the District of Delaware (the "Cases");

C. The Debtors have retained possession of their assets and are authorized to continue the operation of their businesses as debtors-in-possession;

D. Subject to entry of the Orders by the Bankruptcy Court, the Borrower shall be authorized to execute and deliver this Agreement and to incur indebtedness and other obligations to the Administrative Agent and the Lenders, provided herein and secured by virtually all assets and properties of the Borrower and the Guarantors;

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, each of the parties hereto agree as follows:

# ARTICLE 1

# DEFINITIONS

Section 1.01.   Defined Terms. As used in this Agreement, the following terms shall have the meanings specified below:

"363 Proprietary Information" shall mean the information relating to sales of assets under section 363 of the Bankruptcy Code that the Purchaser is not entitled to receive pursuant to the bidding procedures as approved by the Bankruptcy Court in connection with the Sales Procedures Motion.

"363 Sale" shall mean the sale of certain assets of the Debtors to the Lenders pursuant to section 363 of the Bankruptcy Code, free and clear of all Liens (except Liens expressly assumed pursuant to the Asset Purchase Agreement) on the terms and conditions set forth in the Asset Purchase Agreement.

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Account" shall have the meaning assigned to such term in Section 9-102 of the New York UCC.

"Adjusted LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the product of (a) the LIBO Rate in effect for such Interest Period and (b) Statutory Reserves.

"Administrative Agent" shall have the meaning assigned to such term in the preamble.

"Administrative Agent Fee" shall have the meaning assigned to such term in Section 2.05(c).

"Administrative Questionnaire" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"Affiliate" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; provided, however, that (i) for purposes of Section 6.07, the term "Affiliate" shall also include any person that directly or indirectly owns 10% or more of any class of Equity Interests of the person specified or that is an officer or director of the person specified; and (ii) none of the Administrative Agent, the Collateral Agent, Bank and any Lender shall be deemed an "Affiliate" of the Parent, Borrower or any Subsidiary.

"Agents" shall mean the Administrative Agent and the Collateral Agent.

"Aggregate Exposure" shall mean the aggregate amount of the Lenders' Exposures.

"Agreement" shall have the meaning assigned to such term in the preamble.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the greater of (a) 4.00%, (b) the Prime Rate in effect on such day, (c) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (d) the Adjusted LIBO Rate for a one-month Interest Period in effect on such day (or, if such day is not a Business Day, the immediately preceding Business Day) plus 1%; *provided*, the Adjusted LIBO Rate for any day shall be based on the rate determined on such day at approximately 11 a.m. (London time) by reference to the British Bankers' Association Interest Settlement Rates for deposits in dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the British Bankers' Association as an authorized vendor for the purpose of displaying such rates). Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective as of the opening of business on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.

"Applicable Margin" shall mean, (i) with respect to any ABR Loan, 9.00% per annum, and (ii) with respect to any Eurodollar Loan, 10.00% per annum.

"Asset Purchase Agreement" shall mean the Asset Purchase Agreement among Purchaser and the Sellers.

"Asset Sale" shall mean the sale, lease, sub-lease, sale and leaseback, assignment, conveyance, transfer, issuance or other disposition (by way of merger, casualty, condemnation or otherwise) by Parent, the Borrower or any of the Subsidiaries to any person of (a) any Equity Interests of any of the Subsidiaries or (b) any other assets of Parent, the Borrower or any of the Subsidiaries, including Equity Interests of any person that is not a Subsidiary; *provided* that none of the following shall be an "Asset Sale" for any purpose hereunder: (i) sales of inventory in the ordinary course of business, (ii) dispositions of obsolete, worn out or surplus property or property no longer useful in the business of Parent, the Borrower and the Subsidiaries in the ordinary course of business; (iii) sales or other dispositions of cash and Permitted Investments in the ordinary course of business; (iv) leases, subleases, licenses or sublicenses of property (which licenses and sublicenses shall, in the case of intellectual property rights, be non-exclusive) in the ordinary course of business which are not prohibited under this Agreement and do not materially interfere with the business of Parent, the Borrower and the Subsidiaries; (v) dispositions consisting of the sale, assignment, transfer or discount of overdue or disputed accounts receivable, in each case in the ordinary course of business and without recourse, for purposes of collection or compromise thereof consistent with past practice (and not as part of any bulk sale or financing transaction),

(vi) sales, assignments, transfers or other dispositions by Parent, the Borrower or any of the Subsidiaries to Parent, the Borrower or any of the Subsidiaries (including to the extent effected pursuant to a merger, consolidation, liquidation or dissolution permitted by Section 6.05(a)); *provided* that, if the transferor of such property is a Domestic Subsidiary, the transferee thereof must be a Domestic Subsidiary.

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by and between a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"Available Cash" means, on any date, the fair market value on such date of cash and cash equivalents held in securities accounts located in the United States of the Loan Parties and the amount of available funds held on such date in bank deposit accounts located in the United States of the Loan Parties as reflected on the books and records of the Borrower and the other Loan Parties and that are subject to perfected Liens on such accounts, including pursuant to the Orders.

"Avoidance Actions" shall mean claims and causes of action under the sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

"Backstop Fee" shall mean a fee in an amount equal to 2% of the difference between (i) the Total Commitments and (ii) the Initial Lenders' Pre-Petition Claims Percentage of the Total Commitments.

"Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as enacted in 1978, as the same has heretofore been amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals or any other court having jurisdiction over the Cases from time to time.

"Benefit Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Tax Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" shall have the meaning assigned to such term in the preamble.

"Borrowing" shall mean Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" shall mean a request by any Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"Breakage Event" shall have the meaning assigned to such term in Section 2.16.

"Budget" shall mean any of the Initial Budget, the Second Budget, and each Updated Budget, which is most recently delivered to the Administrative Agent.

"Budget Month-End" shall mean the last Friday of the current calendar month.

"Business Day" shall mean any day other than a Saturday, Sunday or day on which commercial banks in New York City, are authorized or required by law to close; *provided*, *however*, that when used in connection with a Eurodollar Loan (including with respect to all notices and determinations in connection therewith and any payments of principal, interest or other amounts thereon), the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP, and the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Carve-Out" shall have the meaning ascribed to such term in the Final Orders or if no Final Order has been entered, in the Interim Order.

"Cases" shall have the meaning assigned to such term in the recitals.

A "Change in Control" shall be deemed to have occurred if (a) the Permitted Holders shall fail to own directly or indirectly, beneficially and of record, Equity Interests representing at least a majority of the aggregate ordinary voting power and aggregate equity value represented by the issued and outstanding Equity Interests in Parent; or (b) Parent shall at any time fail to own directly or indirectly, beneficially and of record, 100% of each class of issued and outstanding Equity Interests in the Borrower; or (c) all or substantially all of the assets of the Borrower and the Subsidiaries shall be sold without the consent of the Required Lenders (other than pursuant to the 363 Sale).

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.14, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Chapter 11 Plan" shall mean a chapter 11 plan filed in the Cases acceptable to the Required Lenders, as the same may thereafter be amended, modified, or supplemented with the consent of the Required Lenders in their reasonable discretion.

"Charges" shall have the meaning assigned to such term in Section 10.09.

"Closing Date" shall mean the date on which the conditions set forth in Article 4 have been satisfied and the initial Loan is made.

"Closing Fee" shall have the meaning assigned to such term in Section 2.05(b).

"Collateral" shall mean all property and assets of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, and shall include the Mortgaged Properties.

"Collateral Agent" shall have the meaning assigned to such term in the preamble.

"Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Loans hereunder as set forth on the Commitment Schedule, or in the Assignment and Acceptance pursuant to which such Lender assumed its Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 10.04.

"Commitment Schedule" shall mean the Schedule attached hereto identified as such.

"Committee" shall have the meaning assigned to such term in Section 3.13.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Copyrights" shall mean (i) all copyrights arising under the laws of the United States, any other country, or union of countries, or any political subdivision of any

of the foregoing, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith and rights corresponding thereto throughout the world, including all registrations, recordings and applications in the United States Copyright Office, (ii) the right to, and to obtain, all extensions and renewals thereof, and the right to sue for past, present and future infringements of any of the foregoing, (iii) all proceeds of the foregoing, including license, royalties, income, payments, claims, damages, and proceeds of suit and (iv) all other rights of any kind whatsoever accruing thereunder or pertaining thereto.

"Copyright Licenses" shall mean any agreement, whether written or oral, naming a Loan Party as licensor or licensee, granting any right in, to or under any Copyright, including the grant of rights to manufacture, print, publish, copy, import, export, distribute, exploit and sell materials derived from any Copyright.

"Credit Event" shall have the meaning assigned to such term in Section 4.01.

"Debtors" shall mean Parent, Borrower, InfoTrends, Inc., Questex Brazil, LLC, Fiercemarkets, Inc., Oxford Publishing, Inc., Oxford Communication, Inc., InfoTrends Research Group, Inc., and Show Events, Inc.

"Default" shall mean any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would constitute an Event of Default.

"Defaulting Lender" shall mean (i) any Lender that has (a) defaulted in its obligation to make a Loan required to be made by it hereunder, or (b) notified the Administrative Agent or a Loan Party in writing that it does not intend to satisfy any such obligation, or (ii) any Lender that has become insolvent or the assets or management of which have been taken over by any Governmental Authority.

"DIP Liens" shall have the meaning assigned to such term in Section 2.24.

"dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Subsidiaries" shall mean all Subsidiaries incorporated, formed or organized under the laws of the United States of America, any state or commonwealth thereof or the District of Columbia.

"Eligible Assignee" shall mean (a) a Lender, (b) an Affiliate or a Related Fund of a Lender and (c) any other person (other than a natural person) approved in accordance with Section 10.04; *provided* that notwithstanding the foregoing or anything to the contrary contained in this Agreement, "Eligible Assignee" shall not include the (i) Borrower or any Affiliates of the Borrower; or (ii) any other person unless the terms and conditions of Section 10.4(j) are satisfied.

"Environmental Laws" shall mean all former, current and future Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives and orders (including consent orders), in each case, relating to protection of the environment, natural resources, human health and safety as it relates to environmental protection or the presence, Release of, threatened Release, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), of any kind or nature, whether contingent or otherwise, arising out of or relating to (a) compliance or non compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" shall mean any Permit required under Environmental Law.

"Equity Interests" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any person, or any obligations convertible into or exchangeable for, or giving any person a right, option or warrant to acquire, such equity interests or such convertible or exchangeable obligations.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Tax Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Tax Code, is treated as a single employer under Section 414 of the Tax Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Benefit Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Benefit Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Tax Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Tax Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Benefit Plan; (d) the incurrence by the Borrower or any ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan or the withdrawal

or partial withdrawal of the Borrower or any ERISA Affiliates from any Benefit Plan or Multiemployer Plan; (e) the receipt by the Borrower or any ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Benefit Plan or Plans or to appoint a trustee to administer any Benefit Plan; (f) the adoption of any amendment to a Benefit Plan that would require the provision of security pursuant to Section 401(a)(29) of the Tax Code or Section 302 of ERISA; (g) the receipt by the Borrower or any ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) any Foreign Benefit Events; (i) the occurrence of a "nonexempt prohibited transaction" with respect to which the Borrower or any Subsidiary is a "disqualified person" (within the meaning of Section 4975 of the Tax Code) or with respect to which the Borrower or any such Subsidiary could reasonably be expected to have a material liability; or (j) any other event or condition with respect to a Benefit Plan or Multiemployer Plan that could reasonably be expected to result in a material liability of the Borrower or any Subsidiary.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" shall have the meaning assigned to such term in Article 7.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income taxes, imposed on (or measured by) its net income or franchise (and similar) Taxes imposed on it in lieu of net income Taxes as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (or any political subdivision thereof), other than any such connection arising solely from such recipient having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document and (b) in the case of any Lender (other than an assignee pursuant to a request by the Borrower under Section 2.21(a)), any United States withholding tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Lender's failure (other than as a result of a Change in Law) to comply with Section 2.20(d) (without regard to the proviso of the first sentence thereof or the third sentence thereof) or Section 2.20(e), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.20(a).

"Executive Officer" of any person shall mean the chief executive officer, president, vice president, or secretary of such person.

"Exit Facility Agreement" shall mean the Exit Facility Agreement, among the Purchaser, as borrower, QMG Holdco, LLC, a Delaware limited liability company, Credit Suisse, as administrative agent and collateral agent and each of the Lenders.

"Exposure" shall mean, with respect to any Lender, at any time, the aggregate principal amount at such time of all outstanding Loans of such Lender.

"Facility" shall mean the Commitments and the extensions of credit made thereunder.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter" shall mean the fee letter dated October 5, 2009 from Credit Suisse, Cayman Islands Branch to the Borrower.

"Fees" shall mean the Unused Commitment Fee, the Closing Fee, the Backstop Fee and the Administrative Agent Fee.

"Fiercemarkets, Inc." shall mean Fiercemarkets, Inc., a Delaware corporation, a wholly owned and direct Domestic Subsidiary of the Borrower.

"Final Order" shall mean the order of the Bankruptcy Court approving this Agreement, the Security Documents and the other Loan Documents and authorizing the granting of post-petition secured credit by Lenders to the Borrower on a permanent basis pursuant to section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court on the docket in the Cases, and as to which no stay on its execution or enforcement in effect, and no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Code, may be but has not then been filed with respect to such order, shall not cause such order not to be a Final Order, substantially in the form of the Interim Order (with such modifications that are reasonably satisfactory to the Required Lenders in their sole discretion).

"Financial Officer" of any person shall mean the chief executive officer, chief financial officer, vice president of finance, principal accounting officer, treasurer or controller of such person.

"First Lien Agent" shall have the meaning given to such term in the preamble.

"First Lien Credit Agreement" shall have the meaning given to such term in the preamble.

"First Lien Lenders" shall have the meaning assigned thereto in the preamble.

"First Lien Loan Documents" shall mean the First Lien Credit Agreement, the First Lien Security Documents, each of the "Loan Documents" as defined in the First Lien Credit Agreement and the promissory notes, if any, executed and delivered pursuant thereto.

"First Lien Obligations" shall mean "Obligations" as such term is defined in the First Lien Credit Agreement.

"First Lien Security Documents" shall mean each of the "Security Documents" as such term is defined in the First Lien Credit Agreement and each of the mortgages and other pledge or security agreements executed and delivered pursuant to any of the foregoing or pursuant to the First Lien Credit Agreement.

"First Priority" shall mean, with respect to any Lien purported to be created in any Collateral pursuant to this Agreement, any Security Document or the Orders, that such Lien is the most senior Lien to which such Collateral is subject other than the Carve-Out.

"Foreign Benefit Event" shall mean, with respect to any Foreign Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the receipt of a notice by a Governmental Authority relating to the intention to terminate any such Foreign Pension Plan or to appoint a trustee or similar official to administer any such Foreign Pension Plan, or alleging the insolvency of any such Foreign Pension Plan, (d) the incurrence of any liability in excess of $50,000 by Parent, Borrower or any Subsidiary under applicable law on account of the complete or partial termination of such Foreign Pension Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any transaction that is prohibited under any applicable law and that could reasonably be expected to result in the incurrence of any liability by Parent, Borrower or any of the Subsidiaries, or the imposition on Parent, Borrower or any of the Subsidiaries of any fine, excise tax or penalty resulting from any noncompliance with any applicable law, in each case in excess of $50,000.

"Foreign Lender" shall mean any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each state thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Pension Plan" shall mean any defined benefit plan or other pension that under applicable law is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Authority.

"Foreign Subsidiary" shall mean any Subsidiary that is not a Domestic Subsidiary.

"GAAP" shall mean generally accepted accounting principles in the United States.

"Governmental Authority" shall mean the government of the United States of America or any other nation, any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"GSM Corporation" shall mean GSM Corporation, a company incorporated in Japan and a wholly owned direct Foreign Subsidiary of InfoTrends, Inc.

"Guarantee" of or by any person (the "guarantor") shall mean any obligation, contingent or otherwise, of (a) the guarantor or (b) another person (including any bank under a letter of credit) to induce the creation of which the guarantor has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation, contingent or otherwise, of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation or (v) to otherwise assure or hold harmless the owner of such Indebtedness or other obligation against loss in respect thereof; *provided, however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantors" shall mean each of Parent, Fiercemarkets, Inc., Oxford Publishing, Inc., Info Trends, Inc., McLean Events International Limited, InfoTrends Limited, InfoTrends Research Group, Inc., Pelican Events Limited, Show Events, Inc., Oxford Communication, Inc. and any other person that becomes a Guarantor pursuant to this Agreement or the Security Documents; *provided* that for the avoidance of doubt,

neither Questex Editora e Comunicacoes Ltda. or Questex Brazil, LLC, shall be a Guarantor hereunder.

"Hazardous Materials" shall mean any petroleum (including crude oil or fraction thereof) or petroleum products or byproducts, or any pollutant, contaminant or hazardous, toxic or other substances, materials or wastes defined, regulated or otherwise characterized as hazardous, toxic, pollutant, contaminant or words of similar meaning or effect, by, or pursuant to, any Environmental Law, or requires removal, remediation or reporting under any Environmental Law, including asbestos, or asbestos containing material, radon or other radioactive material, polychlorinated biphenyls and urea formaldehyde insulation.

"Hedging Agreement" shall mean any agreement with respect to any swap, forward, future, cap, collar, floor or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, fuel or other commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided, however*, that no phantom stock or similar plan providing for payments and on account of services provided by current or former directors, officers, employees or consultants of Parent, the Borrower or any Subsidiary shall be a Hedging Agreement.

"Holdco Notes" shall mean the notes issued pursuant to that certain $30,000,000 Note Purchase Agreement dated as of May 4, 2007 between Parent, as borrower, and Solar Capital, LLC, as note purchaser.

"Indebtedness" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets acquired by such person, (d) all obligations of such person in respect of the deferred purchase price of property or services (other than (i) trade accounts payable incurred in the ordinary course of business and not past due for more than 60 days after the date on which such trade account was created and (ii) any earn-out obligation until such obligation appears on the liability section of the balance sheet of such person), (e) all obligations of such person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Equity Interests in such person, (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such person of Indebtedness of others, (h) all Capital Lease Obligations or Synthetic Lease Obligations of such person, (i) all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such person in respect of bankers' acceptances. The Indebtedness of any person shall include the Indebtedness of any other person (including any partnership in which such person is a general partner) to the extent

such person is liable therefore as a result of such person's ownership interest in such other person, except to the extent the terms of such Indebtedness provide that such person is not liable therefore.

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes and Other Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 10.05(b).

"Information" shall have the meaning assigned to such term in Section 10.16.

"InfoTrends, Inc." shall mean InfoTrends, Inc., a Massachusetts corporation, a wholly owned and direct Domestic Subsidiary of the Borrower.

"InfoTrends Limited" shall mean InfoTrends Limited, a company incorporated in the United Kingdom and a wholly owned direct Foreign Subsidiary of InfoTrends, Inc..

"InfoTrends Research Group, Inc." shall mean InfoTrends Research Group, Inc., a Massachusetts corporation, a wholly owned and direct subsidiary of InfoTrends, Inc.

"Initial Budget" shall mean the weekly cashflow budget for the Borrower and the Subsidiaries for the 13-week period commencing on the Petition Date, substantially in the form of Exhibit D as approved by the Required Lenders in their sole and absolute discretion.

"Initial Lenders" shall mean the Lenders listed on Schedule 1.01(b).

"Intellectual Property" shall mean the collective reference to all rights, priorities and privileges relating to any intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks, the Trademark Licenses, the Trade Secrets and the Trade Secret Licenses, together with URLs, domain names, content of websites and databases, and all rights to sue at law or in equity for any past, present and future infringement or, other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intellectual Property Collateral" shall mean that portion of the Collateral that constitutes Intellectual Property.

"Intellectual Property Security Agreement" shall mean all Intellectual Property Security Agreements to be executed and delivered by the Loan Parties.

"Interest Period" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the day that is one month thereafter; *provided, however*, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Order" shall mean the order of the Bankruptcy Court approving this Agreement, authorizing the execution and performance of the Security Documents and the other Loan Documents by the Debtors and authorizing the granting of post-petition secured credit by Lenders to the Borrower on an interim basis pursuant to section 364 of the Bankruptcy Code, as may be issued or entered by the Bankruptcy Court on the docket in the Cases, and as to which no stay on its execution or enforcement in effect, and no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, in the form of Exhibit E (with such modifications that are reasonably satisfactory to the Required Lenders in their sole discretion).

"Investments" shall have the meaning assigned to such term in Section 6.04.

"Lenders" shall mean (a) each person listed on the Commitment Schedule (other than any such person that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any person that has become a party hereto pursuant to an Assignment and Acceptance.

"LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (a) 3.00% and (b) the rate per annum determined by the Administrative Agent at approximately 11:00 a.m., London time, on the date that is two Business Days prior to the commencement of such Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in dollars (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; *provided* that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in dollars are offered for such relevant Interest Period to major banks in the London interbank market in London,

England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidity" means, at any time, the sum of (i) an amount equal to the aggregate amount of the Loans then available at such time and (ii) Available Cash.

"Loan Documents" shall mean this Agreement, the Security Documents and all other instruments, documents and agreements executed and delivered by the Borrower or any Guarantor for the benefit of the Agents or any Lender in connection herewith.

"Loan Parties" shall mean Parent, Borrower and each Subsidiary that is or becomes a party to a Loan Document.

"Loans" shall mean the loans made by the Lenders to the Borrower pursuant to Section 2.01.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean a material adverse condition or material adverse change in or affecting (a) the validity or enforceability of any of the Loan Documents or the rights and remedies of the Secured Parties thereunder, (b) the condition (financial or otherwise), assets, operations, prospects or business of the Borrower or any of the Subsidiaries, not contemplated by the Budget, (c) the ability of the Borrower or any of the Subsidiaries to comply with their obligations under the Loan Documents and (d) the validity, legality or enforceability of any Lien created by any Security Document; *provided* that, for purposes of all representations and warranties made in connection with the Loan Documents, none of the following shall be deemed in itself, or in any combination, to constitute, a "Material Adverse Effect": (i) the filing of the Cases and (ii) the conditions, events and changes that ordinarily occur in connection with a filing under chapter 11 of the Bankruptcy Code.

"Material Indebtedness" shall mean Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any one or more of Parent, the Borrower and the Subsidiaries in an aggregate principal amount exceeding $250,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of Parent, the Borrower or any Subsidiary in respect of any Hedging

Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Parent, the Borrower or such Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

"Maturity Date" shall mean the earlier of (i) 180 days after the Petition Date, (ii) the effective date of a confirmed Chapter 11 Plan, (iii) the acceleration of the Loans or the termination of this Agreement and (iv) the consummation of the 363 Sale.

"Maximum Rate" shall have the meaning assigned to such term in Section 10.09.

"McLean Events International Limited" shall mean McLean Events International Limited, a company incorporated in United Kingdom and a wholly owned direct Foreign Subsidiary of Borrower.

"Milestone" shall mean each of the actions or the events described in Schedule 1.01(a) attached hereto.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgaged Properties" shall mean each parcel of real property and improvements thereto with respect to which a Mortgage is granted pursuant to Section 5.09 or 5.10.

"Mortgages" shall mean the fee mortgages or deeds of trust, assignments of rents and other security documents granting a Lien on any Mortgaged Property to secure the Obligations, each in a form reasonably satisfactory to the Collateral Agent.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"New York UCC" shall mean the Uniform Commercial Code in effect in the State of New York.

"Non-Consenting Lender" shall have the meaning assigned to such term in Section 10.08(c).

"Non-Funding Lender" shall have the meaning assigned to such term in Section 10.08(c).

"Obligations" shall mean the collective reference to the unpaid principal of and interest on (including interest accruing after the maturity of the Loans) the Loans and all other obligations and liabilities of the Borrower to an Agent, to any Lender, or any Indemnitee of any nature whatsoever, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which arise under, out of, or in connection with this Agreement, any other Loan Document, whether on account of principal, interest, guarantee obligations, reimbursement obligations, fees, indemnities,

costs, expenses (including all fees, charges and disbursements of counsel to any Agent or to any Lender that are required to be paid by the Borrower pursuant to this Agreement or any other Loan Document) or otherwise.

"Orders" shall mean the Interim Order and the Final Order.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including interest, fines, penalties and additions to tax) arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Oxford Communication, Inc." shall mean Oxford Communication, Inc., a Mississippi corporation, a wholly owned and direct Domestic Subsidiary of the Borrower.

"Oxford Publishing, Inc." shall mean Oxford Publishing, Inc., a Mississippi corporation, a wholly owned and direct Domestic Subsidiary of the Borrower.

"Parent" shall have the meaning assigned to such term in the recitals.

"Patents" shall mean (i) all letters of patent of the United States, any other country, union of countries or any political subdivision of any of the foregoing, all reissues and extensions thereof and all goodwill associated therewith, (ii) all applications for letters of patent of the United States or any other country or union of countries or any political subdivision of any of the foregoing and all divisions, continuations and continuations-in-part thereof, all improvements thereof, (iii) all rights to, and to obtain, any reissues or extensions of the foregoing and (iv) all proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

"Patent License" shall mean all agreements, whether written or oral, providing for the grant by or to a Loan Party of any right to manufacture, use, import, export, distribute, offer for sale or sell any invention covered in whole or in part by a Patent.

"Payment Date" shall mean the last Business Day of each calendar month.

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pelican Events Limited" shall mean Pelican Events Limited, a company incorporated in United Kingdom and a wholly owned direct Foreign Subsidiary of McLean Events International Limited.

"Permits" shall mean any and all franchises, licenses, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications,

easements, rights of way, and other rights, privileges and approvals required under any Requirement of Law.

"Permitted Holders" shall mean the owners of the stock of the Parent on Schedule 3.08 attached hereto.

"Permitted Investments" shall mean:

        (a)     dollars, or, in the case of any Foreign Subsidiary, such local foreign currency used in the country of such Foreign Subsidiary held by it from time to time in the ordinary course of business;

        (b)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency or instrumentality thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

        (c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within 365 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $2,000,000,000;

        (d)     marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's;

        (e)     investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above; and

        (f)     other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"person" shall mean any natural person, corporation, trust, business trust, joint venture, joint stock company, association, company, limited liability company, partnership, Governmental Authority or other entity.

"Petition Date" shall have the meaning assigned to such term in the recitals.

"Pre-Petition Claims Percentage" shall mean, with respect to each First Lien Lender, a fraction expressed as a percentage of the numerator of which is the amount of such First Lien Lender's Obligations (as defined in the First Lien Loan Documents) and the denominator of which is the aggregate amount of all such Obligations, in each case, as of the Petition Date.

"Pre-Petition Payment" shall mean a payment made by a Debtor (by way of adequate protection or otherwise) on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against a Loan Party.

"Prime Rate" shall mean the rate of interest per annum announced from time to time by Credit Suisse as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective as of the opening of business on the date such change is announced as being effective. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually available.

"Pro Rata Percentage" shall mean, with respect to any Lender, at any time, the percentage of the Total Commitment represented by such Lender's Commitment. In the event all of the Commitments shall have expired or been terminated, the Pro Rata Percentage of any Lender shall be determined on the basis of the Loans then outstanding.

"Purchaser" shall mean QMG Acquisition, LLC, a Delaware corporation.

"Questex Asia Limited" shall mean Questex Asia Limited, a company organized under the laws of Hong Kong and a wholly owned direct Foreign Subsidiary of Borrower.

"Questex Brazil, LLC" shall mean Questex Brazil, LLC, a Delaware limited liability company, a wholly owned and direct Domestic Subsidiary of the Borrower.

"Questex Editora e Comunicacoes Ltda." shall mean Questex Editora e Comunicacoes Ltda., a company organized under the laws of Brazil and a Foreign Subsidiary owned by Questex Brazil, LLC and the Borrower.

"Real Property" shall mean all Mortgaged Property and all other real property owned or leased from time to time by Parent, Borrower or the Subsidiaries.

"Recovery Event" shall mean any settlement of or payment in respect of any property or casualty or other insurance claim or any taking under power of eminent domain or by condemnation or similar proceeding of or relating to any property or asset of Parent, the Borrower or any Subsidiary.

"Register" shall have the meaning assigned to such term in Section 10.04(d).

"Regulation T" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" shall mean, with respect to any Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is advised or managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Related Parties" shall mean, with respect to any specified person, such person's Affiliates and the respective directors, officers, employees, agents and advisors of such person and such person's Affiliates.

"Release" shall mean any release, spill, seepage, emission, leaking, pumping, injection, pouring, emptying, deposit, disposal, discharge, dispersal, dumping, escaping, leaching, or migration into, onto or through the environment or within or upon any building, structure, facility or fixture.

"Required Lenders" shall mean, at any time, (i) if there are four (4) or more Lenders, then at least three (3) Lenders having Loans and unused Commitments representing at least 51% of the sum of all Loans outstanding and unused Commitments at such time; and (ii) otherwise, all Lenders; *provided* that the Loans and unused Commitments of any Defaulting Lender shall be disregarded in the determination of Required Lenders at any time.

"Requirement of Law" shall mean as to any person, the governing documents of such person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such person or any of its Real Property or personal property or to which such person or any of its property of any nature is subject.

"Responsible Officer" of any person shall mean any Executive Officer or Financial Officer, of such person and any other similar officer thereof responsible for the administration of the obligations of such person in respect of this Agreement.

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Parent, the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, defeasance, retirement, acquisition, cancellation or termination of any Equity

Interests in Parent, the Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in Parent, the Borrower or any Subsidiary.

"S&P" shall mean Standard & Poor's Ratings Group, Inc.

"Sales Procedures Motion" shall have the meaning assigned to such term in Schedule 1.01(a).

"Second Budget" shall mean the weekly cashflow budget for the Borrower and the Subsidiaries for the 60 day period commencing on the 61st day after the Petition Date, substantially in the form of Exhibit D as approved by the Required Lenders in their sole and absolute discretion.

"Second Lien Credit Agreement" shall mean the second lien credit agreement dated as of March 4, 2007 (as amended, modified or supplemented from time to time) between Borrower, Parent, the financial institutions from time to time party thereto (the "Second Lien Lenders"), and Wilmington Trust FSB, as administrative agent and collateral agent (the "Second Lien Agent").

"Second Lien Obligations " shall mean "Obligations" as such term is defined in the First Lien Credit Agreement.

"Secured Parties" shall mean collectively the Administrative Agent, the Collateral Agent and the Lenders and any other party so designated by the Loan Documents.

"Security Documents" shall mean the Orders, the Mortgages, the Intellectual Property Security Agreements and each of the other security agreements, control agreements, pledges, mortgages, consents and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.09 or 5.10.

"Seller" shall mean each of Borrower, Parent, InfoTrends, Inc., Fiercemarkets, Inc., Oxford Publishing, Inc., Oxford Communication, Inc., Show Events, Inc., and InfoTrends Research Group, Inc. (collectively, the "Sellers").

"Share Charges" shall mean, the "Share Charge (re: InfoTrends Limited)" dated as of the date hereof among InfoTrends, Inc. and the Collateral Agent; the "Share Charge (re: McLean Events International Limited)" dated as of the date hereof among the Borrower and the Collateral Agent and the "Share Charge (re: Pelican Events Limited)" dated as of the date hereof among McLean Events International Limited and the Collateral Agent.

"Show Events, Inc." shall mean Show Events, Inc., a Mississippi corporation, a wholly owned and direct Domestic Subsidiary of Oxford Publishing Inc.

"Statutory Reserves" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum (without duplication) reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"subsidiary" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, partnership, limited liability company, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, controlled or held by the parent or (b) that is, at the time any determination is made, otherwise Controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" shall mean any subsidiary of the Borrower.

"Supermajority Lenders" shall mean, at any time, (i) if there are four (4) or more Lenders, then at least three (3) Lenders having Loans and unused Commitments representing at least 66 2/3% of the sum of all Loans outstanding and unused Commitments at such time; and (ii) otherwise, all Lenders; *provided* that the Loans and unused Commitments of any Defaulting Lender shall be disregarded in the determination of Supermajority Lenders at any time.

"Superpriority Claim" shall mean a claim against the Borrower in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

"Synthetic Lease Obligations" shall mean all monetary obligations of a person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of any property (whether real, personal or mixed) creating obligations which do not appear on the balance sheet of such person, but which, upon the insolvency or bankruptcy of such person, would be characterized as Indebtedness of such person (without regard to accounting treatment).

"Tax Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, liabilities or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Topping Bidder" shall have the meaning assigned to such term in Schedule 1.01(a).

"Total Commitment" shall mean, at any time, the aggregate amount of the Commitments, as in effect at such time. The Total Commitment shall not exceed $15,000,000.

"Trademarks" shall mean (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country, union of countries, or any political subdivision of any of the foregoing, or otherwise, and all common-law rights related thereto, (ii) the right to, and to obtain, all renewals thereof, (iii) the goodwill of the business symbolized by the foregoing, (iv) other source or business identifiers, designs and general intangibles of a like nature and (v) the right to sue for past, present and future infringements or dilution of any of the foregoing or for any injury to goodwill, and all proceeds of the foregoing, including royalties, income, payments, claims, damages and proceeds of suit.

"Trademark License" shall mean any agreement, whether written or oral, providing for the grant by or to a Loan Party of any right in, to or under any Trademark.

"Trade Secret License" shall mean any agreement, whether written or oral, providing for the grant by or to a Loan Party of any right in, to or under any Trade Secret.

"Trade Secrets" shall mean all trade secrets and all other confidential or proprietary information and know-how, whether or not reduced to a writing or other tangible form, including all documents and things embodying, incorporating or describing such Trade Secret, the right to sue for past, present and future infringements of any Trade Secret and all proceeds of the foregoing, including royalties, income, payments, claims, damages and proceeds of suit.

"Transactions" shall mean, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party, (b) the Borrowings the use of proceeds thereof, (c) the granting of Liens pursuant to the Security Documents, (d) the payment of fees and expenses incurred in connection with the foregoing, (e) the consummation of the 363 Sale contemplated by the Asset Purchase Agreement and (f) any other transactions related to or entered into in connection with any of the foregoing.

"Type", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "Rate" shall include the Adjusted LIBO Rate and the Alternate Base Rate.

"UCC" shall mean the Uniform Commercial Code.

"UK Debenture" shall mean the debenture dated as of the date hereof among McLean Events International Limited, InfoTrends Limited, Pelican Events Limited and the Collateral Agent.

"Unused Commitment Fee" shall have the meaning assigned to such term in Section 2.05(a).

"Updated Budget" shall mean the weekly cashflow budget for the Borrower and the Subsidiaries for the 60 day period commencing on the day after the end of the period covering the Second Budget or the preceding Updated Budget, as the case may be, substantially in the form of Exhibit D as approved by the Required Lenders in their sole and absolute discretion.

"Weekly Budget" shall mean a weekly cashflow budget for the Borrower and the Subsidiaries for a rolling 13 week period substantially in the form of Exhibit D with the first such 13 week period commencing on the first full week after the Petition Date.

"wholly owned subsidiary" of any person shall mean a subsidiary of such person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, controlled or held by such person or one or more wholly owned subsidiaries of such person or by such person and one or more wholly owned subsidiaries of such person; a "wholly owned Subsidiary" shall mean any wholly owned subsidiary of the Borrower.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02.    Terms Generally.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including", and words of similar import, shall not be limiting and shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all rights and interests in tangible and intangible assets and properties of any kind whatsoever, whether real, personal or mixed,

including cash, securities, Equity Interests, accounts and contract rights. The words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement unless the context shall otherwise require. All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, (a) any definition of, or reference to, any Loan Document or any other agreement, instrument or document in this Agreement shall mean such Loan Document or other agreement, instrument or document as amended, restated, supplemented or otherwise modified from time to time (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein) and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided, however*, that if the Borrower notifies the Administrative Agent that the Borrower wishes to amend any covenant in Article 6 or any related definition to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such covenant (or if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend Article 6 or any related definition for such purpose), then the Borrower and the Administrative Agent shall negotiate in good faith to amend such covenant and related definitions (subject to the approval of the Required Lenders) to preserve the original intent thereof in light of such change in GAAP; *provided* that the Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until such covenant is amended.

Section 1.03.   <u>Classification of Loans and Borrowings</u>.  For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type (*e.g.*, a "Eurodollar Loan").

# ARTICLE 2

# THE CREDITS

Section 2.01.   <u>Commitments</u>.  Subject to the terms and conditions hereof and relying upon the representations and warranties set forth herein, each Lender agrees, severally and not jointly, to make Loans to the Borrower, from time to time on and after the Closing Date until the earlier of the Maturity Date and the termination of the Commitment of such Lender in accordance with the terms hereof, in an aggregate principal amount at any time outstanding that will not result in such Lender's Exposure exceeding such Lender's Commitment. Within the limits set forth in the preceding sentence and subject to the terms, conditions and limitations set forth herein, the Borrower may borrow, pay or prepay and reborrow Loans. Such Loans will be available to the Borrower in two tranches; $5,500,000 of the Total Commitments upon entry of the Interim Order (or such lower amount as specified in the Interim Order); and the balance of the Total Commitments upon entry of the Final Order. Loans will be made to the Borrower once per calendar week in accordance with, and subject to compliance with, the Budget.

Section 2.02. <u>Loans</u>. (a) Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments; *provided, however*, that the failure of any Lender to make any Loan required to be made by it shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). The Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $50,000 and not less than $250,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b) Subject to Sections 2.08 and 2.15, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement. Borrowings of more than one Type may be outstanding at the same time; *provided, however*, that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than four (4) Eurodollar Borrowings outstanding hereunder at any time. For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c) Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 12:00 p.m., New York City time, and the Administrative Agent shall promptly make available the amounts so received by wire transfer of immediately available funds to an account designated by the Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(d) Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) of this Section and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the

Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing or (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short term funds (which determination shall be conclusive absent manifest error). If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement. If the Borrower pays such amount to the Administrative Agent, the amount so paid shall constitute a repayment of such Borrowing by such amount.

(e)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request any Eurodollar Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03.     Borrowing Procedure.  In order to request a Borrowing, the Borrower shall give telephonic notice confirmed promptly by hand delivery, electronic mail or fax to the Administrative Agent of a duly completed Borrowing Request (a) in the case of a Eurodollar Borrowing, not later than 1:00 p.m., New York City time, three Business Days before a proposed Borrowing and (b) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time, one Business Day before a proposed Borrowing. Each Borrowing Request shall be irrevocable, shall be signed by or on behalf of the Borrower and shall specify the following information: (i) whether the Borrowing then being requested is to be a Eurodollar Borrowing or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the number and location of the account to which funds are to be disbursed; and (iv) the amount of such Borrowing; *provided, however*, that, notwithstanding any contrary specification in any Borrowing Request, each requested Borrowing shall comply with the requirements set forth in Section 2.02; *provided* further that each requested Borrowing shall be in accordance with the Budget and permitted variances under Section 5.12. If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing. The Administrative Agent shall promptly advise the applicable Lenders of any notice given in accordance with this Section 2.03 (and the contents thereof), and of each Lender's portion of the requested Borrowing.

Section 2.04.     Repayment of Loans; Evidence of Debt. (a) The Borrower hereby unconditionally promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender made to the Borrower on the Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender to the Borrower from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and the

Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of the sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d) The entries made in the accounts maintained pursuant to paragraphs (b) and (c) of this Section 2.04 shall be prima facie evidence of the existence and amounts of the obligations therein recorded absent manifest error; *provided, however*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans made to the Borrower in accordance with the terms of this Agreement.

(e) Any Lender may request that Loans made by it hereunder be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its permitted registered assigns and in a form and substance reasonably substantially the same as Exhibit G. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 10.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

Section 2.05. Fees. (a) From and after the date of the entry of the Interim Order, a non-refundable unused commitment fee initially at a rate of 1.00% *per annum* will accrue on the daily average unused portion of the Commitments (whether or not then available), payable monthly in arrears and on the Maturity Date ("Unused Commitment Fee").

(b) The Borrower agrees to pay 3.00% of the Total Commitment to the Administrative Agent for the pro rata benefit of the Lenders on the date of the entry of the Interim Order and paid from the proceeds of the Loans (the "Closing Fee").

(c) The Borrower agrees to pay to the Administrative Agent, for its own account an administrative agent fee as set forth in the Fee Letter (the "Administrative Agent Fee").

(d) The Borrower agrees to pay to the Administrative Agent, for the benefit of the Initial Lenders, the Back Stop Fee, to be allocated among the Initial Lenders as they may agree.

(e) All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders. Once paid, the Fees shall not be refundable under any circumstances, absent manifest error in the calculation of such fees.

Section 2.06.  Interest on Loans. (a)  Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 days) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin in effect from time to time.

(b)  Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c)  Interest on each Loan shall accrue to all outstanding amounts under this Agreement in arrears and be payable on each Payment Date

Section 2.07.  Default Interest. If any Event of Default shall occur and be continuing under this Agreement, Interest in an amount equal to the rate that would otherwise be applicable plus 2.00% (the "Default Rate") shall accrue in arrears and payable on each Payment Date.

Section 2.08.  Alternate Rate of Interest. In the event, and on each occasion, that prior to the commencement of any Interest Period (a) the Administrative Agent shall have determined that adequate and reasonable means do not exist for determining the Adjusted LIBO Rate for such Interest Period or (b) the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period, the Administrative Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Borrower and the Lenders. In the event of any such determination, until the Administrative Agent shall have advised the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist (which notice the Administrative Agent shall give promptly upon such circumstances ceasing to exist), (i) any request by the Borrower for a Borrowing pursuant to Section 2.03 shall be deemed to be a request for an ABR Borrowing, and (ii) any request pursuant to Section 2.10 for the continuation of any Loan as a Eurodollar Loan shall be deemed to be a request for the conversion of such Loan to an ABR Loan. Each determination by the Administrative Agent under this Section 2.08 shall be conclusive absent manifest error.

Section 2.09.  Termination and Reduction of Commitments. (a) Unless previously terminated in accordance with the terms hereof, the Commitments shall automatically terminate on the Maturity Date.

(b)  Upon at least one Business Days prior irrevocable written or fax notice to the Administrative Agent, the Borrower may at any time in whole permanently terminate, or from time to time in part permanently reduce, the Commitments; *provided* that (i) each partial reduction of the Commitments shall be in

an integral multiple of $500,000 and in a minimum amount of $1,000,000 and (ii) the Total Commitment shall not be reduced to an amount that is less than the Aggregate Exposure then in effect (after giving effect to any repayment or prepayment effected simultaneously therewith).

(c)     Each reduction in the Commitments hereunder shall be made ratably among the applicable Lenders in accordance with their Pro Rata Percentages.

Section 2.10.    Conversion and Continuation of Borrowings.  The Borrower shall have the right at any time upon prior irrevocable telephonic notice to the Administrative Agent (a) not later than 12:00 noon, New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, and (b) not later than 12:00 noon, New York City time, three Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period.

(i)     each conversion or continuation shall be made pro rata among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(ii)     if less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall satisfy the limitations specified in Sections 2.02(a) and 2.02(b) regarding the principal amount and maximum number of Borrowings of the relevant Type;

(iii)     each conversion shall be effected by each Lender and the Administrative Agent by recording for the account of such Lender the new Loan of such Lender resulting from such conversion and reducing the Loan (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(iv)     if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

(v)     after the occurrence and during the continuance of an Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each notice pursuant to this Section 2.10 shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing and (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business

Day). The Administrative Agent shall advise the Lenders of any notice given pursuant to this Section 2.10 and of each Lender's portion of any converted or continued Borrowing. If the Borrower shall not have given notice in accordance with this Section 2.10 to continue any Eurodollar Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted or continued into an ABR Borrowing.

Section 2.11.    Reserved.

Section 2.12.    Prepayment. (a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written, fax or electronic mail notice (or telephone notice promptly confirmed by written, fax or electronic mail notice) in the case of Eurodollar Loans, or written, fax or electronic mail notice (or telephone notice promptly confirmed by written, fax or electronic mail notice) at least one Business Day prior to the date of prepayment in the case of ABR Loans, to the Administrative Agent before 12:00 noon, New York City time; *provided, however,* that (i) each partial prepayment shall be in an amount that is an integral multiple of $100,000 and not less than $500,000 and (ii) at the Borrower's election in connection with any prepayment of Loans pursuant to this section 2.12(a), such prepayment shall not, so long as no Event of Default then exists and is continuing, be applied to any Loan of a Defaulting Lender.

(b)    Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein; *provided* that any such notice delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other financing arrangements, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. All prepayments under this Section 2.12 shall be subject to Section 2.16, but shall otherwise be without premium or penalty. All Eurodollar prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount prepaid to but excluding the date of payment.

Section 2.13.    Mandatory Prepayments. (a) In the event of any termination of all of the Commitments, the Borrower shall, on the date of such termination, repay or prepay all outstanding Borrowings. If as a result of any partial reduction of the Commitments the Aggregate Exposure would exceed the Total Commitment after giving effect thereto, then the Borrower shall, on the date of such reduction, repay or prepay Borrowings in an amount sufficient to eliminate such excess.

(b)    If at any time the Borrower and the Subsidiaries shall have Available Cash in excess of $2,500,000 for two (2) consecutive Business Days, the

Borrower shall repay the Obligations in an amount equal to such excess on the next Business Day.

(c)     All prepayments of Borrowings pursuant to this Section 2.13 shall be subject to Section 2.16, but shall otherwise be without premium or penalty. All prepayments of Eurodollar Borrowings under this Section 2.13 shall be accompanied by accrued and unpaid interest on the principal amount prepaid to, but excluding, the date of such payment.

(d)     Mandatory prepayments under this Section shall be applied:

(i)     *first*, to prepay accrued and unpaid (x) Fees and (y) expenses payable in accordance with Section 10.05 or any other Loan Document;

(ii)     *second*, to prepay accrued and unpaid interest on the principal amount of Loans;

(iii)     *third*, to prepay outstanding principal amount of the Loans to the full extent thereof; and

(iv)     *fourth*, any remaining amounts to be retained by the Borrower.

Section 2.14.     Reserve Requirements; Change in Circumstances.  (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, the Administrative Agent (except any such reserve requirement which is reflected in the Adjusted LIBO Rate) or

(ii)     impose on any Lender or the Administrative Agent or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender,

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender or the Administrative Agent to be material, then the Borrower will pay to such Lender or the Administrative Agent, as the case may be, upon demand such additional amount or amounts as will compensate the Administrative Agent or such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)     If any Lender or the Administrative Agent shall have determined that any Change in Law regarding capital adequacy has or would have the effect of reducing the rate of return on such Lender's or the Administrative Agent's capital or

on the capital of such Lender's or the Administrative Agent's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or the Administrative Agent or such Lender's or the Administrative Agent's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Administrative Agent's policies and the policies of such Lender's or the Administrative Agent's holding company with respect to capital adequacy) by an amount deemed by such Lender or the Administrative Agent to be material, then from time to time the Borrower shall pay to such Lender or the Administrative Agent, as the case may be, such additional amount or amounts as will compensate such Lender or the Administrative Agent or such Lender's or the Administrative Agent's holding company for any such reduction suffered.

(c)  A certificate of a Lender or the Administrative Agent setting forth the amount or amounts necessary to compensate such Lender or the Administrative Agent or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender or the Administrative Agent, as the case may be, the amount or amounts shown as due on any such certificate delivered by it within 30 days after its receipt of the same.

(d)  Failure or delay on the part of any Lender or the Administrative Agent to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or the Administrative Agent's right to demand such compensation; *provided* that the Borrower shall not be under any obligation to compensate any Lender or the Administrative Agent under paragraph (a) or (b) above for increased costs or reductions with respect to any period prior to the date that is 270 days prior to such request if such Lender or the Administrative Agent knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions; *provided further* that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 270-day period. The protection of this Section shall be available to each Lender and the Administrative Agent regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

(e)  Notwithstanding anything in this Section 2.14 to the contrary, this Section 2.14 shall not apply to any Change in Law with respect to Taxes, which shall be governed exclusively by Section 2.20.

Section 2.15.  Change in Legality. (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)     such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans), whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)     such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under clause (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans. Any such conversion of a Eurodollar Loan under (i) or (ii) above shall be subject to Section 2.16.

(b)     For purposes of this Section 2.15, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower.

Section 2.16.     Indemnity. The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of (a) any event or circumstance, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving or being deemed to receive any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefore, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefore or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.10) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "Breakage Event") or (b) any default in the making of any payment or prepayment required to be made hereunder. In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over

(ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period. A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

Section 2.17. <u>Pro Rata Treatment</u>. Except as required under Section 2.13(e), Section 2.14 and Section 2.15 and subject to the express provisions of this Agreement which require, or permit, differing payments to be made to non-Defaulting Lenders as opposed to Defaulting Lenders, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, the payment of the Unused Commitment Fee, the payment of the Closing Fee, each reduction of the Commitments and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated pro rata among the Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans). Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole dollar amount.

Section 2.18. <u>Sharing of Setoffs</u>. Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of title 11 of the Bankruptcy Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan as a result of which the unpaid principal portion of its Loans shall be proportionately less than the unpaid principal portion of the Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided, however*, that if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.18 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest. The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the

Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

Section 2.19.   Payments.  (a)  The Borrower shall make each payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder and under any other Loan Document not later than 1:00 p.m., New York City time, on the date when due in immediately available dollars, without setoff, defense or counterclaim.  Each such payment shall be made to the Administrative Agent at its offices at Eleven Madison Avenue, New York, NY 10010.  Solely for the purpose of crediting the Borrower's account (and not, for the avoidance of doubt, for the purposes of determining the occurrence of any Default or Event of Default), any payment received by the Administrative Agent after 1:00 p.m., New York City time, may be considered received on the next Business Day in the Administrative Agent's sole discretion.  All payments hereunder and under each other Loan Document shall be made in dollars.

(b)     Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) or performance hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment or performance may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

(c)     Except as otherwise provided herein, payments in respect of the Obligations shall be applied: *first*, to pay interest on and then principal of any portion of the Loans that the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower *second*, to pay Obligations in respect of any expense reimbursements or indemnities then owing, due and payable to the Administrative Agent; *third*, to pay Obligations in respect of any expense reimbursements or indemnities then owing, due and payable to the Lenders; *fourth*, to pay Obligations in respect of any fees then owing, due and payable to the Agents and the Lenders; *fifth*, to pay interest then owing, due and payable in respect of the Loans; *sixth*, to pay or prepay principal amounts on the Loans owing to the Lenders; and *seventh*, to the ratable payment of all other Obligations; *provided*, that no prepayment of the Facility shall permanently reduce the Commitments unless expressly specified herein.

Section 2.20.   Taxes.  (a)  Any and all payments by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document shall be made free and clear of and without withholding, reduction or deduction for any Indemnified Taxes or Other Taxes; *provided* that if any Indemnified Taxes or Other Taxes are required by applicable law to be withheld or deducted from such payments, then (i) the sum payable by or on behalf of the Borrower or Loan Party shall be increased as necessary so that after all required deductions or withholding (including deductions or withholdings applicable to additional sums payable under this Section) the Administrative Agent or such Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii)

the Borrower or such other Loan Party shall make (or cause to be made) such deductions and (iii) the Borrower or such other Loan Party shall pay (or cause to be paid) the full amount deducted to the relevant Governmental Authority in accordance with applicable law. In addition, the Borrower or any other Loan Party hereunder shall pay (or cause to be paid) any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(b)     The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after written demand therefore, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, or any of their respective Affiliates, on or with respect to any payment by or on account of any obligation of the Borrower or any Loan Party hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on its behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(c)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes pursuant to Section 2.20(a), and in any event within 30 days of any such payment being due, the Borrower shall deliver (or cause to be delivered) to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent) on or prior to the date a payment is to be made to such Lender under this Agreement or promptly upon learning that any such documentation expired or became obsolete, at the reasonable written request of the Borrower, such properly completed and executed documentation necessary to establish under applicable law that such payments may be made without withholding or at a reduced rate; *provided* that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's reasonable judgment such completion, execution or delivery would not materially prejudice the legal position of such Lender. In addition, each Foreign Lender shall (i) furnish to the Borrower and the Administrative Agent on or before it becomes a party to the Agreement (or with respect to a Form W-8IMY, the date such Lender does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Lender under this Agreement) either (A) two accurate and complete duly executed U.S. Internal Revenue Service Form W-8BEN

(or successor form), (B) an accurate and complete duly executed U.S. Internal Revenue Service Form W-8ECI (or successor form) (C) an accurate and complete duly executed U.S. Internal Revenue Service Form W-8IMY (or any successor thereto) with appropriate Forms W-9 or W-8 (each such form, properly completed and duly executed) attached thereto or (D) two accurate and complete originally executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding tax, in each case, together with any required attachments, certifying, in each case, to such Foreign Lender's legal entitlement (or, with respect to a Form W-8IMY and any associated Forms W-8 or W-9, the legal entitlement of the person(s) for whom such Foreign Lender is acting) to an exemption or reduction from U.S. federal withholding tax with respect to all interest payments hereunder, and (ii) provide a new Form W-8BEN (or successor form), Form W-8ECI (or successor form) or any such other form as described in clauses (C) or (D) above upon the expiration or obsolescence of any previously delivered form to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any interest payment hereunder; *provided* that any Foreign Lender that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Tax Code and is relying on the so-called "portfolio interest exemption" shall also furnish a "Non-Bank Certificate" in the form of <u>Exhibit F</u> together with a Form W-8BEN. Notwithstanding any other provision of this paragraph, a Foreign Lender shall not be required to deliver any form pursuant to this paragraph that such Foreign Lender is not legally able to deliver.

(e)     Any Lender that is a United States person, as defined in Section 7701(a)(30) of the Tax Code, and is not an exempt recipient within the meaning of Treasury Regulations Section 1.6049-4(c) shall deliver to the Borrower at the times described in Section 2.20(d) (with a copy to the Administrative Agent) two accurate and complete duly signed copies of Internal Revenue Service Form W-9, or any successor form that such person is entitled to provide at such time in order to comply with United States back-up withholding requirements.

(f)     Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 2.20 shall survive the payment in full of all amounts due hereunder.

(g)     If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.20, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.20 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent, such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that (i) the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the

Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority and (ii) nothing herein contained shall interfere with the right of a Lender or the Administrative Agent to arrange its tax affairs in whatever manner it thinks fit nor oblige any Lender or the Administrative Agent to claim any Tax refund. Notwithstanding anything to the contrary, in no event will any Lender or the Administrative Agent be required to pay any amount to Borrower the payment of which would place such Lender or the Administrative Agent in a less favorable net after-tax position than such Lender or the Administrative Agent would have been in if the additional amount giving rise to such Indemnified Taxes or Other Taxes giving rise to such refund had never been indemnified by the Borrower or Loan Party. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other person.

Section 2.21.   Assignment of Commitments under Certain Circumstances; Duty to Mitigate.  (a)  In the event (i) any Lender delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender delivers a notice described in Section 2.15, (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender or (iv) any Lender becomes a Defaulting Lender then, in each case, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 10.04(b)), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions and contributions contained in Section 10.04), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such assigned obligations; *provided* that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, and (z) the Borrower or such Eligible Assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender, plus all Fees and other amounts accrued for the account of such Lender hereunder; *provided further* that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under Section 2.14 or notice under Section 2.15 or the amounts paid pursuant to Section 2.20, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.15, or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender pursuant to paragraph (b) below), or if such Lender shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event or shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event, as

the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder.

(b)    If (i) any Lender shall request compensation under Section 2.14, (ii) any Lender delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender, pursuant to Section 2.20, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing, assignment, delegation or transfer would reduce its claims for compensation under Section 2.14 or enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

Section 2.22.    Priority.  (a) The Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order and the Final Order, the Obligations of the Borrower hereunder and all obligations of the other Loan Parties under or in respect of the other Loan Documents:

(i)    subject to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed claims in the Cases having superpriority over any and all administrative expenses, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 of the Bankruptcy Code or otherwise which superpriority claims shall be payable in accordance with the terms of the Orders; and

(ii)    pursuant to section 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable first-priority and fully-perfected security interest and priming Lien on all of the tangible and intangible property of the Borrower and the other Loan Parties senior to any and all Liens that secure the First Lien Obligations and the Second Lien Obligations and subject only to:  (A) valid, perfected and non-avoidable Liens in existence as of the Petition Date or valid Liens in existence on the Petition Date that are not primed pursuant to the Orders and in each case listed on Schedule 2.22 hereto (but excluding in all events, Liens that secure the First Lien Obligations or the Second Lien Obligations) and (B) the Carve-Out.

(b)     Notwithstanding anything to the contrary contained in this Agreement and subject to the limitations set forth in the Orders, no Loans, cash or cash equivalents or other Collateral or the Carve-Out or proceeds of any of the foregoing may be used to (i) object to or contest in any manner any amount due under this Agreement, the other Loan Documents, the First Lien Credit Agreement, the other First Lien Loan Documents or the Liens or claims granted under the Orders, the Loan Documents or the First Lien Loan Documents, or to assert or prosecute any actions, claims or causes of action against any of the Administrative Agent, the Collateral Agent, the Lenders, the Agents under the First Lien Credit Agreement or the First Lien Lenders, (ii) seek authorization for any party to use any of the Cash Collateral (as defined in the Orders) of Secured Parties except as set forth in the Orders or (iii) obtain Liens that are senior to, or on a parity with, the Liens of the Collateral Agent, the Lenders and the other Secured Parties in the Collateral or any portion thereof.

Section 2.23.    Payment of Obligations.  Subject to the provisions of Section 7.01, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents of the Borrower, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

Section 2.24.    Adequate Protection.  In consideration of the First Lien Lenders consenting to the priming by the Liens granted by the Order and the Security Documents (the "DIP Liens") and the use of their cash collateral by Borrower.

(a)     the First Lien Lenders shall be entitled to an allowed administrative priming claim under Section 507(a) of the Bankruptcy Code junior only to the Obligations and the Carve-Out, to the extent, of any diminution in the value of collateral securing the First Lien Obligation resulting from, among other things, the imposition of the automatic stay, the priming of their Liens by the DIP Liens and the use of such collateral during the Cases and will be granted replacement liens, subject to the DIP Liens and the Carve-Out as set forth in the Orders; and

(b)     the First Lien Agent shall receive in cash an amount equal to all of its accrued but unpaid reasonable and documented fees and expenses (including all reasonable costs and expenses of professionals engaged by the First Lien Agent) for which an invoice was delivered to the Debtors, regardless of whether such amounts accrued prior to the Petition Date and all without further motion, fee application or order of the Bankruptcy Court.

# ARTICLE 3

# REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to the Administrative Agent, the Collateral Agent, and each of the Lenders that:

Section 3.01.    Organization; Powers.  Parent, Borrower and each of the Subsidiaries (a) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, (b) subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), has all requisite power and authority, and the legal right, to own and operate its property and assets, to lease the property it operates as lessee and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required except to the extent that any such failure to qualify or be in good standing could not reasonably be expected to have a Material Adverse Effect, and (d) subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), has the power and authority, and the legal right, to execute, deliver and perform its obligations under this Agreement and each of the other Loan Documents to which it is a party, including to borrow hereunder and to grant the Liens contemplated to be granted by it under the Security Documents.

Section 3.02.    Authorization; No Conflicts.  Subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), the Transactions (a) have been duly authorized by all requisite corporate, partnership or limited liability company and, if required, stockholder, partner or member action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation in any material respect, or of the certificate or articles of incorporation or other constitutive documents or by-laws of Parent, Borrower or any Subsidiary, (B) any order of any Governmental Authority or arbitrator in any material respect or (C) any provision of any indenture, agreement or other instrument in excess of $250,000 to which Parent, Borrower or any Subsidiary is a party or by which any of them entered into or assumed after the Petition Date, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument in excess of $250,000 entered into or assumed after the Petition Date in a material respect or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Parent, Borrower or any Subsidiary (other than Liens created under the Loan Documents, the Orders or Liens permitted hereunder).

Section 3.03.    Enforceability.  Subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), this Agreement has been duly executed and delivered by Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms and the Orders.

Section 3.04.    Governmental Approvals.  Other than the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable) no action, consent or approval of, registration or filing with, Permit from, notice to, or any other action by, any Governmental Authority is or will be required in connection with the

Transactions, except for such as have been made or obtained and are in full force and effect.

Section 3.05. <u>Financial Statements.</u>The Borrower has furnished to the Lenders: (a) its final draft consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and each of the Subsidiaries as of December 31, 2008 and the results of its operations and the operations of the Subsidiaries, together with comparative figures for the immediately preceding fiscal year, audited by McGladrey & Pullen; (b) its quarterly consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and each of the Subsidiaries as of June 30, 2009 and the results of its operations and the operations of the Subsidiaries during such fiscal quarter and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, all certified by one of its Financial Officers as fairly presenting the financial condition and results of operations of the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes; (c) its consolidated balance sheet and related statements of income and cash flows showing the financial condition of the Borrower and each of the Subsidiaries as of August 31, 2009 and the then elapsed portion of the fiscal year, all certified by one of its Financial Officers as fairly presenting the financial condition and results of operations of the Borrower and the Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes; and (d) the Initial Budget.  Such financial statements described in clauses (a) – (c) present fairly in all material respects the financial position and results of operations and cash flows of Parent, Borrower and each of the Subsidiaries as of such dates and for such periods.  Such balance sheets and the notes thereto described in clauses (a) – (c) disclose all material liabilities, direct or contingent, of Parent, Borrower and each of the Subsidiaries as of the dates thereof.  Such financial statements described in clauses (a) – (c) were prepared in accordance with GAAP applied on a consistent basis, subject to normal year-end audit adjustments and the absence of footnotes.

Section 3.06. <u>No Material Adverse Change</u>.  No event, change or condition has occurred since December 31, 2008 that has caused, or could reasonably be expected to cause, a Material Adverse Effect other than (i) events, changes or conditions that ordinarily would occur in connection with a filing under chapter 11 of the Bankruptcy Code and (ii) events, changes or conditions which precipitated the filing of the Cases.

Section 3.07. <u>Title to Properties; Possession Under Leases</u>. (a)  Parent, Borrower and each of the Subsidiaries has good and marketable title to, or valid leasehold interests in, all material properties and assets (including all Real Property) necessary to the conduct of its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and Liens permitted by Section 6.02.

(b)     Parent, Borrower and each of the Subsidiaries, and, to the knowledge of the Borrower, each other party thereto, has complied with all material obligations under all material leases entered into or assumed after the Petition Date to which it is a party and all such leases are legal, valid, binding and in full force and effect and are enforceable in accordance with their terms. Parent, Borrower and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases.

(c)     None of Parent, Borrower or any of the Subsidiaries has received any notice of, nor has any knowledge of, any pending or contemplated condemnation proceeding affecting the Real Properties or any sale or disposition thereof in lieu of condemnation.

(d)     None of Parent, Borrower or any of the Subsidiaries is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Real Property or any interest therein.

Section 3.08.     Subsidiaries.  Schedule 3.08 sets forth as of the Closing Date a list of the Parent's, Borrower's and each Subsidiary's (a) exact legal name (as reflected in such entity's certificate or articles of incorporation or other constitutive documents), (b) jurisdiction of incorporation or formation, (c) the percentage ownership interest of any party therein, and (d) identifies each entity that is a Loan Party. The shares of capital stock or other Equity Interests so indicated on Schedule 3.08 are fully paid and non-assessable and are owned by the applicable entity so indicated free and clear of all Liens (other than Liens created under the Security Documents, the Orders and the Liens permitted hereunder).

Section 3.09.     Litigation; Compliance with Laws.  (a)  There are no actions, suits or proceedings at law or in equity or by or before any arbitrator or Governmental Authority now pending or, to the knowledge of the Borrower, threatened against or affecting the Parent, Borrower or any Subsidiary or any business, property or rights of any such person (i) that involve any Loan Document or, as of the Closing Date, the Transactions or (ii) except for actions, suits or proceedings which (y) would reasonably be expected to result in a judgment against the loan parties in the amount of at least $100,000 or (z) are as set forth on Schedule 3.09.

(b)     Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 3.09 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

(c)     None of the Parent, Borrower or any of the Subsidiaries or any of their respective material properties or assets are in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or any restrictions of record

or agreements affecting a Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default, individually or in the aggregate, (i) could reasonably be expected to result in a Material Adverse Effect and (ii) is not stayed.

Section 3.10.   <u>Agreements</u>.  Except as set forth on <u>Schedule 3.10</u>, none of Parent, Borrower or any of the Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing material Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are bound, in any case, that was entered into, incurred or assumed after the Petition Date.

Section 3.11.   <u>Federal Reserve Regulations</u>.  (a)  None of Parent, Borrower or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)     No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for purchasing or carrying Margin Stock or for the purpose of purchasing, carrying or trading in any securities under such circumstances as to involve the Borrower in a violation of Regulation X or to involve any broker or dealer in a violation of Regulation T.  Following the application of the proceeds of the Loans, Margin Stock will not constitute more than 25% of the value of the assets of the Parent, Borrower and the Subsidiaries.  If reasonably requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in Regulation U.

Section 3.12.   <u>Investment Company Act</u>.  None of Parent, Borrower or any of the Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.13.   <u>Use of Proceeds</u>.  The Borrower will use the proceeds of the Loans solely for the payment of (i) post-petition operating expenses, general corporate purposes and other working capital and financing requirements of the Borrower and the Subsidiaries, and certain fees, costs and expenses of advisors, consultants, counsel and other professionals retained by the Borrower, (ii) certain fees, costs and expenses associated with this Agreement, (iii) certain other costs and expenses of administration of the Cases, and (iv) amounts specified in the first day motions filed with the Bankruptcy Court, in each of (i) – (iv), only to the extent specified in the Budget and variances permitted under Section 5.12.  Notwithstanding the foregoing, no portion of the proceeds of the Loans except as provided in the Orders may be used by the Borrower or the Guarantors to challenge the validity, perfection, priority, extent, or enforceability of the First Lien Credit Documents, or the Liens securing the obligations of the Parent, Borrower or any Subsidiary under the First Lien Credit Agreement.  In the event an

official committee of unsecured creditors is appointed in the Cases (the "Committee"), such Committee shall be permitted to use not more than $50,000 of the proceeds of the Loans to investigate validity, perfection, priority, extent, or enforceability of the obligations under the First Lien Credit Documents, or the liens or security interests securing the obligations under the First Lien Credit Documents but no such amounts shall be used to challenge any such liens or security interests.

Section 3.14.    Tax Returns.  Each of Parent, Borrower and each of the Subsidiaries has timely filed or timely caused to be filed all Federal and state income Tax returns and other material Tax returns required to have been filed by it and all such Tax returns are correct and complete in all material respects.  Each of Parent, Borrower and each of the Subsidiaries has timely paid or caused to be timely paid all Federal income Taxes and all other material Taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which the Parent, the Borrower or such Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP.  Each of Parent, Borrower and each of the Subsidiaries has made adequate provision in accordance with GAAP for all Taxes not yet due and payable.  None of Parent, Borrower or any of the Subsidiaries (a) intends to treat the Loans or any of the transactions contemplated by any Loan Document as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4) (b) is aware of any facts or events that would result in such treatment, or (c) has ever "participated" in a "listed transaction" (within the meaning of Treasury Regulation Section 1.6011-4).  Neither the Borrower nor any of the Subsidiaries is party to any Tax sharing agreement with any Person other than the Parent, the Borrower or one or more of its Subsidiaries.

Section 3.15.    No Material Misstatements.  None of the information, report, financial statement, exhibit or schedule furnished by or on behalf of Parent, Borrower or any Subsidiary to the Administrative Agent or any Lender for use in connection with the Transactions or in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto (as modified or supplemented by other information so furnished), taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, Borrower represents only that it acted in good faith and utilized reasonable assumptions in light of the conditions existing at the time of preparation; *provided, further*, that no representation is made with respect to information of a general economic or industry specific nature.

Section 3.16.    Employee Benefit Plans.  (a) Except as set forth on Schedule 3.16(i), Parent, Borrower and each of its ERISA Affiliates is in compliance with the applicable provisions of ERISA and the Tax Code and the regulations and published interpretations thereunder except to the extent the failure to so comply could not reasonably be expected to (i) result in a liability of more than $100,000 and (ii) no

ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in a liability of more than $100,000 to the Parent, Borrower or any of their ERISA Affiliates. The present value of all benefit liabilities under each Benefit Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the last annual valuation date applicable thereto, exceed by more than $100,000 the fair market value of the assets of such Benefit Plan, and the present value of all benefit liabilities of all underfunded Benefit Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the last annual valuation dates applicable thereto, exceed by more than $100,000 the fair market value of the assets of all such underfunded Benefit Plans.

(b)     Each Foreign Pension Plan of the Parent, Borrower or any Subsidiary is in compliance in all material respects with all requirements of law applicable thereto and the respective requirements of the governing documents for such plan. With respect to each Foreign Pension Plan, none of Parent, Borrower, any Subsidiary or any of their Affiliates or any of their respective directors, officers, employees or agents has engaged in a transaction which would subject Parent, Borrower or any Subsidiary, directly or indirectly, to a tax or civil penalty which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. With respect to each Foreign Pension Plan, reserves have been established in the financial statements furnished to Lenders in respect of any unfunded liabilities in accordance with applicable law and prudent business practice or, where required, in accordance with ordinary accounting practices in the jurisdiction in which such Foreign Pension Plan is maintained. The aggregate unfunded liabilities with respect to such Foreign Pension Plans could not reasonably be expected to result in a Material Adverse Effect.

Section 3.17.    Environmental Matters. (a) Except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, neither Parent, Borrower nor the Subsidiaries:

(i)     has failed to comply with any applicable Environmental Law, and Parent, Borrower and the Subsidiaries are currently in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining, renewing and complying with any Environmental Permit, and all such Environmental Permits are in full force and effect and not subject to any administrative or judicial appeal;

(ii)    is a party to any governmental, administrative or judicial proceeding or possesses knowledge of any such proceeding that has been threatened under applicable Environmental Law;

(iii)   has received notice of, become subject to, or is aware of any facts or circumstances that could form the basis for, any Environmental

Liability other than those which have been fully and finally resolved and for which no obligations remain outstanding;

        (iv)    possesses knowledge that any Mortgaged Property (A) is subject to any Lien, restriction on ownership, occupancy, use or transferability imposed pursuant to Environmental Law or (B) contains or previously contained Hazardous Materials of a form or type or in a quantity or location that could reasonably be expected to result in any Environmental Liability;

        (v)    possesses knowledge that there has been a Release or threat of Release of Hazardous Materials at or from the Mortgaged Properties (or from any facilities or other properties formerly owned, leased or operated by Parent, the Borrower or any of the Subsidiaries) in violation of, or in amounts or in a manner that could give rise to liability under, any applicable Environmental Law;

        (vi)    has generated, treated, stored, transported, or Released Hazardous Materials from the Mortgaged Properties (or from any facilities or other properties formerly owned, leased or operated by Parent, the Borrower or any of the Subsidiaries) in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law;

        (vii)    is aware of any facts, circumstances, conditions or occurrences in respect of any of the facilities and properties owned, leased or operated that could (A) form the basis of any action, suit, claim or other judicial or administrative proceeding relating to liability under or noncompliance with Environmental Law on the part of Parent, the Borrower or any of the Subsidiaries or (B) interfere with or prevent continued compliance with Environmental Laws by Parent, the Borrower or the Subsidiaries; or

        (viii)    has pursuant to any order, decree, judgment or agreement by which it is bound or has assumed the Environmental Liability for any Person.

        (b)    Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 3.17 that, individually or in the aggregate, has resulted in, or would reasonably be expected to result in, a Material Adverse Effect.

        Section 3.18.    Insurance.  Schedule 3.18 sets forth a true, complete and correct description of all insurance maintained by or on behalf of the Borrower and the Subsidiaries as of the Closing Date. As of the Closing Date, such insurance is in full force and effect and all premiums have been duly paid. The Borrower and the Subsidiaries are insured by financially sound and reputable insurers and such insurance is in such amounts and covering such risks and liabilities (and with such deductibles, retentions and exclusions) as is reasonable and customary for companies in the same or similar businesses operating in the same or similar locations. Except as could not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or

any of the Subsidiaries has received notice from any insurer (or any agent thereof) that substantial capital improvements or other substantial expenditures will have to be made in order to continue such insurance.

Section 3.19. Security Documents. Subject to the entry of the Interim Order (and when applicable, the Final Order), the execution and delivery of the Security Documents (including those Security Documents delivered pursuant to Sections 5.09 and 5.10) by the parties hereto are effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in the Collateral described in, and having the priority set forth in, Section 2.22.

Section 3.20. Location of Real Property. Schedule 3.20 lists completely and correctly as of the Closing Date all Real Property and the addresses thereof, indicating for each parcel whether it is owned or leased, including in the case of leased Real Property, the landlord name, lease date and lease expiration date.

Section 3.21. Labor Matters. As of the Closing Date, there are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened. Except as could not reasonably be expected to result in a Material Adverse Effect, the hours worked by and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. All payments due from the Parent, Borrower or any Subsidiary, or for which any claim may be made against the Parent, Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Parent, Borrower or such Subsidiary. The consummation of the Transactions (other than the filing of the Cases) will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Parent, Borrower or any Subsidiary is bound.

Section 3.22. Liens. There are no Liens of any nature whatsoever on any of the properties or assets of Parent, Borrower or any of the Subsidiaries (other than Liens expressly permitted by Section 6.02).

Section 3.23. Intellectual Property. Parent, Borrower and each of the Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by the Borrower and, the Subsidiaries does not infringe upon the rights of any other person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.24. First Lien Obligations. The Borrower hereby acknowledges, confirms and agrees that, as of the date hereof, the Borrower is indebted to the First Lien Lenders in respect of First Lien Obligations in the aggregate amount of not less than $185,305,011, consisting of $182,952,440 of principal together with interest

accrued and accruing thereon, together with other charges now or hereafter owed by the Borrower to the First Lien Lenders without offset, defense or counterclaim of any kind, nature and description whatsoever.

Section 3.25. Permits. Except for Permits the failure of which to obtain, hold or maintain in full force and effect, and such events, restrictions, renewals and government actions, as could not reasonably be expected to have a Material Adverse Effect with respect to Parent, Borrower or any Subsidiary, (a) each of Parent, Borrower and each Subsidiary has obtained and hold all Permits required for the operation of their businesses as presently conducted, (b) all such Permits are in full force and effect, and Parent, Borrower and each of the Subsidiaries have performed and observed all requirements of such Permits, (c) no event has occurred that allows or results in, or after notice or lapse of time would allow or result in, revocation or termination by the issuer thereof or in any other impairment of the rights of the holder of any such Permit, (d) no such Permits contain any restrictions, either individually or in the aggregate, that are materially burdensome to Parent, Borrower or any Subsidiary, or to the operation of any of their respective businesses or any property owned, leased or otherwise operated by such person, (e) Parent, Borrower and each Subsidiary reasonably believes that each of its Permits will be timely renewed and complied with and that any additional Permits that may be required of such person will be timely obtained and complied with and (f) the Loan Parties have no knowledge or reason to believe that any Governmental Authority is considering limiting, suspending, revoking or renewing on materially burdensome terms any such Permit.

Section 3.26. Foreign Corrupt Practices Act. Parent, Borrower, the any Subsidiary, and any of their respective directors and officers or, to the knowledge of Parent, Borrower or any Subsidiary, any agent, employee or other person acting on behalf of the Parent, Borrower or any Subsidiary, have not, in the course of their actions for, or on behalf of, the Parent, Borrower or any Subsidiary (a) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended (15 U.S.C. §§ 78dd-1, *et seq.*); or (d) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

# ARTICLE 4

## CONDITIONS OF LENDING

The obligations of the Lenders to make Loans are subject to the satisfaction of the following conditions:

Section 4.01.    All Credit Events.  On the date of each Borrowing (each such event being called a "Credit Event"):

(a)    The Administrative Agent shall have received a notice of such Borrowing as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03).

(b)    The representations and warranties set forth in each Loan Document shall be true and correct in all material respects on and as of the date of such Credit Event with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

(c)    At the time of and immediately after giving effect to such Credit Event, no Event of Default or Default shall have occurred and be continuing.

(d)    At the time of such Credit Event, either (i) the Interim Order shall be in full force and effect or (ii) if (A) the date of such requested extension of credit is more than 30 days after the date of the entry of the Interim Order or (B) the amount of such requested extension of credit, together with the amount of all extensions of credit then outstanding, shall exceed the maximum amount authorized pursuant to the Interim Order (but in compliance with Section 2.01), the Final Order shall have been entered.

Each Credit Event shall be deemed to constitute a representation and warranty by the Borrower on the date of such Credit Event as to the matters specified in paragraphs (b), (c) and (d) of this Section 4.01.

Section 4.02.    First Credit Event.  On or prior to the Closing Date:

(a)    The Administrative Agent shall have received, in a form reasonably acceptable to the Administrative Agent, on behalf of itself and the Lenders, a written opinion of Kirkland & Ellis LLP, counsel for the Loan Parties.

(b)    The Administrative Agent shall have received (i) a copy of the certificate or articles of incorporation or other formation documents, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing of each

Loan Party as of a recent date, from such Secretary of State (to the extent available under local law); (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws (or other governing documents) of such Loan Party as in effect on the Closing Date and at the time of the resolutions described in clause (B) below; (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors (or other governing body) of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which it is a party, in the case of the Borrower, the borrowings hereunder, in the case of each Loan Party, the granting of the Liens contemplated to be granted by it under the Security Documents and the guaranteeing of the Obligations and related transactions, in the case of each of the Sellers, authorizing the 363 Sale contemplated by the Asset Purchase Agreement and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation or other formation documents of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate furnished pursuant to clause (i) above and (D) as to the incumbency and signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; (iii) certification by another officer as to the incumbency and signature of the Secretary or Assistant Secretary executing the certificate pursuant to (ii) above; and (iv) any such other documents as the Administrative Agent or the Lenders may reasonably request.

(c)     The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (b) and (c) of Section 4.01.

(d)     The Administrative Agent shall have received (i) this Agreement, executed and delivered by a duly authorized officer of each the Borrower, Guarantor and by each Lender, (ii) the Share Charges duly authorized and delivered by the relevant Loan Party and any deliverables required thereunder if requested by any Lender pursuant to Section 2.04(e), a promissory note or notes conforming to the requirements of such Section and executed and delivered by a duly authorized officer of the Borrower.

(e)     The Collateral Agent, for the ratable benefit of the Secured Parties, shall have been granted, on the Closing Date, First Priority perfected Liens on the Collateral (subject only to Liens expressly permitted by Section 6.02 and subject to the terms of Section 2.22), and certificates or instruments representing and certificated Equity Interest or instruments accompanied by instruments of transfer and if applicable stock powers endorsed in blank, shall be in the possession of the Collateral Agent.

(f)     The Administrative Agent shall have received complete and accurate Schedules to this Agreement that are acceptable to the Required Lenders in their sole discretion.

(g)     There shall be no litigation, governmental, administrative or judicial action, actual or threatened, that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby.

(h)     The Administrative Agent and each Lender shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(i)     All fees, disbursements and other charges incurred by Weil, Gotshal & Manges LLP, that are invoiced, due, owing and payable on or prior to the Closing Date.

(j)     The Agent shall have received payment of all Fees and other amounts due and payable on the Closing Date.

(k)     The Administrative Agent shall have received (i) evidence that insurance required by Section 5.02 is in effect including the receipt of the insurance certificates in a form reasonably satisfactory to the Administrative Agent naming the Collateral Agent as the loss payee for the benefit of the Secured Parties, their successors and assigns and (ii) such other evidence of insurance upon the reasonable request of the Administrative Agent or the Required Lenders.

(l)     The Administrative Agent and the Required Lenders shall have received, and the Required Lenders shall have approved, the Initial Budget.

(m)     The Administrative Agent shall have received evidence satisfactory to the Required Lenders in their reasonable discretion of the entry of the Interim Order (i) approving the Loan Documents and (ii) granting the Superpriority Claim status and senior priming and other Liens described in Section 2.22.

(n)     All "first day orders," including, without limitation, all employee related orders and critical vendor orders entered at or about the time of the commencement of the chapter 11 case, will be in form and substances reasonably satisfactory to the Administrative Agent.

## ARTICLE 5

## AFFIRMATIVE COVENANTS

Each of the Loan Parties covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, each of the Loan Parties will, and will cause each of the Subsidiaries to:

Section 5.01.     Existence; Businesses and Properties.  (a)  Except as occasioned by the Cases, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05.

(b)     Except to the extent failure to do so could not reasonably be expected to have a Material Adverse Effect or would violate the Order, (i) do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names used in the conduct of its business; (ii) comply with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted; (iii) comply with the terms of, and enforce its rights under, each lease of real property and each other agreement so as to not permit any uncured default on its part to exist thereunder; and (iv) at all times maintain and preserve all of its property and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times.

Section 5.02.     Insurance.  Keep its insurable properties adequately insured at all times by financially sound and reputable insurers to such extent and against such risks (and with such deductibles, retentions and exclusions), including fire and other risks insured against by extended coverage, as is reasonable and customary for companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; maintain such other insurance as may be required by law; and maintain such other insurance as otherwise required by the Security Documents (and comply with all covenants in the Security Documents with respect thereto).

Section 5.03.     Obligations and Taxes.  Except to the extent otherwise required by the Order, (a) pay its Material Indebtedness and other material obligations arising after the Petition Date that are approved by the Bankruptcy Court and provided in the Budget promptly and in accordance with their terms; (b) timely file (after giving effect to any valid extensions of time in which to file such filings) all of its Tax returns and (c) pay and discharge promptly when due all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, arising after the Petition Date before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, would reasonably be expected to give rise to a Lien (other than a Lien permitted under Section 6.02) upon such properties or any part thereof; *provided, however,* that such payment and discharge shall not be required with respect to any such material Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Borrower or the

applicable Subsidiary shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP.

Section 5.04.    Financial Statements, Reports, Etc.  In the case of the Borrower, furnish to the Administrative Agent for distribution to each Lender:

(a)    within 120 days after the end of each fiscal year, its consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal year and the results of its operations and the operations of such Subsidiaries during such year, together with comparative figures for the immediately preceding fiscal year, all audited by McGladrey & Pullen, LLP or other independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which shall not be qualified in any material respect) to the effect that such consolidated financial statements fairly present the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)    within 45 days after the end of each of the first three fiscal quarters of each fiscal year, commencing with the fiscal quarter ending September 30, 2009, its consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal quarter and the results of its operations and the operations of such Subsidiaries during such fiscal quarter and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, all certified by one of its Financial Officers as fairly presenting the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    within 30 days after the end of the first two fiscal months of each fiscal quarter, its consolidated balance sheet and related statements of income and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries during such fiscal month and the then elapsed portion of the fiscal year, all certified by one of its Financial Officers as fairly presenting the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(d)    concurrently with any delivery of financial statements under paragraph (a) or (b) above, a certificate of the Financial Officer certifying such statements (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(e)     concurrently with any delivery of financial statements under paragraph (a) above, a certificate of the accounting firm that reported on such financial statements stating whether obtained knowledge during the course of their examination of such financial statements of any Event of Default or Default (which certificate may be limited to the extent required by generally accepted accounting rules or guidelines and may clarify that such examination was not undertaken for the purpose of discovering any Event of Default or Default) to the extent available;

(f)     (i) On the date hereof the Initial Budget and on the date that is 50 days after the Petition Date, the Second Budget, (ii) ten (10) days prior to the last day of the Second Budget, the Updated Budget for the 60 day period following the end of the Second Budget, and (iii) ten (10) days prior to the end of the period covered by the then current Updated Budget, the succeeding Updated Budget for the 60 day period following the end of the then current Updated Budget.

(g)     promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by Parent, Borrower or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to its public shareholders, as the case may be;

(h)     promptly after the receipt thereof by Parent, Borrower or any of the Subsidiaries, a copy of any "management letter" received by any such person from its certified public accountants in connection with any audit and the management's response thereto;

(i)     as soon as possible, and in any event when the Loan Parties' statement of financial affairs and schedules of assets and liabilities are required to be filed with the Bankruptcy Court (but no later than 30 days after the Petition Date or such later date as approved by the Bankruptcy Court), a consolidated *pro forma* balance sheet of the Borrower's financial condition as of the Petition Date;

(j)     copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Debtors to any official committee appointed in the Cases;

(k)     promptly and in any event no later than 6:00 p.m. (New York City time) each Wednesday, an updated Weekly Budget and commencing on October 14, 2009, a weekly reconciliation of the actual results (including, but not limited to, cash balances) for the immediately preceding week period to the Initial Budget, Second Budget, or Updated Budget, as applicable for such immediately preceding week period and a detailed explanation of all material variances therefrom.

(l)     no later than 30 days after the end of each calendar month, a list of all professional fees and related expenses incurred by Parent, the Borrower and the Subsidiaries during the preceding month;

(m)     prompt notice of any of the following: (i) changes to any material customer contracts; (ii) material changes to any labor agreement; (iii) changes in personnel constituting executive management, and (iv) any event that has or could reasonably be expected to result in a Material Adverse Effect with respect to any Debtor;

(n)     promptly provide any other information regarding (i) the operations, business affairs, or financial condition of Parent, Borrower and the Subsidiaries, (ii) compliance with the terms of any material contract entered into or assumed after the Petition and (iii) information and updates regarding the achievement or progress towards the Milestones as the Administrative Agent or any Lender (requesting through the Administrative Agent) may reasonably request other than 363 Proprietary Information;

(o)     promptly provide all written materials and documents to which the Purchaser is entitled to receive pursuant to the bidding procedures as approved by the Bankruptcy Court in connection with the Sales Procedures Motion; and

(p)     cooperate with the Lenders' legal and financial advisors and promptly provide all information reasonably requested by the Lenders' legal and financial advisors with respect to the Parent, Borrower or any Subsidiary, and/or the 363 Sale other than 363 Proprietary Information and cause Borrower's financial advisors to meet in-person or telephonically with the Lenders' financial advisors or the Lenders no less than on a weekly basis.

Section 5.05.     Litigation and Other Notices.  Furnish to the Administrative Agent and each Lender, prompt written notice of the following:

(a)     any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)     the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any arbitrator or Governmental Authority, against Parent, Borrower or any Subsidiary that could reasonably be expected to result in a Material Adverse Effect; and

(c)     the occurrence of any ERISA Event described in clause (b) of the definition thereof or any other ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of Parent, the Borrower and the Subsidiaries in an aggregate amount exceeding $250,000.

Section 5.06.    Information Regarding Collateral. Furnish to each of the Administrative Agent and the Collateral Agent prompt written notice of any change in any Loan Party's (a) corporate name, (b) jurisdiction of organization or any office in which it maintains books or records relating to Collateral owned by it, (c) identity or corporate structure or (d) Organizational Identification Number. Borrower agrees promptly to notify each of the Administrative Agent and the Collateral Agent if any material portion of the Collateral is damaged or destroyed.

Section 5.07.    Maintaining Records; Access to Properties and Inspections; Environmental Assessments. (a) Keep proper books of record and account in which materially full, true and correct entries in conformity with GAAP are made of all material dealings and transactions in relation to its business and activities. Parent, Borrower and each of the Subsidiaries will permit any representatives designated by the Administrative Agent or any Lender to visit and inspect their respective financial records and properties at reasonable times during normal business hours on reasonable notice and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances and condition of the Borrower or any of its subsidiaries with the officers thereof and independent accountants therefore; *provided* that (i) any such visit or inspection shall be coordinated through the Administrative Agent, and (ii) in respect of any such discussions with any independent accountants, the Borrower or such subsidiary, as the case may be, shall have received reasonable advance notice thereof and a reasonable opportunity to participate therein.

(b)    At its election, the Administrative Agent or any Lender may, at its own cost and expense, retain an independent engineer or environmental consultant to conduct an environmental assessment of any Mortgaged Property or facility of any Loan Party. Parent, Borrower and each Subsidiary shall cooperate in the performance of any such environmental assessment and permit any such engineer or consultant designated by the Administrative Agent or such Lender to have reasonable access to each property or facility at reasonable times and after reasonable notice to the Borrower of the plans to conduct such an environmental assessment. Environmental assessments conducted under this paragraph shall be limited to visual inspections of the Mortgaged Property or facility, interviews with representatives of the Borrower or facility personnel, and review of applicable records and documents pertaining to the property or facility and shall be undertaken no more than once each calendar year in the absence of the occurrence and continuance of an Event of Default.

(c)    In the event that the Administrative Agent or any Lender shall have reason to believe that Hazardous Materials have been Released or are threatened to be Released on or from any Mortgaged Property or other facility of the Parent, Borrower or the Subsidiaries or that any such property or facility is not being operated in compliance with applicable Environmental Law, the Administrative Agent may, at its election and after reasonable notice to the Borrower, retain an independent engineer or other qualified environmental consultant to evaluate whether Hazardous Materials are present in the soil, groundwater, or surface water at such Mortgaged Property or

facility or whether the facilities or properties are being operated and maintained in compliance with applicable Environmental Laws; *provided* that neither the Administrative Agent nor any Lender shall have any rights hereunder unless such Hazardous Materials or violations of Environmental Laws could reasonably be expected to result in a material liability to any Loan Party. Such environmental assessments may include detailed visual inspections of the Mortgaged Property or facility, including any and all storage areas, storage tanks, drains, dry wells and leaching areas, and the taking of soil samples, surface water samples and groundwater samples as well as such other reasonable investigations or analyses as are necessary; *provided* such is not prohibited by applicable law. The scope of any such environmental assessments under this paragraph shall be reasonable in scope to address the perceived presence of Hazardous Materials or violations of Environmental Laws as determined in the reasonable discretion of the Required Lenders. Parent, Borrower and each of the Subsidiaries shall cooperate in the performance of any such environmental assessment and permit any such engineer or consultant designated by the Required Lenders to have reasonable access to each property or facility at reasonable times and after reasonable notice to the Borrower of the plans to conduct such an environmental assessment. All environmental assessments conducted pursuant to this paragraph shall be at the Borrower's sole cost and expense and shall be conducted by a qualified environmental professional possessing reasonable levels of insurance.

Section 5.08.    Use of Proceeds.  Use the proceeds of the Loans only for the purposes set forth in Section 3.13.

Section 5.09.    Additional Collateral, Etc.  (a)  With respect to any Collateral acquired after the Closing Date or, in the case of inventory or equipment (other than inventory or equipment in transit), any material Collateral moved after the Closing Date by the Borrower or any other Loan Party (other than any Collateral described in paragraphs (b), (c) or (d) of this Section) which is not subject to the Liens created hereby or by any of the Security Documents or the Orders, promptly (and, in any event, within 10 days following the date of such acquisition or move or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent and the Collateral Agent such additional documents and amendments to the Security Documents as are necessary or that the Collateral Agent may deem advisable in their sole discretion to grant to the Collateral Agent, for the benefit of the Secured Parties, a Lien in such Collateral (having the priority set forth in Section 2.22) and (ii) take all actions necessary or that the Collateral Agent or the Required Lenders may deem advisable to grant to, or continue on behalf of, the Collateral Agent, for the benefit of the Secured Parties, a Lien (having the priority set forth in Section 2.22).

(b)      With respect to any fee interest in any Collateral consisting of Real Property having a fair market value of at least $100,000 acquired after the Closing Date by the Borrower or any other Loan Party, promptly (and, in any event, within 30 days following the date of such acquisition or such longer period as agreed by the Administrative Agent) (i) execute and deliver a Mortgage in favor of the

Collateral Agent, for the benefit of the Secured Parties, covering such real property and complying with the provisions herein and in the Security Documents, (ii) to the extent reasonably requested by the Administrative Agent, provide the Secured Parties with title and extended coverage insurance in an amount at least equal to the purchase price of such Real Property (or such other amount as the Administrative Agent shall reasonably specify), copies of existing as-built surveys, and if applicable, flood insurance, (iii) if requested by the Administrative Agent, deliver to the Administrative Agent and the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent and the Collateral Agent and (iv) deliver to the Administrative Agent a notice identifying, and upon the Administrative Agent's request, provide a copy of, the consultant's reports, environmental site assessments or other documents, if any, relied upon by the Borrower to determine that any such real property included in such Collateral does not contain Hazardous Materials of a form or type or in a quantity or location that could reasonably be expected to result in a material Environmental Liability.

(c)     With respect to any Subsidiary created or acquired after the Closing Date by the Borrower or any other Loan Party, promptly (and, in any event, within 30 days following such creation or the date of such acquisition or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent and the Collateral Agent such additional documents and amendments to the Security Documents as the Administrative Agent or the Collateral Agent deems necessary or advisable in its discretion to grant to the Collateral Agent, for the benefit of the Secured Parties, a valid, perfected first priority security interest in the Equity Interests in such new Subsidiary that are owned by the Borrower or any other Loan Party, (ii) deliver to the Collateral Agent the certificates, if any, representing such Equity Interests, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower or such other Loan Party, as the case may be, (iii) cause such new Subsidiary (A) to become a party to this Agreement and/or enter into such other documents as determined by the Administrative Agent in its sole discretion to be required to provide a guaranty of the Obligations (including the Intellectual Property Security Agreements, if applicable), and (B) to take such actions necessary or that the Collateral Agent may deem advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a Lien having the priority set forth in Section 2.22, and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent and the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent and the Collateral Agent.

(d)     Within 10 days after a request by the Collateral Agent (or such further time as the Collateral Agent in its sole discretion may grant), execute and deliver, or cause to be executed and delivered, one or more control agreements reasonably satisfactory in form and substance to the Collateral Agent that provides the Collateral Agent to have "control" (as defined in the New York UCC) over the funds

or investments in any deposit accounts and securities accounts located in the United States of the Loan Parties which are the subject of such request.

Section 5.10. <u>Further Assurances</u>. From time to time duly authorize, execute and deliver, or cause to be duly authorized, executed and delivered, such additional instruments, certificates, financing statements, agreements or documents, and take all such actions (including filing UCC and other financing statements), as the Administrative Agent, or the Collateral Agent or the Required Lenders may reasonably request, for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or documenting (other than the Orders) perfecting or renewing the rights of the Administrative Agent, the Collateral Agent and the Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by Parent, the Borrower or any Subsidiary which may be deemed to be part of the Collateral), the Security Documents and the Orders. Upon the exercise by the Administrative Agent, the Collateral Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, Parent, Borrower and each Subsidiary will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent, the Collateral Agent or such Lender may be required to obtain from Parent, the Borrower or any of the Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

Section 5.11. <u>Accounts</u>. All payments received, cash or other receipts received by the Debtors shall be deposited into accounts in which the Collateral Agent has a first priority perfected Lien and the Borrower shall and shall cause its Subsidiaries to comply in all respects with the cash management order forming a part of the first day orders.

Section 5.12. <u>Budget</u>. (a)Make all payments, incur expenses and all cash receipts received shall be in accordance with the then current Budget and such Budget will take into account all funds received by Borrower and each of the Subsidiaries from customer accounts or otherwise; *provided, however*, the Borrower shall be deemed to be in compliance with such Budget to the extent the (i) cumulative amount of all cash payments in respect of Indebtedness (including, interest, fees and principal) for any prior periods covered by such Budget (and including such week) does not exceed 110% of the aggregate amount provided therefor in such Budget, (ii) cumulative amount of cash payments in respect of professional fees for any prior period covered by such Budget (and including such week) does not exceed 110% of the aggregate amount provided therefor in such Budget, and (iii) the cumulative amount of net cash operating expenses (revenues) for any prior period covered by such Budget (including such week) does not exceed (in the case of net cash operating expenses) 110% of the aggregate amount provided therefor in such Budget or (in the case of net cash operating revenues) is at least 90% of the aggregate amount provided therefor in such Budget.

(b)     In the event that management of the Borrower determines it necessary to take any action or make any payment in an emergency situation, management will obtain the consent of the Required Lenders.

Section 5.13.    Post-Closing Items.  (a) The Borrower shall take all necessary actions to satisfy the requirements set forth on Schedule 5.13 within the applicable period set forth on such Schedule (and the Administrative Agent may, in its sole discretion, grant a one-time extension of time for each applicable time period, each such extension not to exceed (10) days and the Required Lenders, in their sole discretion, may grant any further extensions of each such applicable time periods).

(b)     Subject to the requirements of applicable local law, the Borrower will cause each of GSM Corporation and Questex Asia Limited to execute and deliver to the Administrative Agent a joinder in substantially in the form of Exhibit H or such other form as shall be approved by the Administrative Agent.  Upon the execution and delivery of such joinder, GSM Corporation and Questex Asia Limited shall, subject to the requirements of applicable local law, become a "Guarantor" hereunder with the same force and effect as if it were originally a party to this Agreement and named as a "Guarantor" hereunder.  The execution and delivery of such joinder shall not require the consent of any other Loan Party and the rights and obligations of each other Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any new party, including GSM Corporation and Questex Asia Limited, as a Guarantor as a party to this Agreement.

Section 5.14.    Milestones.  The Borrower shall consult with the Administrative Agent in connection with carrying out the Milestones, including providing the Administrative Agent with copies of the material documents prepared to achieve such Milestones in advance of their submission to the Bankruptcy Court.

## ARTICLE 6

## NEGATIVE COVENANTS

Each of the Loan Parties covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full, each of the Loan Parties will not, nor will it cause or permit any of the Subsidiaries to:

Section 6.01.    Indebtedness.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness that exist as of the date hereof and set forth in Schedule 6.01;

(b)     Indebtedness approved by the Required Lenders;

(c)     Indebtedness specified in the Budget (to the extent such Budget has been approved as provided in the definition thereof);

(d)     Indebtedness created hereunder, under the other Loan Documents and the Orders;

(e)     Indebtedness existing on the Petition Date that has not been assumed and the enforcement of which is stayed; and

(f)     Indebtedness under performance bonds or with respect to workers' compensation claims, in each case incurred in the ordinary course of business.

Section 6.02.     Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any person, including any Subsidiary) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except:

(a)     Liens on property or assets of the Borrower and the Subsidiaries existing on the date hereof and set forth in Schedule 6.02; *provided* that such Liens shall secure only those obligations which they secure on the date hereof and extensions, renewals and replacements thereof permitted hereunder;

(b)     Liens approved by the Required Lenders;

(c)     the adequate protection liens granted to the First Lien Lenders to the extent provided in Section 2.24 and Liens to the Second Lien Lenders, in the same collateral with the priority as provided in the Intercreditor Agreement (as defined in the First Lien Credit Agreement);

(d)     any Lien in favor of the Administrative Agent, Lenders or Collateral Agent created under the Loan Documents and the Orders;

(e)     Liens for Taxes (i) not yet due, (ii) which are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) that are not, either individually or in the aggregate, material;

(f)     statutory Liens of landlords, carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not overdue for a period of more than 30 days or which are being contested in compliance with Section 5.03;

(g)     zoning restrictions, easements, rights-of-way, restrictions on use of real property and other similar encumbrances and minor title defects affecting Real

Property which, in the aggregate, do not interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(h)     any interest or title of a lessor or sublessor under any lease entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and covering only the assets so leased;

(i)     Liens on cash deposits and other funds maintained with a depositary institution, in each case arising in the ordinary course of business by virtue of any statutory or common law provision relating to banker's liens; provided that (i) the applicable deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the Borrower or the Subsidiaries in excess of those set forth in regulations promulgated by the Board and (ii) the applicable deposit account is not intended by the Borrower or any of the Subsidiaries to provide collateral or security to the applicable depositary institution or any other person; and

(j)     leases, licenses, subleases or sublicenses in each case, granted to others in the ordinary course of business which do not interfere in any material respect with the business of the Borrower or any Subsidiary or secure any Indebtedness.

Section 6.03.     Sale and Lease-Back Transactions.  Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

Section 6.04.     Investments, Loans and Advances.  (a)  Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances or capital contributions to, or make or permit to exist any investment or any other interest in, any other person (all of the foregoing, "Investments"), except (i) Investments existing on the date hereof and set forth on Schedule 6.04;  (ii) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case, in the ordinary course of business; (iii) extensions of trade credit in the ordinary course of business; (iv) Investments in the ordinary course of business and consistent with the terms in the Budget; (v) Investments in Loan Parties other than Foreign Subsidiaries, (vi) Investments by Loan Parties in Foreign Subsidiaries in connection with cash management activities that are consistent in scope and nature with historic cash management activities of the Borrower and its Subsidiaries in amounts not to exceed $200,000 in the aggregate per month and (vii) Permitted Investments.

Section 6.05.     Mergers, Consolidations, Sales of Assets and Acquisitions.  (a)  Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or liquidate or dissolve, or sell, transfer, lease, issue or otherwise dispose of (in one transaction or in a series of transactions) all or any

substantial part of the assets (whether now owned or hereafter acquired) or the Equity Interests of any Loan Party, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person, except for (i) the purchase and sale by the Borrower or any Subsidiary of inventory in the ordinary course of business, or (ii) the sale or discount by the Borrower or any Subsidiary in each case without recourse and in the ordinary course of business of overdue accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing transaction).

Section 6.06.    Restricted Payments; Restrictive Agreements.  (a) Pay directly or indirectly any dividends or make any distributions on capital stock or with respect to any other interest or participation in, or measured by, its profits, or pay any indebtedness owed to Parent, Borrowers or any Subsidiary to holders of their capital stock; make loans or advances to the holders of Parent's capital stock; or sell, lease or transfer any of their properties or assets to Parent, Borrowers or any Subsidiaries or holders of their capital stock (i) without the approval of the Required Lenders or (ii) that are not contemplated by the Budget.

(b)    Enter into, incur or assume any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of Parent, Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (ii) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; *provided* that  the foregoing shall not apply to restrictions and conditions imposed by law, by any Loan Document, by the Orders, or in effect as of the date hereof.

Section 6.07.    Transactions with Affiliates.  Except for transactions by or among Loan Parties (other than transactions with Loan Parties that are Foreign Subsidiaries), sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except that (a) the Borrower or any Subsidiary may engage in any of the foregoing transactions in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions permitted under Section 6.04, and (c) transactions consented to by the Required Lenders and approved by the Bankruptcy Court pursuant to orders and acceptable to the Administrative Agent.

Section 6.08.    Business of Parent, Borrower and the Subsidiaries; Limitation on Hedging Agreements.  (a)  With respect to Parent, engage in any business activities or have any assets or liabilities other than (i) its ownership of the Equity Interests in the Borrower and activities and liabilities incidental thereto, including its liabilities pursuant to the Loan Documents and the "Loan Documents" (as defined in the First Lien Credit Agreement and the Second Lien Credit Agreement); (ii) owning cash

and Permitted Investments in immaterial amounts the sole purpose of paying general operating expenses of Parent; and (iii) its "Obligations" under and as defined in the Holdco Notes and the "Loan Documents" (as defined in the Holdco Notes).

(b) With respect to the Borrower and the Subsidiaries, engage at any time in any business or business activity other than the business conducted by it as of the date hereof and business activities reasonably incidental or related thereto.

(c) Enter into or be party to any Hedging Agreement other than any such agreement or arrangement set forth on Schedule 6.08.

Section 6.09. Pre-Petition Payments. (a) Make (i) any distribution, whether in cash, property, securities or a combination thereof, other than regular scheduled payments of principal and interest on Indebtedness permitted to be incurred hereunder as and when due (to the extent not prohibited by applicable subordination provisions), or pay, or offer or commit to pay, or directly or indirectly redeem, repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes Indebtedness assumed or incurred hereunder and incurred after the Petition Date (other than the Obligations), or (ii) Pre-Petition Payments; other than Pre-Petition Payments which are authorized by the Bankruptcy Court pursuant to authority granted by the Orders, the "first-day orders" or other orders in form and substance satisfactory to the Required Lenders in their sole discretion.

(b) Pay any management, consulting or similar fees to or any salary expense for executives, directors, officers or shareholders of Parent, Borrower or any Subsidiary, in any case by direct payment or otherwise or enter into any employment or consulting agreements with current management, shareholders or directors of Parent, Borrower or any Subsidiary, in any case, unless (a) contemplated by the Budget or (b) made with the prior written consent of the Required Lenders.

(c) Permit any waiver, supplement, modification, amendment or termination of any organizational document or any material agreement of Parent, the Borrower or any Subsidiary in a manner adverse to the Administrative Agent or the Lenders in any material respect.

(d) Without the prior written consent of the Required Lenders, (i) enter into any contract, term sheet, letter of intent or similar agreement for the actual or proposed sale, lease or disposition of any or all asset except (x) in the ordinary course of business and consistent with past practices and to the extent the same would not violate the Asset Purchase Agreement and (y) confidentiality and other agreements as necessary to conduct the auction contemplated by the Sales Procedures Motion or (ii) except as set forth on Schedule 6.09(d), enter into any material contract with any third party to supply any services or assets requiring payments exceeding $250,000 in the aggregate.

Section 6.10.    Minimum Liquidity Covenant.  Permit Liquidity as of each Budget Month-End to be less than 90% of the amount set forth in the relevant Budget for such Budget Month-End.

Section 6.11.    Case Matters.

(a)    Seek or consent to any modification, stay, vacation or amendment of the Orders without the consent of the Required Lenders;

(b)    Seek or consent to (i) any grant or imposition, or request that the Bankruptcy Court grant or impose, under Section 364 of the Bankruptcy Code or otherwise, Liens on the property of Parent, Borrower or any of the Subsidiaries, whether equal, superior, or subordinate, to the Liens created under the Loan Documents and the Orders on that property, except as expressly permitted by this Agreement, or (ii) any request of the Bankruptcy Court to seek authority for Parent, Borrower or any of the Subsidiaries to use cash collateral as defined in Section 363 of the Bankruptcy Code, except as set forth as provided in the Orders or the first day motions.

(c)    Seek or consent to the assertion of any claims against or defenses (including, without limitation, offsets and counterclaims of any nature or kind) to the validity, perfection, enforceability, or nonavoidability (under Sections 105, 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or otherwise) of the First Lien Obligations (other than the priming thereof pursuant to the Orders), the Obligations, or the Liens created under the Loan Documents and the Orders.

(d)    Seek or consent to the assertion of any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief invalidating, setting aside, avoiding, or subordinating, in whole or in part, the First Lien Obligations (other than the priming thereof pursuant to the Orders), the Obligations, or the Liens created under the Loan Documents and the Orders.

(e)    Seek or consent to the modification, alteration, or impairment in any manner of the Liens, security interests, rights, or remedies granted to the Agents pursuant to the Orders, this Agreement, or the Loan Documents (including, without limitation, the Agents' right to demand payment of all Obligations and to enforce its Liens in the Collateral), whether by plan of reorganization or liquidation, order of confirmation, or any financings of, extensions of credit to, or incurring of debt by the Borrower, whether pursuant to Section 364 of the Bankruptcy Code or otherwise;

(f)    Seek or consent to any order (i) dismissing the Cases under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; or (ii) converting the Cases under Sections 105 or 1112 of the Bankruptcy Code or otherwise;

(g)     Seek or consent to a priority for any administrative expense, secured claim or unsecured claim against Parent, Borrower or any of the Subsidiaries (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 of the Bankruptcy Code or otherwise) which are equal or superior to the priority of the Liens created under the Loan Documents and the Orders, except for the Carve-Out;

(h)     Except pursuant to an order of the Bankruptcy Court after an actual hearing and sufficient notice thereof to the Administrative Agent and each Lender with an opportunity to object, prior to the date on which the Obligations have been paid in full in cash, pay or incur any administrative expenses, except for such expenses which are administrative expense claims incurred in the ordinary course of the business of the Parent, Borrower and each of the Subsidiaries;

(i)     Make any payments or transfer any property on account of claims asserted by the vendors of Parent, Borrower and each of the Subsidiaries for reclamation in accordance with Section 2-702 of any applicable Uniform Commercial Code and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Administrative Agent and each Lender;

(j)     Seek to return any property to any party pursuant to Section 546(g) of the Bankruptcy Code; and

(k)     Seek or consent to any "Avoidance Action," as defined in the Orders.

(l)     Incur, create, assume, suffer to exist or permit any other Superpriority Claim which is *pari passu* with or senior to the claims of the Administrative Agent and the Lenders against the Borrower hereunder, except for the Carve-Out.

## ARTICLE 7

## EVENTS OF DEFAULT

Section 7.01.     Events of Default.  In case of the happening of any of the following events ("Events of Default"):

(a)     any representation or warranty made or deemed made in or in connection with any Loan Document or the Borrowings, or any representation, warranty or statement of fact contained in any report, certificate, financial statement or other instrument required to be furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)    default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)    default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

(d)    default shall be made in the due observance or performance by Parent, the Borrower or any Subsidiary of any covenant, condition or agreement contained in Section 5.01(a), Section 5.05(a), Section 5.08, Section 5.11, Section 5.12 or Section 5.13 or in Article 6;

(e)    default shall be made in the due observance or performance by Parent, Borrower or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in clauses (b), (c) or (d) above or (r) below) and such default shall continue unremedied for a period of five Business Days after notice thereof has been given to the Borrower by the Administrative Agent;

(f)    (i) Parent, Borrower or any Subsidiary shall fail to pay any principal or interest (subject, in the case of interest, to any applicable grace period), regardless of amount, due in respect of any Material Indebtedness incurred on or after the Petition Date, when and as the same shall become due and payable, or (ii) any other event or condition occurs that results in any Material Indebtedness incurred on or after the Petition Date becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; *provided* that this clause (ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(g)    one or more judgments or orders as to any obligation arising after the Petition Date in excess of $250,000 (to the extent not covered by independent third-party insurance as to which the insurer has not denied or disputed its obligation to cover such judgment) or that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect shall be rendered against Parent, Borrower, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed by reason of appeal or otherwise, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Parent, Borrower or any Subsidiary to enforce any such judgment;

(h)     an ERISA Event described in clause (b) of the definition thereof shall have occurred or any other ERISA Event shall have occurred that, when taken together with all other such ERISA Events, could reasonably be expected to result in liability of the Borrower and their ERISA Affiliates in an aggregate amount exceeding $250,000;

(i)     any Guarantee provided in this Agreement or any Security Document for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall deny that it has any further liability under its Guarantee (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents);

(j)     any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by the Borrower or any other Loan Party not to be, a valid, perfected and, with respect to the Secured Parties, First Priority (except as otherwise expressly provided in this Agreement or such Security Document) Lien on any material Collateral covered thereby, except to the extent that any such loss of perfection or priority results from the failure of the Collateral Agent to maintain possession of certificates representing Equity Interests pledged under the Security Documents;

(k)     there shall have occurred a Change in Control;

(l)     any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within 30 days after the entry thereof, or an application shall be filed by any of the Loan Parties without the consent of each of the Lenders for the approval of any other Superpriority Claim (other than the Carve-Out) in any of the Cases that is *pari passu* with or senior to the claims of the Administrative Agent and the Lenders against the Loan Parties hereunder, or there shall arise or be granted any such *pari passu* or senior Superpriority Claim;

(m)     any of the Loan Parties shall file a pleading seeking, or otherwise consenting to, any of the matters listed in Section 7.01(l);

(n)     the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any of the assets of the Loan Parties;

(o)     any order of the Bankruptcy Court shall be entered (i) staying, reversing or vacating any of the Orders or this Agreement or (ii) without the written

consent of the Required Lenders (which consent shall be in their sole discretion), otherwise amending, supplementing or modifying any of the Orders or this Agreement;

(p)     the Final Order shall not have been entered within 30 days of the entry of the Interim Order; or

(q)     (i) any Loan Party shall assert any claims against the Lenders pursuant to section 506(c) of the Bankruptcy Code or any other action is commenced by any Loan Party that is adverse to the Lenders or the Lenders' respective rights and remedies under this Agreement or any Bankruptcy Court order, or (ii) any person shall prevail in the assertion of any claim against the Lenders pursuant to section 506(c) of the Bankruptcy Code; or

(r)     the Borrower shall fail to comply with or achieve the Milestones in Schedule 1.01(a).

then, and in every such Event of Default, and at any time thereafter during the continuance of such Event of Default either or both of the following actions may be taken: (i) the Administrative Agent may with the consent of, and shall at the request of, the Required Lenders, by notice to the Borrower, terminate forthwith the Commitments and (ii) the Administrative Agent may with the consent of, and shall at the request of, the Required Lenders, declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived (to the extent permitted by applicable law) by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding, and the Administrative Agent and the Collateral Agent shall have the right to take all or any actions and exercise any remedies available to a secured party under the Security Documents or applicable law or in equity subject to any requirements set forth in the Order. Upon the occurrence of an Event of Default, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated and the Administrative Agent shall have the right to exercise any of the remedies under the Loan Documents, including any rights and remedies provided in the Orders and the right to realize on all of the Collateral without relief or order of the Bankruptcy Court except as provided in the Orders.

## ARTICLE 8

## THE AGENTS

Each Lender hereby irrevocably appoints each of the Agents its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the

foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and (ii) negotiate, enforce or the settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

Each person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Parent, Borrower or any Subsidiary or any of their respective Affiliates as if it were not an Agent hereunder.

Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.08), and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Parent, Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.08) or in the absence of its own gross negligence or willful misconduct. Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by Parent, Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper person. Each Agent may also rely upon any statement made to it orally or by

telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities.

Each Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. If no successor Agent has been appointed pursuant to the immediately preceding sentence by the 30th day after the date such notice of resignation was given by such Agent, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent and/or Collateral Agent, as the case may be. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred, whether or not such tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.

## ARTICLE 9

## GUARANTY

Section 9.01. <u>The Guaranty</u>. In order to induce the Administrative Agent, the Collateral Agent and the Lenders to enter into this Agreement and to extend credit hereunder and in recognition of the benefits to be received by each Guarantor from the proceeds of the Loans, each Guarantor hereby agrees with the Administrative Agent, the Collateral Agent and the Lenders that such Guarantor hereby unconditionally and irrevocably, jointly and severally, guarantees as primary obligor and not merely as surety the full and prompt payment and performance by the Borrower when due, whether upon maturity, by acceleration or otherwise, of any and all of (i) the Obligations of the Borrower and the other Guarantors and (ii) all other amounts, obligations, covenants and duties owing by the Borrower and the other Guarantors to the Administrative Agent, the Collateral Agent any Lender, any Affiliate of any of them or any Indemnitee, of every type and description (whether by reason of an extension of credit, loan, guaranty, indemnification, foreign exchange or currency swap transaction, interest rate hedging transaction or otherwise), present or future (collectively, the "<u>Guaranteed Obligations</u>"). If any or all of the Guaranteed Obligations become due and payable hereunder, each Guarantor, jointly and severally, unconditionally promises to pay such Guaranteed Obligations to the Administrative Agent, on demand, together with any and all reasonable expenses which may be incurred by the Administrative Agent, the Collateral Agent or the Lenders in collecting any of the Guaranteed Obligations.

Section 9.02. <u>Nature of Liability</u>. The liability of each Guarantor hereunder is exclusive and independent of any security for or other guaranty of the Guaranteed Obligations of the Borrower whether executed by such Guarantor, any other guarantor or by any other party, and the liability of each Guarantor hereunder shall not be affected or impaired by (a) any direction as to application of payment by the Borrower or by any other party, or (b) any other continuing or other guaranty, undertaking or

maximum liability of a guarantor or of any other party as to the Guaranteed Obligations of the Borrower, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, or (e) any payment made to the Administrative Agent, the Collateral Agent or the Lenders on the Obligations which the Administrative Agent, the Collateral Agent or such Lenders repay to the Borrower pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding.

Section 9.03.    Independent Obligation. Each Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Guarantors.

Section 9.04.    Authorization. Each Guarantor authorizes the Administrative Agent and the Collateral Agent, without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a)    change, in accordance with the Loan Documents, the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the rate of interest thereon), any security therefore, or any liability incurred directly or indirectly in respect thereof, and the Guaranty herein made shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)    take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)    exercise or refrain from exercising any rights against the Borrower or others or otherwise act or refrain from acting;

(d)    release or substitute any one or more endorsers, guarantors (including the Guarantors), the Borrower or other obligors;

(e)    settle or compromise any of the Guaranteed Obligations, any security therefore or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, or subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to its creditors;

(f)     apply, subject to the other provisions of this Agreement, any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower regardless of what liability or liabilities of such Guarantor or the Borrower remain unpaid; and/or

(g)     consent to or waive any breach of, or any act, omission or default under, this Agreement, any Loan Document or any of the instruments or agreements referred to herein or therein, or otherwise, in accordance with the Loan Documents, amend, modify or supplement this Agreement, any Loan Document or any of such other instruments or agreements or therein.

## ARTICLE 10

## MISCELLANEOUS

Section 10.01.   Notices.   Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or electronic mail, as follows:

(a)     if to Parent, Borrower or any Subsidiary, to them at Questex Media Group, Inc., 275 Grove Street, Suite 2-130, Newton, Massachusetts 02466, Attention of Thomas Caridi, Chief Financial Officer (Fax No. (617) 219-8310; Telephone No. (617) 219-8331; e-mail: tcaridi@questex.com), with a copy to Audax Group, 101 Huntington Avenue, Boston, Massachusetts 02199, Attention of Donald G. Bramley (Fax No. (617) 859-1600; Telephone No. (617) 859-1500; e-mail: dbramley@audaxgroup.com) and a further copy to Kirkland & Ellis LLP, 777 South Figueroa Street, Los Angeles, California 90017, Attention of Samantha Barryessa Good, Esq. (Fax No. (213) 808-8104; Telephone No. (213) 680-8204).

(b)     if to the Administrative Agent, to Credit Suisse, Cayman Islands Branch, at Eleven Madison Avenue, New York, New York 10010, Attention of Agency Group Manager (Fax No. (212) 322-2291; e-mail: agency.loanops@credit-suisse.com) with a copy (which shall not constitute notice) to Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153-0119, Attention of Elaine Stangland (Fax No. (212) 310-8007; Telephone No. (212) 310-8315); and

(c)     if to a Lender, to it at its address (or fax number) set forth in its signature page attached hereto, its Administrative Questionnaire or the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service, when sent and confirmation of receipt has been obtained if sent by fax (except that, if not received during normal business hours for the recipient, such faxed notices and communications shall be deemed to have been given on the next business day for the recipient) or on the

date three Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 10.01.

Parent, Borrower and each Subsidiary hereby agree, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that they will provide to the Administrative Agent all information, documents and other materials that they are obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article 5, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Borrowing Request, a notice pursuant to Section 2.10, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefore, (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document, or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent. In addition, Parent, Borrower and each Subsidiary agrees to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on Intralinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or their securities) (each, a "Public Lender"). Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 11.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor."

Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC", unless such Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Loan Documents and (2) notification of changes in the terms of the Facility.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender at its e-mail address shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Section 10.02.  Survival of Agreement.  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and so long as the Commitments have not been terminated.  The provisions of Section 2.14, Section 2.16, Section 2.20 and Section 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

Section 10.03.  Binding Effect.  This Agreement shall become effective when (i) it shall have been executed by each of the parties hereto and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto and (ii) the Interim Order and, to the extent applicable, the Final Order shall have been entered.

Section 10.04.  Successors and Assigns.  (a)  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and permitted assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, the Administrative Agent, the Collateral Agent, or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and permitted assigns.

(b)      Subject to the provisions of clause (f) below, each Lender may without the consent of Borrower, assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided, however,* that (i) the Administrative Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed), (ii) the amount of the Commitment of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $500,000 (or, if less, the entire remaining amount of such Lender's Commitment) and shall be in an amount that is an integral multiple of $500,000 (or the entire remaining amount of such Lender's Commitment); *provided* that simultaneous assignments by or to two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (iii) the parties to each such assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance (such Assignment and Acceptance to be electronically executed and delivered to the Administrative Agent via an electronic settlement system then acceptable to the

Administrative Agent (or, if previously agreed with the Administrative Agent, manually)) and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); and (iv) the Eligible Assignee, if it shall not be a Lender immediately prior to the assignment, shall deliver to the Administrative Agent an Administrative Questionnaire and applicable tax forms required under Section 2.20(d) or Section 2.20(e), as applicable.  Upon acceptance and recording pursuant to paragraph (e) of this Section 10.04, from and after the effective date specified in each Assignment and Acceptance, and provided the terms and conditions of subsection (j) below are satisfied, (A) the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.14, Section 2.16, Section 2.20 and Section 10.05, with respect to facts and circumstances occurring prior to the effective date of such assignment, as well as to any Fees accrued for its account and not yet paid).

(c)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Eligible Assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:  (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Commitment, and the outstanding balances of Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of Parent, Borrower or any Subsidiary or the performance or observance by Parent, Borrower or any Subsidiary of any of their obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such Eligible Assignee represents and warrants that it is legally authorized to enter into such Assignment and Acceptance; and satisfies the terms and conditions of clause (j) below (iv) such Eligible Assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05 or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such Eligible Assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, such assigning

Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such Eligible Assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such Eligible Assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders may treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Eligible Assignee, an Administrative Questionnaire completed in respect of the Eligible Assignee (unless the Eligible Assignee shall already be a Lender hereunder ), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Borrower, and the Administrative Agent to such assignment, in each case to the extent required pursuant to Section 10.04(b), and any applicable tax forms, the Administrative Agent shall promptly (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Lenders and the Borrower.  No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)     Each Lender may without the consent of the Borrower, or the Administrative Agent but subject to compliance with the provisions of clause (j) below, sell participations to one or more banks or other entities in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans); *provided, however*, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall, to the fullest extent permitted by law, be entitled to the benefit of the cost protection provisions contained in Section 2.14, Section 2.16 and Section 2.20 to the same extent as if they were Lenders (but, with

respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant and, in the case of Section 2.20, only if such participant shall have provided any form or updating information that it would have been required to provide under such Section if it were a Lender) and (iv) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees payable hereunder or the amount of principal of or the rate at which interest is payable on the Loans, extending the Maturity Date, any scheduled principal payment date or date fixed for the payment of interest on the Loans, increasing or extending the Commitments or releasing any material Guarantor (except in respect of a transaction permitted under this Agreement) or all or substantially all of the Collateral).

(g)     Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.04, disclose to the Eligible Assignee or participant or proposed Eligible Assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided* that, prior to any such disclosure of information designated by the Borrower as confidential, each such Eligible Assignee or participant or proposed Eligible Assignee or participant shall execute an agreement whereby such Eligible Assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 10.16.

(h)     Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; *provided* that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such Eligible Assignee for such Lender as a party hereto.

(i)     Borrower shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

(j)     Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document:

(i)  no person may be assigned any Loan or Commitment unless, after giving effect to such any such assignment, such person and its Related Funds and Affiliates hold the same proportion of the "Loans" and "Commitments" as defined in and under the Exit Facility Agreement as the Loans and Commitments under this Agreement;

(ii) during the 30 day period commencing on the Closing Date, the Administrative Agent shall offer to assign to each First Lien Lender that is not an Initial Lender a portion of the Loans and Commitments under this Agreement and the Revolving Commitments (under and as defined in the Exit Credit Agreement), in each case in an amount equal to such First Lien Lender's "Pro Rata Percentage" (as defined in the First Lien Credit Agreement) thereof as of the date of the assignment and during such period, subject to clause (iii), below,

(iii) all assignments, participations and other transfers of the Loans, Commitments and Revolving Commitments or any interest therein (except to an Affiliate or Related Fund of a Lender) shall be coordinated exclusively by the Administrative Agent;

(iv) the assignments to First Lien Lenders accepting the offer described above shall be made *pro rata* among all Initial Lenders based on their respective Commitment Percentages as of the date of such assignment; and

(v) no Lender may assign, participate, negotiate or otherwise transfer any interest of any kind in the Loans, Commitments or Revolving Commitments except pursuant to the terms of this clause (j) and the other provisions of this Section 10.04 (or in the case of Revolving Commitments, Section 9.04 of the Exit Credit Agreement).

(k) Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document: (i) no person may be assigned any Loan or Commitment unless, after giving effect to such any such assignment, such person and its Related Funds and Affiliates hold the same proportion of the "Loans" and "Commitments" as defined in and under the Exit Facility as the Loans and Commitments under this Agreement and (ii) no person may be granted any participation or other Loan or Commitment unless, after giving effect to such any such grant, such person and its Related Funds and Affiliates hold the same proportion of the "Loans" and "Commitments" as defined in and under the Exit Facility as the Loans and Commitments under this Agreement.

Section 10.05. Expenses; Indemnity. (a) The Borrower agrees to pay (i) all reasonable out-of-pocket costs and expenses incurred by the Initial Lenders (*provided* that for purposes of this clause (i) only, the aggregate amount of such costs and expenses for each Initial Lender payable by the Borrower under this clause (i) shall not exceed $35,000), the Administrative Agent and the Collateral Agent (including the reasonable fees, disbursements and other charges of Weil, Gotshal & Manges LLP, counsel for the Administrative Agent and the Collateral Agent, and of Imperial Capital, LLC, financial advisor to the Administrative Agent and the Collateral Agent) in connection with the preparation and administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or

thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) and (ii) all out-of-pocket costs and expenses incurred by the Administrative Agent, the Collateral Agent or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made hereunder, including the fees, disbursements and other charges of Weil, Gotshal & Manges LLP, counsel for the Administrative Agent and the Collateral Agent, and of Imperial Capital, LLC, financial advisor to the Administrative Agent and the Collateral Agent, and, in connection with any such enforcement or protection, the reasonable fees, disbursements and other charges of any counsel for the Administrative Agent, the Collateral Agent or any Lender (it being understood that, subject to customary exceptions for actual and potential conflicts, local counsel and special counsel, such persons shall be represented by a single firm as counsel).

(b)  The Borrower agrees to indemnify the Administrative Agent, the Collateral Agent, each Lender and each Related Party of any of the foregoing persons (each such person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related reasonable out-of-pocket costs and expenses, including reasonable counsel fees, disbursements and other charges (it being understood that, subject to customary exceptions for actual and potential conflicts, local counsel and special counsel, such Indemnitees shall be represented by a single firm as counsel), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby, (ii) the use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, or (iv) any actual or alleged presence or Release of Hazardous Materials on any property owned or operated by Parent, Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to Parent, Borrower or any of the Subsidiaries; *provided* that such indemnity (x) shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related costs and expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee.

(c)  To the extent that the Borrower fails to pay any amount required to be paid to the Administrative Agent or the Collateral Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Collateral Agent in its capacity as

such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the Aggregate Exposure and unused Commitments at the time (in each case, determined as if no Lender were a Defaulting Lender).

(d)  To the extent permitted by applicable law, Borrower agrees not to assert, and hereby waives, any claim against any Indemnitee or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)  The provisions of this Section 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Transactions or the other transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.  All amounts due under this Section 10.05 shall be payable on written demand therefore.

Section 10.06.  <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of Parent, Borrower or any Subsidiary against any and all the obligations of Parent, Borrower or any Subsidiary now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured.  The rights of each Lender under this Section 10.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.  Promptly upon the exercise of any such rights of setoff, such Lender shall give the Borrower and the Administrative Agent notice thereof.

Section 10.07.  <u>Applicable Law</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PROVISIONS (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

Section 10.08.  <u>Waivers; Amendment</u>.  (a)  No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or

discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders; *provided, however,* that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest on any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan, without the prior written consent of each Lender affected thereby (it being understood that a waiver of any mandatory prepayment or of the obligation to pay default interest shall only require the consent of the Required Lenders), (ii) increase or extend the Commitment or decrease or extend the date for payment of any Fees of any Lender without the prior written consent of each Lender affected thereby, (iii) amend or modify the pro rata requirements of Section 2.17, the provisions of Sections 10.04(i) and (j), the provisions of this Section, the definition of the term "Required Lenders," or the definition of the term "Supermajority Lenders," or release any material Guarantor (other than pursuant to a transaction permitted by Section 6.05), without the prior written consent of each Lender, (iv) release all or substantially all of the Collateral without the prior written consent of each Lender or subordinate same without the prior written consent of Supermajority Lenders; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable.

(c)     Notwithstanding the foregoing, each Lender grants (x) to the Administrative Agent the right to purchase all (but not less than all) of such Lender's Commitments and Loans owing to it and the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents, which right may be exercised by the Administrative Agent, if (i) such Lender refuses to execute any amendment, waiver or consent which requires the written consent of Lenders other than Required Lenders and to which Required Lenders, the Administrative Agent and the Borrower has otherwise agreed (such refusing Lender, a "Non-Consenting Lender") or (ii) such Lender shall have failed to fund any Loan that it was required to have funded hereunder within one Business Day of the date on which such funding

was required, or shall have been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding (any such Lender described in this clause (ii), a "Non-Funding Lender"); *provided* that such Non-Consenting Lender or Non-Funding Lender, as applicable, shall receive, in connection with such assignments, payment equal to the aggregate amount of outstanding Loans owed to such Lender (together with all accrued and unpaid interest, fees and other amounts (other than indemnities) owed to such Lender). Each Lender agrees that if the Administrative Agent exercises its option hereunder, it shall promptly execute and deliver all agreements and documentation necessary to effectuate such assignment as set forth in Section 10.04. The Administrative Agent shall be entitled (but not obligated) to execute and deliver such agreement and documentation on behalf of such Non-Consenting Lender or Non-Funding Lender, as applicable, and any such agreement and/or documentation so executed by the Administrative Agent shall be effective for purposes of documenting an assignment pursuant to Section 10.04.

Section 10.09.   Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 10.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefore) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.10.   Entire Agreement.  This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders ) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 10.11.   WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN

CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.

Section 10.12. Severability. In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 10.13. Counterparts. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 10.03. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 10.14. Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 10.15. Jurisdiction; Consent to Service of Process. (a) Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and the Bankruptcy Court for the District of Delaware, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court or the Bankruptcy Court for the District of Delaware. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner

provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, the Collateral Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Borrower or its properties in the courts of any jurisdiction.

(b)     Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court or the Bankruptcy Court for the District of Delaware. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.16.  Confidentiality. Each of the Administrative Agent, the Collateral Agent, and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (i) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) *provided*, to the extent permitted by applicable law, that the Borrower shall be given prior written notice of such disclosure, to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (iii) *provided*, to the extent permitted by applicable law, that the Borrower shall be given prior written notice of such disclosure, to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (v) subject to an agreement containing provisions substantially the same as those of this Section 10.16, to (A) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Parent, Borrower or any Subsidiary or any of its respective obligations, (vi) with the consent of the Borrower or (vii) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.16. For the purposes of this Section, "Information" shall mean all information received from the Borrower and related to the Borrower or its business, other than any such information that was available to the Administrative Agent, the Collateral Agent, or any Lender on a nonconfidential basis prior to its disclosure by the Borrower. Any person required to maintain the confidentiality of Information as provided in this Section 10.16 shall be considered to have complied with its obligation to do so if such

person has exercised the same degree of care to maintain the confidentiality of such Information as such person would accord its own confidential information. Notwithstanding any other express or implied agreement, arrangement or understanding to the contrary, each of the parties hereto agrees that each other party hereto (and each of its employees, representatives or agents) are permitted to disclose to any persons the tax treatment and tax structure of the Loans and the other transactions contemplated by the Loan Documents and all materials of any kind (including opinions and tax analyses) that are provided to the Loan Parties, the Lenders or any Agent related to such tax treatment and tax aspects. To the extent not inconsistent with the immediately preceding sentence, this authorization does not extend to disclosure of any other information or any other term or detail not related to the tax treatment or tax aspects of the Loans or the transactions contemplated by the Loan Documents.

Section 10.17. <u>USA PATRIOT Act Notice</u>. Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the USA PATRIOT Act.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**QUESTEX MEDIA GROUP, INC.**

By: _____

Name:  Thomas E. Caridi
Title:  Chief Financial Officer

**QMG HOLDINGS, INC.**

By: _____

Name:  Thomas E. Caridi
Title:  Vice President, Secretary and
       Treasurer

**INFOTRENDS, INC.**

By: _____

Name:  Thomas E. Caridi
Title:  Secretary and Treasurer

**INFOTRENDS RESEARCH
GROUP, INC.**

By: _____

Name:  Thomas E. Caridi
Title:  Chief Financial Officer,
       Secretary and Treasurer

**FIERCEMARKETS, INC.**

By: _____

Name:  Thomas E. Caridi
Title:  Secretary and Treasurer

[SIGNATURE PAGE TO QUESTEX DIP CREDIT AGREEMENT]

**OXFORD PUBLISHING, INC.**

By: _____
    Name:   Thomas E. Caridi
    Title:    Treasurer

**OXFORD COMMUNICATION, INC.**

By: _____
    Name:   Thomas E. Caridi
    Title:    Treasurer

**SHOW EVENTS, INC.**

By: _____
    Name:   Thomas E. Caridi
    Title:    Treasurer

**MCLEAN EVENTS INTERNATIONAL LIMITED**

By: _____
  Name:
  Title:

**PELICAN EVENTS LIMITED**

By: _____
  Name:
  Title:

**INFOTRENDS LTD**

By: _____
  Name:
  Title:

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH,** as Administrative Agent and Collateral Agent

By: _____
Name: Bryan J. Matthews
Title: Director

By: _____
Name:
Title: Michael A. Criscito
Managing Director

**CREDIT SUISSE LOAN FUNDING LLC** *MH*

By: _____
Name:   BARRY ZAMORE
Title:   MANAGING DIRECTOR

By: _____
Name:   Kenneth Hoffman
Title:   Managing Director

**BANK OF MONTREAL**

By: _____

Name: *B. W. Stratton*

Title: *MD*

Address:

115 South LaSalle Street, 12W

Chicago, IL 60603

Fax: 312-461-7958

E-Mail Address:

barry.stratton@harrisbank.com

Attention: Barry Stratton

[SIGNATURE PAGE TO QUESTEX DIP CREDIT AGREEMENT]

**GENERAL ELECTRIC CAPITAL
CORPORATION**

By: _____
Name: Jason A. Soto
Title: Authorized Signatory

Address:
    GE Corporate Financial Services
    201 Merritt 7, P.O. Box 5201
    Norwalk, CT 06856-5201

Fax:    678-624-7903

E-Mail Address:
    drew.miller@ge.com

Attention:    Drew Miller

**ING CAPITAL, LLC**

By: _____
Name: WILLIAM JAMES
Title: MANAGING DIRECTOR

Address:
1325 Avenue of the Americas
New York, NY 10019

Fax:    646-424-6633

E-Mail Address:
chris.moon@americas.ing.com

Attention:    Christopher J. Moon

**WELLS FARGO FOOTHILL, INC.**

By: _____

Name: ADRIAN AVALOS
Title: VP

Address:
    2450 Colorado Avenue,
    Suite 3000 West
    Santa Monica, CA 90404

Fax:   310-453-7442

E-Mail Address:
    adrian.r.avalos@wellsfargo.com

Attention:    Specialty Finance Manager
            and Adrian Avalos

 

### ADMINISTRATIVE QUESTIONNAIRE

## QUESTEX MEDIA GROUP, INC. (DIP)

Agent Information     Agent Closing Contact
Credit Suisse       Candace Sorina
Eleven Madison Avenue    Tel:  212-538-2903
New York, NY   10010     E-Mail: Candace.Sorina@credit-suisse.com

Agent Wire Instructions
Bank of New York
ABA 021000018
Account Name:  CS Agency Cayman Account
Account Number:  **8900492627**

> It is very important that **all** of the requested information be completed accurately and that this questionnaire be returned promptly.  If your institution is sub-allocating its allocation, please fill out an administrative questionnaire for each legal entity.

Legal Name of Lender to appear in Documentation:

_____

Signature Block Information: _____

- Signing Credit Agreement [    ] Yes [    ] No

- Coming in via Assignment [    ] Yes [    ] No

Type of Lender: _____

(Bank, Asset Manager, Broker/Dealer, CLO/CDO; Finance Company, Hedge Fund, Insurance, Mutual Fund, Pension Fund, Other Regulated Investment Fund, Special Purpose Vehicle, Other-please specify)

Lender Parent: _____

Lender Domestic Address     Lender Eurodollar Address

_____  _____

_____  _____

_____  _____

**Contacts/Notification Methods:  Borrowings, Paydowns, Interest, Fees, etc.**

|  | Primary Credit Contact | Secondary Credit Contact |
|---|---|---|
| Name: | _____ | _____ |
| Company: | _____ | _____ |
| Title: | _____ | _____ |
| Address: | _____ | _____ |
|  | _____ | _____ |
| Telephone: | _____ | _____ |
| Facsimile: | _____ | _____ |
| E-Mail Address: | _____ | _____ |

|  | Primary Operations Contact | Secondary Operations Contact |
|---|---|---|
| Name: | _____ | _____ |
| Company: | _____ | _____ |
| Title: | _____ | _____ |
| Address: | _____ | _____ |
|  | _____ | _____ |
| Telephone: | _____ | _____ |
| Facsimile: | _____ | _____ |
| E-Mail Address: | _____ | _____ |

**Lender's Domestic Wire Instructions**

| Bank Name: | _____ |
|---|---|
| ABA/Routing No.: | _____ |
| Account Name: | _____ |
| Account No.: | _____ |
| FFC Account Name: | _____ |
| FFC Account No.: | _____ |
| Attention: | _____ |
| Reference: | _____ |

A-2

## NON-U.S. LENDER INSTITUTIONS:

### *I. Corporations:*

If your institution is incorporated outside of the United States for U.S. federal income tax purposes, <u>and</u> is the beneficial owner of the interest and other income it receives, you must complete one of the following three tax forms, as applicable to your institution: *a.) Form W-8BEN (Certificate of Foreign Status of Beneficial Owner)*, *b.) Form W-8ECI (Income Effectively Connected to a U.S. Trade or Business)*, or *c.) Form W-8EXP (Certificate of Foreign Government or Governmental Agency)*.

A U.S. taxpayer identification number is required for any institution submitting Form W-8ECI. It is also required on Form W-8BEN for certain institutions claiming the benefits of a tax treaty with the U.S. Please refer to the instructions when completing the form applicable to your institution. In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms. **An original tax form must be submitted.**

### *II. Flow-Through Entities:*

If your institution is organized outside the U.S., and is classified for U.S. federal income tax purposes as either a Partnership, Trust, Qualified or Non-Qualified Intermediary, or other non-U.S. flow-through entity, an original *Form W-8IMY (Certificate of Foreign Intermediary, Foreign Flow-Through Entity, or Certain U.S. Branches for United States Tax Withholding)* must be completed by the intermediary together with a withholding statement. Flow-through entities other than Qualified Intermediaries are required to include tax forms for each of the underlying beneficial owners.

Please refer to the instructions when completing this form. In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms. **Original tax form(s) must be submitted.**

## U.S. LENDER INSTITUTIONS:

If your institution is incorporated or organized <u>within</u> the United States, you must complete and return *Form W-9 (Request for Taxpayer Identification Number and Certification).* **Please be advised that we request that you submit an original Form W-9.**

*Pursuant to the language contained in the tax section of the Credit Agreement, the applicable tax form for your institution must be completed and returned prior to the first payment of income. Failure to provide the proper tax form when requested may subject your institution to U.S. tax withholding.*

# FORM OF ASSIGNMENT AND ACCEPTANCE

   This Assignment and Acceptance (the **"Assignment and Acceptance"**) is dated as of the Effective Date (as defined below) and is entered into by and between the Assignor (as defined below) and the Assignee (as defined below). Capitalized terms used but not defined herein shall have the meanings given to them in the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement identified below (as amended, the **"Credit Agreement"**), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

   For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, including without limitation Section 10.04(j), as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective Facilities identified below (including without limitation any Guarantees included in such Facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the **"Assigned Interest"**). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by the Assignor.

| | |
|---|---|
| 1.   Assignor (the **"Assignor"**): | |
| 2.   Assignee (the **"Assignee"**): | |
| 3.   Borrower: | Questex Media Group, Inc. |
| 4.   Administrative Agent and Collateral Agent: | Credit Suisse, Cayman Islands Branch, as the Administrative Agent and Collateral Agent under the Credit Agreement |
| 5.   Credit Agreement: | The Senior Secured Super-Priority Debtor-In-Possession Credit Agreement dated as of |

| | ___ __, 2009 among Questex Media Group, Inc., the Lenders from time to time party thereto, the Guarantors party thereto, and Credit Suisse, Cayman Islands Branch, as Administrative Agent and as Collateral Agent. |
|---|---|
| 6.      Assigned Interest: | |

| Aggregate Amount of Commitment/ Loans for all Lenders | Amount of Commitment/ Loans Assigned | Percentage Assigned of Commitment/Loans[1] | CUSIP Number |
|---|---|---|---|
| $[_____] | $ | % | |

7.      Effective Date of Assignment (the **"Effective Date"**): _____ __, 20___.[2]

The terms set forth in this Assignment and Acceptance are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]


By:_____
      Name:
      Title:



ASSIGNEE
[NAME OF ASSIGNEE]


By:_____
      Name:
      Title:



Consented to and Accepted:

_____

[1] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.
[2] To be inserted by Administrative Agent and which shall be the effective date of recordation of transfer in the Register therefor.

US_ACTIVE:\43179144\05\43179144_5.DOC\39593.0133

CREDIT SUISSE, CAYMAN ISLANDS BRANCH,
as Administrative Agent

By_____
   Name:
   Title:


By_____
   Name:
   Title:

US_ACTIVE:\43179144\05\43179144_5.DOC\39593.0133

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ACCEPTANCE

1.     Representations and Warranties.

1.1     Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any Collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2     Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender thereunder, including such Assignee being an "Eligible Assignee" thereunder (subject to the receipt of such consents as may be required under the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.04 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent, any other Agent or any other Lender, and (v) if it is a Foreign Lender, attached to the Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, any other Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

US_ACTIVE:\43179144\05\43179144_5.DOC\39593.0133

2.      Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      General Provisions.  This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.  This Assignment and Acceptance shall be governed by, and construed in accordance with, the law of the State of New York.

US_ACTIVE:\43179144\05\43179144_5.DOC\39593.0133