UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .  Chapter 11
                                .
QUESTEX MEDIA GROUP, INC.,      .  Case No. 09-13423(MFW)
*et al.*,                       .  (Jointly Administered)
                                .
                                .  November 24, 2009
                                .  4:00 p.m.
           Debtors.             .  (Wilmington)
                                .



TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

<u>APPEARANCES:</u>

For the Debtors:            Michael R. Nestor, Esq.
                            Young, Conaway, Stargatt
                            & Taylor, LLP

                            Eric W. Chalut, Esq.
                            Kirkland & Ellis, LLP

For Committee:              Lorenzo Marinuzzi, Esq.
                            Morrison & Foerster, LLP


For Sharp Electronics
Corporation:                Scott Leonhardt, Esq.
                            Messana, Rosner & Stern, LLP


For Miller Buckfire:        Michael E. Wiles, Esq.
                            Debevoise & Plimpton, LLP


For the US. Trustee:        Richard L. Schepacarter, Esq.
                            Office of the United States Trustee

<u>VIA TELEPHONE:</u>

For Oracle USA Inc.:        Marie Polito Hofsdal, Esq.
                            Day Pitney, LLP

Audio Operator:        Brandon McCarthy

Transcriptionist:      Jennifer Ryan Enslen
                       43 Bay Boulevard
                       Newark, De 19702
                       (302)836-1905

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

# INDEX

|                                  | DIRECT | CROSS | REDIRECT |
| -------------------------------- | ------ | ----- | -------- |
| WITNESS FOR THE DEBTOR:          |        |       |          |
| THOMAS CARIDI                    | 12     |       |          |
|                                  | 17     |       |          |
| WITNESS FOR MILLER BUCKFIRE:     |        |       |          |
| RONEN BOJMEL                     |        | 31    | 44       |

|                                  |        |       | MARKED |
| -------------------------------- | ------ | ----- | ------ |
| EXHIBITS FOR THE TRUSTEE:        |        |       |        |
| EXHIBIT 1 - Email Between Miller Buckfire and Audax |  |  | 33 |

1          THE CLERK: All rise.  You may be seated.

2          THE COURT: Good afternoon.

3          MR. NESTOR: May it please the Court, Your Honor,

4    Michael Nestor of Young, Conaway, Stargatt & Taylor here on

5    behalf of Questex Media Group, Inc. and its affiliated

6    Debtors.  Your Honor, turning to the agenda that we filed, we

7    filed an amended agenda.  Did Your Honor receive a copy of

8    that?  I believe it was earlier today.

9          THE COURT: Oh, I did, yes.  I'm sorry.

10          MR. NESTOR: Good.  Thank you, Your Honor.  Item

11    numbers 1 through 5, I believe have been resolved by entry of

12    an order by Your Honor.  That leaves two items on the agenda.

13    Item numbers 5 and item number 6.  Item number 5 is the, Your

14    Honor's consideration of the sale of substantially all of the

15    Debtors' assets.  Item number 6 is the Debtors' motion to

16    employ Miller Buckfire.  We'd like to start with the sale

17    motion.

18          THE COURT: Okay.

19          MR. NESTOR: It's largely uncontested.  There are a

20    few open issues.  My colleague, Mr. Chalut from Kirkland &

21    Ellis will address the Court.  Thank you.

22          THE COURT: All right.  Thank you.

23          MR. CHALUT: Good afternoon, Your Honor.  Eric

24    Chalut from Kirkland & Ellis on behalf of the Debtors.  We

25    appreciate your time today, Your Honor.  As we said from the

1    beginning, we wanted to conduct a robust and timely §363 sale

2    process of substantially all of the Debtors' assets.  In

3    consultation and coordination with our major constituents,

4    I'm pleased to say today that we have accomplished that goal.

5    As Your Honor knows, there were no alternate bids ultimately

6    made for any assets of the company, and so we did send out a

7    notice last week cancelling the auction which was originally

8    scheduled for Friday of last week.  Your Honor, this, we

9    believe, is a significant success, and we believe it will

10   give the company, its employees, and the creditors of this

11   estate a great opportunity going forward.  Your Honor, we can

12   proceed as you deem appropriate, but we did file a chart with

13   the Court earlier today setting forth the status of all

14   responses to the sale motion and the Debtors' cure notices.

15   Only one response was filed.  The reservation of rights of

16   the Official Committee of Unsecured Creditors, which related

17   directly to the sales motion.  As noted on the chart, and

18   Your Honor, I don't know if you have a copy of the chart.  I

19   can pass one up if you - -

20          THE COURT: I have it.

21          MR. CHALUT: Okay.  Your Honor, that item is number

22   13 on the chart.  The Creditors Committee had reserved its

23   right because it wanted to see a copy of Schedule 1.1(b) to

24   the asset purchase agreement, a more comprehensive list than

25   had been originally included.  Schedule 1.1(b) is a list of

1   the purchased contracts under the asset purchase agreement.

2   Last week we did provide them with a copy of Schedule 1.1(b).

3   Based upon a receipt of that schedule, and a couple of

4   conversations and emails, the Creditors Committee has

5   indicated that it will withdraw its reservation of rights at

6   the hearing today.

7        MR. MARINUZZI: That's correct, Your Honor.

8        THE COURT: All right.

9        MR. CHALUT: Your Honor, as indicated on the chart,

10   the remaining issues on the, that were filed in connection

11   with this sale motion are cure objections.  Of the 14 filed,

12   12 of them - - I'm sorry.  Of the 14 filings, 13 of which are

13   cure objections, 11 of them have been resolved, or were in

14   fact really uncontested in the first place.  And I think Your

15   Honor, it makes sense probably to walk through quickly the

16   ones that were resolved, and then finish up with the matters

17   that are contested.

18        THE COURT: Well, I think do you want to incorporate

19   - - all right.  Did you file, you did file the charts.  So

20   why don't we just incorporate that.  Does more need to be

21   said about those that are resolved?

22        MR. CHALUT: In some cases, yes, because we

23   indicated in some cases that we would make a statement on the

24   record - -

25        THE COURT: All right.  Then do so.

1          MR. CHALUT:  - - Your Honor.  Your Honor, number 2

2     on the chart involves Nikon, Inc.  Your Honor, we did

3     indicate on the record that, or we did indicate to Nikon that

4     to the extent that a final decision is made to take

5     assignment of that contract, if the purchaser ultimately

6     decides to take assignment of that contract, that the

7     assignee will ultimately comply with the contract terms.  On

8     the basis of that representation, Nikon agreed to withdraw

9     its objection.  Number 3 on the cure and sale objection chart

10    is Microsoft Corporation.  With respect to this matter, we

11    agreed to increase their cure claim to $113,065.38.  On the

12    basis of that, the matter will be resolved.  Number 4 is a

13    going forward, so we'll skip that for now.  Number 5, Henkel

14    Corporation, we have agreed that we will acknowledge that

15    Henkel has made a deposit to the Debtors.  They originally

16    asserted that their deposit was a cure claim, but we

17    indicated that a deposit does not constitute a cure claim.

18    They agreed to that, but did want us to represent on the

19    record that in fact they did make a deposit and wanted us to

20    make that representation.  So we are making that

21    representation to Your Honor.  Number 6, Your Honor, the

22    Jacob Javits Center has agreed to withdraw its objection.

23    Number 7, Hallmark Data Systems filed an objection asserting

24    that the cure claim should be increased to $170,270.34, which

25    we agreed to.  Number 8, involving Realty Associates Fund,

1    was withdrawn.  Number 9 involving CIGNA.  When we filed the

2    chart it was resolved in principle.  But subsequent to the,

3    subsequent to the filing of this chart, in fact, that has

4    become resolved, finally.  We have agreed to language in the

5    sale order that we will include.  The next matter up involves

6    Oracle.  And with respect to Oracle, I apologize Your Honor,

7    we have some language that we wanted to state on the record.

8    Oracle's objection is resolved by the Debtor and the purchase

9    agreement, purchaser's agreement to the following.  It is

10   resolved by the Debtors' and purchaser's agreement to one,

11   assume and assign the underlying license agreements with

12   Oracle, inclusive of the ordering documents in addition to

13   the related support contracts initially identified for

14   assumption.  Specifically the 2005 and 2006 Oracle license

15   and service agreements.  And two, execute the Oracle

16   assignment documentation to be effective upon the closing.

17   Period.  With that Oracle agrees to, that there's no contest

18   with respect to its objection.

19              MS. HOFSDAL (Telephonic): Your Honor?  I'm sorry to

20   interrupt.  Marie Polito Hofsdal, Day Pitney, on behalf of

21   Oracle.

22              THE COURT: Yes.

23              MS. HOFSDAL (Telephonic): We, that exact language

24   was not agreed to.  And if we could, you know, speak on the

25   record about it after it's completed.  But I just wanted to

1    note that at this time.  Unless we want to continue with it

2    now.

3              THE COURT: Well, do you - -

4              MR. CHALUT: Your Honor, it was my understanding

5    that it was agreed to.  But - -

6              THE COURT: Well, perhaps we'll take a short break

7    and you can resolve that.  But let's pass that for now.

8              MS. HOFSDAL (Telephonic): Thank you, Your Honor.

9              MR. CHALUT: Number 11, Your Honor, is

10   Massachusetts-Riverside Project, LLC.  With respect to this

11   matter, Your Honor, we've agreed that we initially asserted

12   that the cure claim was zero.  They asserted that there

13   should be a cure claim of $2,531.70.  We've agreed to that.

14   We've also included a change in the sale order to resolve

15   their issues.  Which, when we talk about the sale order,

16   we'll point out that change.  So with that, that matter is

17   resolved.  Number 12 is the claim of Renderx, Inc.  With

18   respect to this matter, they did not actually object to the

19   relief requested.  But we did agree to acknowledge on the

20   record that Renderx did file a deposit for an upcoming trade

21   show, so we'll state on the record that in fact they did file

22   that deposit with the Debtors.  As requested by Renderx.

23   Number 13, as indicated, was by the Official Committee of

24   Unsecured Creditors.  We've already talked about that.  So as

25   indicated that's resolved.  Number 14 is Gamma & Bross, SPA.

1    As with Renderx, this entity, Gamma, did not contest the

2    relief requested, simply wanted us to acknowledge on the

3    record that a deposit was given to the Debtors prior to the

4    petition date.  We will acknowledge that in fact one was.

5    And on the basis of that, Gamma has no objection to the

6    relief requested.  Your Honor, that takes us back to the two

7    remaining matters that are contested.  The Anchor Computer

8    Software and the Sharp Electronics Corporation matters.  Your

9    Honor, starting with the Anchor Computer Software objection,

10    Your Honor, the only basis for the Anchor Computer Software

11    objection is the assertion that - - and just to take a step

12    back, Your Honor.  Anchor Computer Software is a customer of

13    the Debtors.  They will be participating in an upcoming trade

14    show of the Debtors.  They provided the Debtors with a

15    deposit towards that trade show.  They misunderstood what a

16    cure claim was, asserting that the deposit that they had

17    previously made constituted a cure claim saying that the $25

18    hundred was in fact owed.  Obviously, our obligation in

19    assuming the contract and the assignment is to honor the

20    contract and to honor the terms, which is to do the trade

21    show.  Not to repay the deposit.  Unless, of course, under

22    the terms of the contract, there was a required obligation to

23    return the payment.  We have attempted to reach out to Anchor

24    on multiple occasions to explain this to them.  And while

25    they did initially respond to our calls, they indicated that

1  they were not interested in withdrawing their objection, and

2  subsequently have not been responsive.  I don't believe that

3  they're at the hearing, although if they are at the hearing I

4  will - -

5         THE COURT: Let me ask.  Is anybody here for Anchor

6  Computer Software?  All right.  I will overrule the

7  objection.

8         MR. CHALUT: Thank you, Your Honor.  Your Honor, the

9  second remaining contested matter involves Sharp Electronics

10  Corporation.  Sharp has not objected to the Debtors proposed

11  cure amount.  Sharp is instead suggesting that there is some

12  likelihood that the Debtors will not perform under the

13  contract because the Debtors are continuing to have the same

14  management that the Debtors have previously had.  Your Honor,

15  if necessary, the Debtors are prepared to put Mr. Tom Caridi,

16  our CFO on the stand.

17         THE COURT: Well are you going to proffer any

18  testimony in support of the motion to sell?

19         MR. CHALUT: Your Honor, as I indicated, we would be

20  prepared to put Mr. Caridi on the stand to address this

21  matter if you would like.

22         THE COURT: Well, not just this matter, but the

23  whole sale motion.

24         MR. CHALUT: We were not planning to proffer

25  testimony on the sale motion itself, Your Honor.  No.  Unless

1    Your Honor needs to have testimony on it.  There were no

2    objections filed to the sale hearing.

3          THE COURT: Well, I think you have to put on some

4    case.

5          MR. LEONHARDT: Your Honor, I'm here from Sharp

6    Electronics as well, and there was a representation to us

7    that there would be evidence presented to give us comfort

8    that there would be adequate assurances.

9          THE COURT: All right.

10          MR. CHALUT: Your Honor, we'll certainly put Mr.

11    Caridi on the stand.

12          THE COURT: Okay.  Please remain standing so you can

13    be sworn.

14                **THOMAS CARIDI, DEBTORS' WITNESS, SWORN**

15                          DIRECT EXAMINATION

16    BY MR. CHALUT:

17    Q.   Mr. Caridi, can you tell the Court what your position

18    with Questex Media Corporation is?

19    A.   Chief Financial Officer.

20    Q.   Mr. Caridi, with which trade show does Sharp Electronics

21    have a relationship?

22    A.   Our On Demand show.

23    Q.   How many years has this trade show been in existence?

24    A.   Approximately 12.

25    Q.   When is this trade show scheduled to be performed?

1  A.    The next show is April, April 20 to 22nd, in

2  Philadelphia.  Of 2010.

3  Q.    Mr. Caridi, are you planning to have a, are you

4  currently planning to have this show in April?

5  A.    Yes.

6         MR. CHALUT: Your Honor - - I'm sorry.

7  BY MR. CHALUT:

8  Q.    Mr. Caridi, is this show one of your more successful

9  shows during the course of the year?

10  A.    It is.  It's one of our largest and most successful.

11  Q.    Are you currently publicizing for the show?

12  A.    Yes we are.

13  Q.    Is there anything other than normal - - strike that.  Is

14  there anything other than normal, anything other than a

15  normal amount of cancellation for the show from your other

16  exhibitors?

17  A.    No there's not.

18  Q.    When was the last time, if ever, that you've cancelled

19  this trade show?

20  A.    Never.

21         MR. CHALUT: That's all that I have for Mr. Caridi,

22  Your Honor.

23         THE COURT: Would Sharp wish to cross examine?

24  Please remain seated.

25         MR. LEONHARDT: No, Your Honor.  However, just for

1    the record, we'd like to reserve all our rights to object,

2    based on the lack of adequate assurances, at any subsequent

3    sale hearing.  The agreement reached was that we would just

4    hear the evidence presented during this hearing and then

5    digest it while reserving all of our rights.

6         THE COURT: Well, are we going to have another sale

7    hearing?

8         MR. CHALUT: There's no intention to have another

9    sale hearing, Your Honor.  So - -

10         THE COURT: Well, do you want to have your witness

11    tell the process by which you had your sale, and - -

12         MR. CHALUT: Your Honor, if we could have a moment

13    to discuss that matter.  But Your Honor on the issue

14    regarding Sharp, if Mr. - - our view, Your Honor, is that Mr.

15    Caridi has provided the answers that should provide the Court

16    with the necessary answers.  If Mr., if Sharp's counsel

17    wishes to receive adequate assurances of future performance

18    with respect to this individual contract, Your Honor, we're

19    prepared to continue this particular objection to the next

20    omnibus hearing.  Just with respect to this particular cure

21    issue.

22         THE COURT: Well, let's take a break and you can

23    talk about it.  All right?

24         MR. CHALUT: Okay.  Thank you, Your Honor.

25         (Whereupon at 4:15 p.m. a recess was taken in the

1    hearing in this matter.)

2         (Whereupon at 4:43 p.m. the hearing in this matter

3    reconvened and the following proceedings were had:)

4              THE CLERK: All rise.  You may be seated.

5              THE COURT: Okay.

6              MR. CHALUT: Your Honor, for the record again, Eric

7    Chalut on behalf of the Debtors.  Two things, Your Honor, per

8    where we were at the end of the last moments we were here.

9              THE COURT: Okay.

10             MR. CHALUT: Two things.  First, with respect to the

11   matter involving Sharp, Your Honor, after discussion, we've

12   agreed that with respect to that specific matter, that

13   specific contract, we'd like to continue that issue to the

14   December, I think it's 20th, omnibus hearing.  Whatever the

15   next omnibus hearing is.

16             THE COURT: Okay.

17             MR. CHALUT: But just with respect to that one

18   matter.

19             THE COURT: Okay.

20             MR. CHALUT: And we would expect at that time either

21   to have the matter resolved or to put on evidence to support

22   adequate assurance of future performance to satisfy the party

23   or Your Honor.

24             THE COURT: Okay.

25             MR. CHALUT: The other open issue with respect to a

1    cure was the matter involving Oracle.  This was the one

2    involving a question of what the statement on the record was

3    supposed to be.  Your Honor, just so that we're clear on what

4    that statement should be, I'll state it on the record, and if

5    it's incorrect, just state that I'm incorrect.  But I believe

6    this is the correct statement.  Oracle's objection is

7    resolved by the Debtor and the purchaser's agreement to one,

8    to be effective upon the closing assume and assign the

9    underlying license agreements inclusive of the ordering

10   documents in addition to the related support contracts

11   initially identified for assumption, specifically the 2005

12   and 2006 Oracle license and service agreements.  And two,

13   execute the Oracle assignment documentation to be effective

14   upon the closing.

15          THE COURT: Is that - -

16          MS. HOFSDAL (Telephonic): That's fine, Your Honor.

17          THE COURT: That's correct?

18          MS. HOFSDAL (Telephonic): Yes.  Yes.

19          THE COURT: Okay.  Sorry to speak over you.

20          MR. CHALUT: Okay, Your Honor.  With that, Your

21   Honor, there are no other objections to the sale.  The only

22   issue remaining, as I indicated, is the Sharp matter, which

23   we will continue to the next hearing.  Your Honor, we had Mr.

24   Caridi on the stand previously, and as we intended, we would

25   like to put Mr. Caridi on the stand now to proffer, I'm

1    sorry, to ask him a few questions about the sale process.

2             THE COURT: Okay.

3             MR. CHALUT: So that Your Honor can be satisfied as

4    to the factual record.

5             THE COURT: Okay.  Thanks.  All right.  You're still

6    under oath.

7                       DIRECT EXAMINATION

8    BY MR. CHALUT:

9    Q.   Mr. Caridi, were you involved in the sale process

10   involving the assets of Questex Media and its affiliates?

11   A.   Yes I was.

12   Q.   Did you interface with Miller Buckfire, the investment

13   banker, in connection with the sale process?

14   A.   Yes.

15   Q.   Was the sale process run in accordance with the Court

16   approved bid procedures?

17   A.   Yes it was.

18   Q.   Are you familiar with the stalking horse bid of the

19   senior secured lenders in this case?

20   A.   I am.

21   Q.   Does that bid represent the highest and best bid for the

22   assets?

23   A.   Yes it was.

24   Q.   Did you receive any alternate bids on any of the assets?

25   A.   No we did not.

1   Q.    Is the stalking horse bidder an insider of the Debtors?

2   A.    No.

3   Q.    Was the asset purchase agreement negotiated in good

4   faith with the senior secured lenders?

5   A.    Yes it was.

6   Q.    Was it negotiated at arm's length?

7   A.    Yes it was.

8   Q.    And were both sides represented by counsel?

9   A.    Yes.

10          MR. CHALUT: Your Honor, those were all of our

11   questions.

12          THE COURT: All right.  Thank you.  Anybody wish to

13   cross examine Mr. Caridi?  All right.  I'll accept the

14   testimony, and I have no further questions.  You may step

15   down.

16          MR. CHALUT: Your Honor - -

17          THE COURT: Based on that and the resolution of the

18   objections, I'd be prepared to approve the sale, unless any

19   other party wishes to be heard.  Okay.

20          MR. CHALUT: Your Honor, we did have a few minor

21   changes to the sale order, if you'd like to walk through

22   those now.  I can hand up a black line of some minor changes

23   that we'd like to walk through.

24          THE COURT: You may.

25          MR. CHALUT: If I may approach?

1            THE COURT: Yes.  Thank you.

2            MR. CHALUT: Your Honor, the changes on page 1 are

3    simply, I think in the formatting.  They aren't actual

4    changes to the document.

5            THE COURT: Okay.

6            MR. CHALUT: Except with respect to reference

7    document number 46.  The only change on page 2 references the

8    date that the bidding procedures order was entered, October

9    26th.

10           THE COURT: You can just hit the substantive - -

11           MR. CHALUT: Hit the substantive changes.  Okay,

12   Your Honor.  The first substantive change, Your Honor, and

13   it's not truly substantive, is on page 8 of the black line,

14   section (p).  Just notes that we did receive no other

15   qualified bids for the purchased assets or the transferred

16   equity interests.

17           THE COURT: Okay.

18           MR. CHALUT: The next substantive change of any note

19   is on page 15, paragraph 2.  Simply says, all objections,

20   responses, and requests for continuance concerning the sale

21   motion, to the extent not withdrawn, are resolved in

22   accordance with the terms of this order.  Your Honor, we may

23   have to make one slight change in light of the issue we just

24   talked about.

25           THE COURT: Okay.

1          MR. CHALUT: Or Your Honor, it actually does say,

2     or, are resolved in accordance with the terms of this order

3     and as set forth in the record of the sale hearing.  So Your

4     Honor, I believe that would satisfy the issue with respect to

5     the matter involving Sharp.

6          THE COURT: Well, is it resolved yet?  Resolved or

7     continued.  Why don't we add?

8          MR. CHALUT: We can make that change.  Your Honor, I

9     think we could just interlineate that change into the

10    document and hand it up at the end of the hearing, Your

11    Honor.

12         THE COURT: That's fine.

13         MR. CHALUT: The next change of any note, Your

14    Honor, is on page 24 of the black line.  Page, paragraph 24.

15    Where it says in parentheses, Unless otherwise agreed to in

16    writing by the Debtors and purchaser, or as reflected in the

17    record at the sale hearing.  Your Honor, this was a

18    resolution with respect to one of the, this was intended to

19    resolve one of the specific cure objections.  That of

20    Massachusetts-Riverside.  I had noted on the record that the

21    Debtors and Massachusetts-Riverside would include a change in

22    the sale order to resolve their issues.  Your Honor,

23    Massachusetts-Riverside was concerned that at the end of each

24    year there are occasionally adjustments with respect to their

25    lease, that that could be deemed a pre-petition claim.  They

1  wanted just to ensure that there wouldn't be an argument that

2  that would constitute a pre-petition claim and therefore be

3  somehow, that somehow they would lose their rights with

4  respect to those adjustments on the basis of the fact that

5  the cure had already been set by the Court.  And so this

6  change in paragraph 24 was intended to reflect their concern,

7  and they were happy with this change in paragraph 24.

8      THE COURT: So you do have an agreement in writing

9  with them?

10     MR. CHALUT: Yes we do.  In an email, Your Honor.

11     THE COURT: All right.

12     MR. CHALUT: Your Honor, paragraph, down at the very

13  end of paragraph 24, there's another change which was also

14  intended to resolve a specific cure objection.  This was the

15  CIGNA cure objection.  Your Honor, the first point in this

16  change was to specifically reflect which of the CIGNA

17  contracts were being assumed in connection with this sale

18  order.

19     THE COURT: Um-hum.

20     MR. CHALUT: And also was intended to deal with the

21  issue of retroactive premium adjustments that might be made

22  afer the closing date.  They, similarly to Massachusetts-

23  Riverside, were concerned that there might be an argument

24  raised that those retroactive premium adjustments could be

25  deemed pre-petition, and therefore their rights would have

1    been lost because they didn't assert a cure claim.  So this

2    was reflected in this change here in paragraph 24.

3            THE COURT: Okay.

4            MR. CHALUT: And again, CIGNA agreed to withdraw its

5    objection on the basis of this change made here in paragraph

6    24.

7            THE COURT: Okay.

8            MR. CHALUT: If I'm not mistaken, Your Honor, that

9    may be the last significant change.  But - - sorry, Your

10   Honor.  One more change.  Paragraph 52, the Debtors and the

11   purchasers shall be authorized to make non-material

12   amendments to the asset purchase agreement and the related

13   documents without further order of this Court.  Your Honor,

14   we added this paragraph simply to reflect, I think it's a

15   pretty standard paragraph designed to allow us, between now

16   and the actual closing of the sale, to make non-material

17   changes to the asset purchase agreement.  Maybe Mr.

18   Smolinsky, I'm sorry, Mr. Marinuzzi has a comment.

19           MR. MARINUZZI: Just, I'm sorry, Your Honor.  I got

20   the nod of approval from counsel for the lenders.  I hope

21   that the Debtors will also agree to provide notice to the

22   Committee.  We're not looking to approve any changes, we just

23   want to know of any changes that were made.

24           MR. CHALUT: Your Honor, we don't have any problem

25   with that.  And I see Mr. Smolinsky nodding his approval as

1   well. So we have no problem with that. We will definitely

2   make sure that the Creditors Committee is kept in the loop of

3   any changes that we make to the APA.

4           THE COURT: All right.

5           MR. CHALUT: With that, Your Honor, those are the

6   only changes to the sale order. And with the one

7   interlineation that we will make regarding the continuance of

8   the Sharp objection, I think we can hand up the order now if

9   you'd like.

10          THE COURT: You may. Okay. All right. I'll enter

11  the order as modified, then.

12          MR. CHALUT: Thank you, Your Honor. The next item

13  on the agenda, Your Honor, is the motion of Miller Buckfire,

14  I should say the application of Miller Buckfire. I should

15  say the application of the Debtors for retention of Miller

16  Buckfire in its bankruptcy case as its investment banker.

17  Mr. Wiles from Debevoise & Plimpton will be representing

18  Miller Buckfire. But I did want to state on the record, and

19  we will make a statement at the closing as well, on behalf of

20  the Debtors and their position, the Debtors certainly support

21  this application and the fee requested by Miller Buckfire.

22  Miller Buckfire, in our view, has done a very effective, very

23  good job in this case, and we believe that the fee that was

24  requested, which we negotiated with them, was perfectly

25  consistent with the market, and we believe it was a good fee,

1   and we support wholeheartedly the position that they're

2   taking in this case.  But we will turn over the mic to Mr.

3   Wiles at this time.

4           THE COURT: Okay.

5           MR. WILES: Good afternoon, Your Honor.  I'm Michael

6   Wiles, for the record, from Debevoise & Plimpton in New York

7   here for Miller Buckfire.  I believe my *pro hac vice* has

8   already been signed as of about a month ago.  Your Honor,

9   there are two points that we're prepared to address today.

10  And in light of the time, we're happy to do this in whatever

11  way suits the Court and the parties to get this, let

12  everybody head towards their Thanksgiving weekends as quickly

13  as possible.  The first point is the reasonableness of the

14  fee.  I'm prepared to do this by proffer or by testimony of

15  Mr. Bojmel, but we have produced and shared with the United

16  States Trustee, about a month ago, a list of other cases and

17  comparable transactions.  And I can, as I say, I can either,

18  however that suits everybody.  I can either do this by

19  proffer, or I can do this by having Mr. Bojmel actually

20  testify.  And that would be the first issue.

21          THE COURT: Any objection to proceeding by proffer?

22          MR. SCHEPACARTER: For the record, Richard

23  Schepacarter for the United States Trustee.  No objection,

24  Your Honor.  We do reserve the right to cross examine, so I

25  think - -

1          THE COURT: Okay.

2          MR. SCHEPACARTER:  - - the witness will end up

3    taking the stand one way or another.  But however Your Honor

4    wants to do it is fine with us.

5          THE COURT: All right.  Let's proceed by proffer.

6          MR. WILES: Okay.  And then just before I do that,

7    Your Honor, the other issue, which I suspect is actually the

8    real issue of the day is the standard of review and whether

9    that should be §328 versus §330, a recurring issue we seem to

10   have with the United States Trustee's Office these days.  Why

11   don't I do the proffer first, and we'll save the argument on

12   the standard - -

13         THE COURT: Okay.

14         MR. WILES:  - - until afterwards.  Actually,

15   there's two witnesses that I would offer by proffer.  The

16   first would be Ronen Bojmel, who is a Managing Director of

17   Miller Buckfire.  If called to the stand, Ronen would testify

18   that he has worked in the Bankruptcy and Restructuring field

19   since 1997.  That he is currently a Managing Director at

20   Miller Buckfire.  That Miller Buckfire is an investment bank

21   that, I'm sure Your Honor knows this, that specializes in

22   assisting companies in restructuring and companies that are

23   in a distressed situation in connection with restructurings,

24   or M&A transactions, or financings, or sometimes all three.

25   That Mr. Bojmel is leading the team that is working on Miller

1    Buckfire's engagement for Questex.  That he is familiar with

2    the work being done and with the proposed fees in this case.

3    He is also familiar with the relevant market practices, both

4    in and outside of bankruptcy, including the market practices

5    with respect to fees for restructuring work done by

6    investment banks.  He would testify that in addition to the

7    cases where Miller Buckfire itself is retained, it regularly

8    monitors the retentions of other firms and the terms of those

9    retentions.  And he would testify that the standard market

10   practice of investment banks who do restructuring work is to

11   charge fixed monthly fees, plus transaction based fees.  That

12   investment banks, the standard market practice is not to work

13   on an hourly fee basis, and that Miller Buckfire does not do

14   so.  He would further testify that monthly fees vary

15   depending on the size of the case and difficulty of the case,

16   and in large cases they can exceed $300 thousand.

17   Restructuring fees, as a rule of thumb, are generally around

18   1%.  A higher percent for a smaller case.  A smaller percent

19   if you get a case over a billion dollars or more.  Or many,

20   or close to a billion dollars or more.  That sale fees are

21   typically 1 to 2% of aggregate consideration.  And that

22   financing fees normally depend on the type of capital being

23   raised.  That a typical structure is 1% for secured debt, 2

24   or 3% for unsecured debt, and 5%, or sometimes higher, for

25   equity.  That in this particular case, as a result of

1   negotiations, the fees that were proposed for this assignment
2   were actually reduced.  The initial proposal was for monthly
3   fees of $200 thousand.  That was reduced to 175 thousand.  In
4   addition, the initial proposal was that there would be a
5   crediting of one half of monthly fees after the first six
6   months.  That was changed to provide for a crediting of one
7   half of the monthly fees after three months.  The original
8   proposed DIP financing fee, which I think became moot in this
9   case, was 1½%, but was reduced to 1%.  And the proposed
10  restructuring fee initially was 3.75 million, you may have
11  seen in the engagement letter filed with the retention
12  application, it was reduced to 3.5 million.  And as the
13  result of further discussions with the secured lenders, it
14  was reduced to $3.25 million.  Mr. Bojmel would also testify
15  that as to the accuracy of a table, of two tables that have
16  been put together.  Actually, I should say he would verify
17  Exhibit 1, which is the engagement letter of Miller Buckfire
18  in this case.  He would also verify Exhibit 2, which is a
19  table that has been prepared by Miller Buckfire showing the
20  restructuring and sale fees over, in all cases over the past
21  year, the past 12 months, that had between $140 million and
22  $400 million in debt.  And he would testify that the table,
23  in an effort to kind of provide some standard basis of
24  comparison, since monthly fees vary and crediting
25  arrangements vary - -

1          THE COURT: Do you want to hand a copy of that chart

2    to me?

3          MR. WILES: Absolutely.

4          THE COURT: So I can follow along.

5          MR. WILES: Absolutely.

6          THE COURT: Thank you.

7          MR. WILES: I will give you all three exhibits, Your

8    Honor.  And I will give them to Mr. Schepacarter.

9          THE COURT: Thank you.

10          MR. WILES: As to Exhibit 2, Mr. Bojmel would

11    testify that it shows, that in order to provide a standard

12    method of comparison, what Miller Buckfire has done is assume

13    that each of the cases listed here lasted for 12 months.

14    Cases last for different amounts of time.  The actual, you'll

15    see the monthly fees vary, the crediting arrangements vary.

16    So just in order to provide some standard method of

17    comparison, they assumed the cases lasted for 12 months and

18    then figured out what the overall fees were, as a percentage

19    of debt.  The actual fees shown for Miller Buckfire, I should

20    note, as a result of that, the 4.6 million, it's there for

21    basis of comparison.  That's what the fee would have been if

22    this case had lasted for 12 months.  The actual fee is

23    smaller than that, because the case doesn't last for 12

24    months.  But what the table shows is when you put everything

25    on the same way of looking at things, that the overall fees,

1    not just the restructuring fee, which is usually 1%, the

2    overall fees on a restructuring basis ranged from a low of

3    .78 to a high of 2.15 and an average of 1.43%.  And on this

4    basis of comparison, Miller Buckfire's would be 1.61%.  And

5    as I just mentioned, it's actually lower than that, because

6    the case has not lasted for 12 months.  In terms of the sale

7    chart, the Exhibit 3 that I've handed up to Your Honor, Mr.

8    Bojmel would testify that this shows, this shows sale

9    transactions since January of 2007 with a deal value of

10   between 75 million and $200 million.  This has been taken

11   from public databases.  And it shows what the reported fees

12   were as a percentage of the deal value.  And it shows that

13   during that period of time, the standard customary fees

14   ranged from a low of .62% to a high of 3.66%, and an average

15   of 1.74%.  That the proposed $3.25 million fee here is 2.5%.

16   And that that's, in each case, within the range of what is

17   charged in the market by comparable firms for comparable

18   services.  He would also testify that in agreeing to take on

19   this assignment, he considered the fact that Miller Buckfire,

20   at a very busy time in its business, would be taking on this

21   work and possibly foreclosing other work.  Possibly even on

22   bigger cases that might, that might have higher fees, and

23   that that was a factor also in setting the fees.  Finally

24   Your Honor, Mr. Bojmel would describe the work that was done.

25   He would describe how Miller Buckfire and its team first

1   familiarized itself with the business, negotiated standstill

2   arrangements with all the major creditor groups, explored

3   restructuring options, including negotiation with the equity

4   sponsor, were fairly far along in attempting to work out a

5   restructuring, but time and a lack of liquidity, and other

6   pressures kind of made that academic, and forced the company

7   in the direction of a sale.  That they negotiated with the

8   secured lenders.  That they ran a full and complete sale

9   process in an effort to find other parties.  And that they

10  have provided for the company, and for its creditors, the

11  best deal that could be obtained.  The other proffer would be

12  by Kyle Herman, who actually prepared these tables, who would

13  testify that they are an accurate summary of all of the

14  public information that is cited in them.

15          THE COURT: All right.  Does the US Trustee wish to

16  examine either witness?

17          MR. SCHEPACARTER: For the record, Richard

18  Schepacarter for the United States Trustee.  Your Honor, we

19  wish to cross examine, I think it was Mr. Bojmel.  I hope I'm

20  saying the name right.  The other witness is just a

21  foundation witness for those charts, and that's fine.

22          THE COURT: Okay.

23          MR. SCHEPACARTER: Thank you.

24          THE COURT: Then the witness should take the stand.

25  Please remain standing so you can be sworn.

1      **RONEN BOJMEL, MILLER BUCKFIRE'S WITNESS, SWORN**

2                        CROSS EXAMINATION

3    BY MR. SCHEPACARTER:

4    Q.   Good afternoon, Mr. Bojmel.  Perhaps you can just

5    enlighten me a little bit.  How did Miller Buckfire come

6    about this engagement?

7    A.   We were contacted by the company's sponsor, Audax.

8    Q.   Okay.  And when you say company's sponsor, explain that.

9    A.   The owner of the company, Audax Capital Management.

10   Q.   Okay.

11   A.   We were contacted by them.

12   Q.   Okay.  And have you had previous dealings with Audax?

13   A.   No.

14   Q.   Okay.  With respect to the fee that was negotiated,

15   there was proffered testimony that indicated that there was

16   other work that was either forsaken, or given up, or turned

17   down, other opportunities to earn income.  What other

18   opportunities, without going into the specifics of those,

19   what other opportunities were there that were not taken, in

20   light of having to choose to take this engagement?

21   A.    I cannot talk about specific, you know, private matters.

22   The company is, on average, smaller than the average company

23   that we advise, and we've had to take a decision to take on

24   this piece of business in an environment where Miller

25   Buckfire was extremely busy on many other restructurings

1    during 2009.

2    Q.   Okay.  Were there any specific engagements that were

3    either turned down or where Miller Buckfire made a decision

4    not to take those engagements in light, and instead took this

5    engagement?

6    A.   There were no specific engagements that were turned down

7    by me having taken on this engagement.  I have essentially

8    sold all my remaining time and was not available to do

9    anything else.

10   Q.   Okay.

11        MR. SCHEPACARTER:  Well, I hope that's not my

12   Blackberry.  If it is, I'm going to put it back here.

13        THE COURT: Thank you.  No, not yours.

14        MR. SCHEPACARTER: That's not me.  So I feel a

15   little bit better.

16   BY MR. SCHEPACARTER:

17   Q.   Maybe if you could, inform us a little bit about the

18   negotiation of the fee.  How, let's start at the top.  Who

19   proposed the first sort of salvo with respect to the fee that

20   Miller Buckfire was going to charge?

21   A.   I did.

22   Q.   Okay.  And who did you give that information to?

23   A.   The fee was communicated to one of the officers at

24   Audax.  His name was Edward Feuerstein.  Actually a colleague

25   of mine that I've worked with at Wasserstein Perella many,

1    many years ago, who knew of us.  And then as we continued the

2    negotiations of the fees, the CEO of the firm, as well as the

3    counsel, was involved.

4    Q.   Okay.  I'm going to show you an exhibit.  It's an email

5    that was produced in discovery.  And I'll make sure counsel

6    has it.

7             MR. SCHEPACARTER: Your Honor, if I might approach

8    the witness with - -

9             THE COURT: You may.

10            THE WITNESS: Thank you.

11            THE COURT: Thank you.  Shall we mark this UST 1?

12            MR. SCHEPACARTER: UST 1.  It's going to be the only

13   exhibit we're going to have, Your Honor.

14            THE COURT: All right.

15            MR. SCHEPACARTER: I'll let the witness have a few

16   minutes to identify that or become familiar with that

17   document.

18   BY MR. SCHEPACARTER:

19   Q.   Just let me know when you're - -

20   A.   Yes.

21   Q.   Okay.  Mr. Bojmel, do you recognize this document?

22   A.   Yes.

23   Q.   Okay.  And is it an email exchange between you and

24   somebody at Audax?

25   A.   Yes.

1    Q.   Okay.  There's a statement there, and it's the front

2    page, right at the bottom.  It basically says, and I'll just

3    read it into the record, "One hour is more than enough to

4    dazzle your guys.  We are currently working on three directly

5    comparable and related companies and a number of same

6    creditors involved.  There is no one better to get you a

7    swift out-of-court restructuring done.  You will need to

8    decide if you are willing to pay the price."  Is that, you

9    actually wrote that email?

10   A.   Yes.

11   Q.   Okay.  And let me just drill down on that just a little

12   bit.  When you say you were working on, currently working on

13   three directly comparable and related companies, can you

14   explain what you meant by that?

15   A.   The firm is involved in advising companies in the B to B

16   media.  Another way just to tell Edward that we understand

17   the industry well.

18   Q.   Okay.  All right.  And when it says a number of same

19   creditors involved, are they the same creditors for this

20   Debtor, or are the same types of creditors?

21   A.   If they are the same creditors?  Some of them are the

22   same.  Some of them are not.  When I was communicating with

23   Edward, I had no idea who the creditors were.

24   Q.   Right.  And there's the last statement, the last

25   sentence.  It says, "You will need to decide if you are

1  willing to pay the price." Can you explain what you meant by

2  that?

3  A.   Edward knows that Miller Buckfire's average deal is much

4  larger.  We usually are getting hired by larger companies to

5  conduct their restructurings.  And I was trying to tell them

6  that essentially there is going to be a minimum fee that

7  we're going to need to make, and that they will have to, they

8  will have to decide whether this works for them or not.

9  Q.   Okay.  Did you relate to him what that minimum fee would

10 be?

11 A.   No.  No.  Well, at some point, yes.  But not when, I

12 don't think I have when the email was sent.  This was the - -

13 Q.   All right.  With respect to this engagement, did you or

14 anyone at Miller Buckfire undertake any sort of due diligence

15 before the engagement was entered into?

16 A.   No.  It's a private company.  All we knew was generally

17 speaking how much debt it had, and you know, what the issues

18 were.

19 Q.   Okay.  Now with respect to, you indicated the debt.  I'm

20 going to, I don't know if you still have your exhibits.  The

21 ones that counsel gave you.  Exhibit 2 is the debt, is the

22 one that deals with the restructuring, the in court

23 restructuring, as I believe.  Correct?

24 A.   Um-hum.

25 Q.   Okay.  And - -

1    A.    I'm sorry.  Is this in this, in the email exchange?

2    Q.    No, no.  We're on to Exhibit 2 of the ones that, I'm not

3    sure if you have those exhibits.

4    A.    I don't have them with me anymore.

5          THE COURT: Could somebody give the witness the

6    exhibits?

7          THE WITNESS: Thank you.

8          UNIDENTIFIED SPEAKER: You're welcome.

9    BY MR. SCHEPACARTER:

10   A.    Yes.

11   Q.    With respect to Exhibit 2, that is the one that deals

12   with in court bankruptcy related, Bankruptcy Court related

13   restructurings, correct?

14   A.    Yes.

15   Q.    Okay.  And the restructuring fee, and correct me if I'm

16   wrong.  The way I understand it is it's based on a percentage

17   of debt.

18   A.    It's usually quoted as a percentage of debt.  Or thought

19   of as a percentage of debt.

20   Q.    Okay.  And the out of, the out-of-court restructurings

21   are based on some kind of deal value, correct?

22   A.    No.  Restructurings are, transaction fees for

23   restructurings, whether in court or out-of-court, it doesn't

24   really matter.  I usually quote it as a percentage of debt.

25   People think about them as a percentage of debt.  When we

1  start transactions, we don't know whether they're going to

2  end up in or out of court.

3  Q.   Okay.  And if, how did Miller Buckfire come to the fee

4  that was eventually charged in this case?  That it ended up

5  being a percentage of 1.61% of the debt of this Debtor.

6  A.   The only piece of information that I had about this case

7  was approximately how much debt it had, and I thought about

8  it as a, about 1½% when I initially quoted it.

9  Q.   Okay.  And, I mean, theoretically, if the debt were

10  double whatever the debt is, and if it were double in the

11  amount, would that make your fee double in that, in light of

12  that?

13  A.   Not - -

14  Q.   Your meaning Miller Buckfire.

15  A.   - - not necessarily.  The more amount of debt there is,

16  the smaller the percentage becomes.  There are increments.

17  So it wouldn't be necessarily double.

18  Q.   Okay.  All right.  With respect to the marketing of

19  these assets, can you take us through the efforts that Miller

20  Buckfire undertook with respect to marketing these assets

21  with respect to this engagement?

22  A.   Sure.  We have initially tried to arrive into a

23  restructuring agreement as opposed to go out and market the

24  assets on a 363 sale basis.  We have organized the creditors

25  group, or the creditor groups.  We have helped the company

1   put together the business plan, liquidity analysis and began

2   a conversation with them about the restructuring.  We have

3   solicited the company's sponsor, Audax, to provide an initial

4   proposal to the company's lenders.  And have gone a long road

5   in an effort to restructure the company on a consensual basis

6   out-of-court.  That was the preference.  That process has

7   taken quite a while.  The second lien creditors were not

8   interested in engaging in a meaningful conversation about a

9   restructuring.  We, our liquidity situation has deteriorated,

10  and there was very little time to arrive into a restructuring

11  or a sale.  In addition to that, the booking season is, was

12  arriving closely, which was the November and December time

13  frame.  The reason for which we have decided to change

14  direction.  And in an effort to try to salvage some value for

15  creditors who are not just the first liens, decided to go to

16  a sale.  A full, outright sale.  Anchor the first liens, as

17  an initial bidder, with a view to try to maximize value and

18  generate some value to other stakeholders by putting the

19  company out in the market in an organized fashion within the

20  time frame that we had.  We have put together an initial list

21  of between 50 to 60 investors which we thought are the ones

22  who are going to most likely to be interested in the asset.

23  Again, with the information and knowledge that we have in

24  advising other companies.  We put that initial list.  We

25  then, pursuant to requests by the Creditors Committee to

1   increase that list to over 200 and contacted each and every

2   one of them in person and by email in an effort to have them

3   interested in participating in the auction.

4   Q.   Okay.  The initial list you said was 50 to 60.  That was

5   what Miller Buckfire came up with?

6   A.   That was the initial very focused list of people we know

7   are interested in investing in these assets.  That have

8   transacted in the market.  A lot of them are strategic.

9   Those that we thought could actually be interested in

10  maximizing value as well as some financial investors as well.

11  Q.   Okay.  And that's a list that Miller Buckfire - -

12  A.   We put together - -

13  Q.   - - keeps or was it one that was sort of put together

14  for this engagement?

15  A.   No, no.  It was put together for this engagement with a

16  lot of help from the company.  The people who know the

17  industry.  With input from the first lien lenders as well.

18  Input from creditors who know the market and who are, you

19  know, transactioning other B to B media companies.  That was

20  how this initial list was put together.

21  Q.   Okay.  And then I think your testimony was that the list

22  increased to 200 names?

23  A.   We received a much larger list from the UCC and have

24  decided to expand the effort to contact those parties as

25  well.

1  Q.   Okay.  And contact was made with those parties or at

2  least - -

3  A.   Yes.

4  Q.   - - some information was given to them?

5  A.   Yes.

6  Q.   What was the nature of the information that was given?

7  A.   Well, we have contacted them with our FP, with

8  essentially a query as to their interest in investing in the

9  company, buying it in whole or in part.  With not, without

10  the confidential information.

11  Q.   Okay.  And as a result of that marketing, did Miller

12  Buckfire maintain a due diligence room or website of some

13  sort where people could get information?

14  A.   Yes.  We have created, and helped the company create a

15  robust data room with a lot of information.

16  Q.   And as a result of the marketing, can you tell me how

17  many, I'll call them letters of intent, may have been

18  received as a result of those efforts?

19  A.   We received one query, but no real letters of intent.

20  Q.   Okay.  Tell me a little bit about the staffing of the

21  engagement.  How many people were put on this engagement by

22  Miller Buckfire?

23  A.   It's a five people staff.

24  Q.   Okay.  Including yourself?

25  A.   Including myself.

1    Q.    Okay.  And the names and the sort of the positions of

2    the other people were?  What were they?

3    A.    I was the Managing Director, Patrick Dumont (phonetic),

4    the Vice President, Kyle Herman, Associate, Sonjay Markin

5    (phonetic), an Analyst as well as a summer analyst during the

6    summer time.

7    Q.    Okay.  And without saying number of hours or whatever,

8    but how much, if you could tell me in percentage base, of

9    their time was dedicated to this engagement?

10   A.    It depends.  It depends on the professional.  It could

11   be anywhere from 30 to 70% of the time.

12   Q.    Okay.  How much time did you spend on this engagement as

13   opposed to other matters in percentages?

14   A.    Hard for me to say.  But I can tell you a lot more than

15   I thought.  When we entered the case, we thought it was going

16   to be a simpler case.  An out-of-court transaction.

17   Q.    Would you state that there was any special expertise

18   that Miller Buckfire utilized with respect to this

19   engagement?  In any fashion?

20   A.    Well the knowledge of the industry is very important,

21   obviously, to understand the company.  To convey to

22   interested parties, to the creditors about the situation.

23   And obviously to put together a list of interested parties

24   and communicate with them intelligently about it.  The other

25   major expertise is a restructuring expertise.  Is the ability

1    to bring credibility to a process.  To organize the

2    creditors.  To get the companies, for example, in this case,

3    for example the companies earn out parties to agree to a

4    standstill.  That is actually an important point to the earn

5    out parties that are generating a significant portion of the

6    company's EBITDA.  We have managed to calm them down.  The

7    company owed them a lot of money.  To get the 90 day

8    standstill during which we've actually done all the work and

9    performed, and you know, conducted the process to arrive to

10   where we are today.  The, that is something that we call a

11   restructuring expertise.

12   Q.    Okay.  And if you can, tell me what the ultimate outcome

13   was of all the marketing that was done, and the efforts by

14   Miller Buckfire, what ultimately occurred in this case?

15   A.    Well there was a number of outcomes.  Number one,

16   avoiding complete collapse of the company's liquidity and

17   value by successfully keeping their earn out parties, which

18   are important operators of the business, in place and

19   interested in the process and the lives of the company going

20   forward.  That would be avoidance of, you know, critical

21   issues going forward.  We have managed to deliver value to

22   the secured creditors by way of completing their process and

23   delivering a company that is a functioning company that

24   generates EBITDA that hopefully will be successful in

25   creating value to them in the future.  Unfortunately, we

1  haven't been able to deliver value to other constituents.

2  However, we tried our best.  The company has been, is

3  leveraged through the first liens at about 15, sorry, 12 or

4  13 times.  Which is a lot of leverage.  These businesses are

5  usually worth a much lower multiple than that.  We thought

6  that, you know, showing up in court with a regular

7  restructuring, the valuation would not, certainly not justify

8  any value.  And ultimately decided to change course to try

9  to benefit other constituents as well.

10 Q.   Okay.  The ultimate outcome, though, was a credit bid by

11 a secured lien lender, correct?  Is that what happened?

12 A.   It was the outcome.  Correct.

13 Q.   Okay.  When you say the multiple of this business, can

14 you explain that a little bit more?

15 A.   The value of these businesses.  Where the public

16 businesses trade is a, usually is a multiple of EBITDA.  Is a

17 number that is substantially lower than the amount of first

18 lien debt on a company.

19 Q.   All right.  The multiple for this Debtor, is it

20 comparable to other companies in this industry?

21 A.   The amount of the implied multiple by the credit bid?

22 Q.   Right.

23 A.   Probably higher.  The reason for which we couldn't find

24 anybody who would be willing to buy the company for more than

25 that.

1  Q.   All right.

2          MR. SCHEPACARTER: Your Honor, I don't have any

3  further questions.  I'll reserve recross if there's any

4  redirect.

5          THE COURT: Any redirect?

6          MR. WILES: Very briefly, Your Honor.

7                    REDIRECT EXAMINATION

8  BY MR. WILES:

9  Q.   Mr. Bojmel, on US Trustee's Exhibit 1, your comment

10  about whether the Debtor was willing to pay the price.  I

11  just want to make sure I understood.  At that point in your

12  discussions, had you made an initial fee proposal to the

13  Debtors?

14  A.   No.

15  Q.   And what was your initial monthly fee proposal to the

16  Debtors?

17  A.   The initial monthly fee we proposed was 200.

18  Q.   And did the Debtor agree to that number?

19  A.   No.  They did not.

20  Q.   What was the final number?

21  A.   175.

22  Q.   And what was your initial restructuring fee proposal?

23  A.   375.

24  Q.   And what was the final number?

25  A.   325.

1  Q.  Okay.

2       MR. WILES: I don't have anything else, Your Honor.

3       MR. SCHEPACARTER: Nothing further.

4       THE COURT: All right.  You may step down.

5       THE WITNESS: Thank you.

6       THE COURT: All right.  Let me hear from the

7  objector first.

8       MR. WILES: Okay.

9       THE COURT: You're done with the evidence, I think.

10       MR. SCHEPACARTER: Thank you, Your Honor.  For the

11  record, Richard Schepacarter for the United States Trustee.

12  This case is a little bit of an oddity only from the

13  standpoint of the fact that the engagement that we're

14  debating is also the same date as the, basically the award of

15  the fee.  So we do know exactly what the amount of the fee is

16  going to be.  But I don't think that changes the analysis

17  from the standpoint of whether the United States Trustee in

18  this case, we've asked for review under §330 of the

19  Bankruptcy Code rather than applying §328 of the Bankruptcy

20  Code only from the standpoint of the fact that 330 gives our

21  office the ability to review the fee for reasonableness, to

22  make sure that the fee is reasonable.  In most cases - -

23       THE COURT: Well, is that moot in this case?  I

24  mean, you know the fee and - -

25       MR. SCHEPACARTER: We do know the fee.  And I don't

1  think it's moot, because I think that the standard is that we

2  need to still review the amount of the fee.  Because you're

3  - -

4          THE COURT: Today?  Or when?

5          MR. SCHEPACARTER: Today or - - well, the fee is

6  actually - - well strike that.  The retention is *nunc pro*

7  *tunc* to the date of whenever the application was made.  I'll

8  assume it was the first day of the case.  So the standard

9  would be 328.  That's what the parties are looking for.  What

10 we're looking for is to be able to say under 330 we can

11 review the fee for all of those factors that are set forth in

12 §330, and I'll just go through them briefly.

13         THE COURT: Well - -

14         MR. SCHEPACARTER: The time spent on - -

15         THE COURT: - - let me ask you - -

16         MR. SCHEPACARTER: Sure.

17         THE COURT:  - - a question.  Are we, is it

18 contemplated they'll file a fee application, or am I, is that

19 right?

20         MR. SCHEPACARTER: I'm not sure if they're filing a

21 fee application or if the application is, basically as part

22 of the sale order their fee is awarded.  That part I'm not

23 certain about.

24         THE COURT: Debtor want to answer that?

25         MR. WILES: Your Honor, the proposed order

contemplates that fees can be paid at the time specified in
the order.  So that a sale fee could be paid.  But it also
contemplates, just as all the orders do, that a fee
application will be made, and would be subject to review
under §328, if you approve the order as we've requested it.

THE COURT: Okay.

MR. SCHEPACARTER: Thank you.

THE COURT: All right.

MR. SCHEPACARTER: So I don't think it's moot.  I
think that although we know what the fee is, we still need to
see what the fee application is.  We need to be able to apply
all of those factors in §330, I think it's (a)(3).  What it
talks about is determining the amount of the compensation to
be awarded to a professional person.  The Court shall
consider the nature, and the extent, and the value of such
services taking into account all relevant factors including
time spent on the services, rates charged, whether those
services were necessary and beneficial, whether those
services were performed within a reasonable amount of time.
Skip over, I guess, (e), because I don't think it applies.
But then again, the last factor, and it's again, a number of
factors, not just one sole factor is applying to one another.
Whether the compensation is reasonable based on the customary
compensation charged by comparably skilled practitioners in
cases other than cases under this title.  So, and again,

1    we're not asking for the other parties in the case to have

2    that review, but for our office to have that §330, that

3    reasonableness review, so that we can look at the fees in

4    this case.  And frankly, in every other case where an

5    investment banker or financial advisor is employed, so that

6    we have the ability to sort of be, as is our role in these

7    cases, to be the watchdog.  To be able to guard the fees

8    are not, that are charged are not exorbitant.  Because Your

9    Honor is, if we have an objection, Your Honor is the last

10   line of defense, so to speak, with respect to those fees.  So

11   that if we have an objection, and if Your Honor thinks that

12   we're off base, not on point, that the fees are reasonable,

13   Your Honor could overrule that objection.  Or find that the

14   objection is warranted, that it has merit, that it has the

15   ability to review the fees, is well under §330.  I know that

16   counsel will point to cases in other jurisdictions where the

17   investment bankers have sort of gotten stung for another, for

18   lack of a better word.  But I think that that's important to

19   note that those courts had the ability to, even though they

20   may not have liked that result, the courts had the ability to

21   look at those fees under §330, to be able to determine that

22   those fees are reasonable, and have sort of the last look at

23   those fees to be able to say, Yes.  This is a reasonable

24   case.  This is a fee that is reasonable.  Because you've got

25   to remember that this is sort of public money to a certain

1    extent.  It's the fees that are earned in Bankruptcy Courts

2    have to be subject to, in certain circumstances, especially

3    this one, reasonableness fees.  So that the public interest

4    is served in this respect.  Thank you.

5           THE COURT: Okay.  Thank you.

6           MR. WILES: Thank you, Your Honor.  Your Honor, I

7    think the evidence shows that the fees that we're proposing

8    are within the customary ranges.  Well within the customary

9    ranges.  Unlike the usual case, the work has all been done.

10   We explored all the options, got the best result that could

11   have been accomplished for the company, and the people who

12   have an economic stake in all of this are in full support of

13   the fee.  The Debtors, the secured creditors, in fact as I

14   understand it, the secured creditors have funded the payment

15   of the fee.  And I think as I said before I made the proffer,

16   that I think this really boils down to a philosophical issue

17   about §328 and §330.  And let me be candid about that and

18   about our history of dealings with the United States Trustee

19   on this point.  And there's two points I want to make.  One

20   is that §328 often gets talked about in these objections as

21   if it's intended to be an exception to the rule and that §330

22   is what Congress intended for everybody.  That's not what the

23   Code says.  The only provision in the Code that talks about

24   fees of the kind that investment bankers charge, fixed fees

25   and percentage based fees, is §328.  In fact, it was amended

1    just a couple years ago to make it clear that it applies to

2    fixed fee and percentage fee basis retentions.  And there's

3    nothing in it that says that you need unusual circumstances

4    or anything like that in order for fees to be approved.  It

5    just says that as long as the fees are reasonable, which in

6    this circuit and in other circuits, excuse me, has generally

7    been interpreted as meaning as long as it's consistent with

8    what the market does.  Now I know, I know the standard is

9    very inflexible.  If I could rewrite it, I would.  And we

10   have, over the years, negotiated, quite frankly, I think

11   three, probably four different standards that we've used to

12   try to make this issue go away in dealing with the Office of

13   the United States Trustee.  Something that puts the focus on

14   what we think are the right factors.  The same kind of

15   factors you consider in a 328 application, but not 330.  And

16   the reason is the 330 criteria don't fit.  It's written for

17   hourly retentions.  And in fact, my client, Miller Buckfire,

18   was very severely burned, on this very issue, in a case in

19   Alabama a few years ago.  The <u>Citation</u> case.  Where they had

20   a fixed fee, they were asked, everybody said they understood

21   it was a fixed fee, but they were asked to agree to 330 with

22   the understanding it would be judged as a fixed fee, but the

23   reasonableness, just once the outcome of the case was known,

24   and that's not what happened.  The judge applied hourly rate

25   criteria, calculated what she thought a reasonable hourly

1    rate would be.  And the Court of Appeals in that case came

2    within a hairs breadth, I would say, of holding that not only

3    was that permissible, but that it was required by §330.  Now

4    we do not work on an hourly fee basis, and we cannot be in a

5    position of having our fees judged on an hourly fee basis.

6    The reason we seek 328 is to get what Congress intended when

7    it passed the statute.  If somebody works on this kind of a

8    basis, then they're entitled to know when they negotiate it

9    up front that that's the fee they're going to get.  So when

10   they're making a decision, a business decision to commit

11   their resources to a matter in exchange for a particular fee,

12   they know they're going to get it, unless circumstances have

13   really gone awry.  Now we have been more than happy in other

14   cases, we offered it in this case, we've been more than happy

15   to agree to give the United States Trustee some kind of a

16   look back, as long as we can have some kind of reasonable

17   criteria.  But what we've done in other cases has been

18   rejected here.  What we've been told, not in this case, but

19   in other cases, I haven't had any such conversations with Mr.

20   Schepacarter.  But I know in other cases what I have been

21   told very specifically is that the United States Trustee has

22   decided it wants to reserve the right to judge fees on hourly

23   based criteria.  So I wish I could stand here and tell you

24   that I can make this issue go away, because I have a standard

25   that makes perfect sense, that bridges the gap, that doesn't

1    force you to lock yourself in to §328, but doesn't expose us

2    to criteria that don't make sense, but I can't.  Because

3    everything we've proposed just doesn't work anymore.

4             THE COURT: Well, but I didn't hear the US Trustee

5    to say that 330 required the Court to consider only the

6    hourly basis.  In fact, isn't the provision dealing with

7    whether the compensation is reasonable based on the customary

8    compensation charged by comparably skilled practitioners?

9             MR. WILES: That's one of the factors.

10            THE COURT: Right.  I mean, and isn't that what

11   would be applied in your - -

12            MR. WILES: Well if I had a 330 case in front of

13   you, I would be arguing that that should be the most

14   important factor, absolutely.  But frankly, I think that's

15   what it should only be.  But I've got case history saying,

16   No.  Hourly rate criteria are relevant.  I don't have any

17   agreement as to what the §330 criteria would be.  And quite

18   frankly, Your Honor, I've got to say, 328(a) has been

19   approved practically everywhere.  And if it's not appropriate

20   in this case, when we already know everything that's

21   happened, we already know all the market factors, we already

22   know all the evidence, we already have everybody in support

23   knowing exactly the economic outcome and the cost, then if we

24   take the view that it's not appropriate in this case, then

25   we're basically telling Congress we just don't agree that you

1  put it in the statute in the first place.  And I don't think

2  that's appropriate.  You know, it's there for a reason.  And

3  it does not require special showing.  It says that if the

4  Debtor makes the application, and if it's, if the fee

5  arrangement is done on this basis, and if it's reasonable, it

6  gets approved.  And whether we like the inflexibility of the

7  standard that Congress has proposed, that's what they gave

8  us.

9          THE COURT: Um-hum.

10          MR. WILES: And that's the result that we should

11  have.

12          THE COURT: Well, I think we are caught in a

13  quandary.  And because of the inflexibility of 328, I'm not

14  prepared to approve it on a 328 basis.  I will approve it

15  with the right of the US Trustee to review it on a 330.  I

16  don't read 330 as restrictively as other Courts have, that

17  I'm required to apply an hourly.  It is a factor that could

18  be considered, but with fixed fee arrangements - - well, I

19  won't say with fixed fee, generally.  But with investment

20  bankers, I am perfectly aware, and the evidence presented,

21  you know, is that that is the way practitioners in that area

22  get paid.  And if it's reasonable compared to comparable

23  practitioners' fees, then I think it would satisfy 330.  I'm

24  not prepared to, in any case, even though this is an unusual

25  case where the facts are all known, I am very reluctant to

1   approve a fee without a look back, if you will.  After we

2   know the circumstances.  In this case we know the

3   circumstances, but that's why I was a little confused as to

4   whether we we having the final fee application.  But I'll

5   consider all the evidence that was presented in connection

6   with the retention application at the fee application time

7   without your, the necessity to repeat it.  And it may be

8   moot.  There may be no objection.  But I am reluctant because

9   of the way Congress wrote 328 to apply it.  So I'll approve

10  the retention, but with a 330 look back by the US Trustee's

11  Office.

12        MR. WILES: Okay.  We'll prepare an order to that

13  effect, Your Honor.

14        THE COURT: All right.

15        MR. CHALUT: Your Honor, the Debtors did want to

16  state again on the record that it is our view that the,

17  Miller Buckfire should have been retained under 328, and I

18  did want to make that statement on the record.  We do believe

19  this issue should be moot at this time for the reasons that

20  were stated by Mr. Wiles.  The fact is is that at this point

21  in time, we've completed the sale process.  I think that I

22  can speak for the company and say that we believe Miller

23  Buckfire performed admirably, performed very well, performed

24  – –

25        THE COURT: Okay.

1          MR. CHALUT:  - - frankly worked very hard on this

2     case, throughout the process.  And we do want to make that

3     statement on the record so that everybody knows that we were

4     very happy with the work performed by Miller Buckfire.

5          THE COURT: And I'll incorporate that into the final

6     fee hearing as well.

7          MR. CHALUT: Thank you, Your Honor.

8          THE COURT: All right.  Anything else, then, today?

9     We'll stand adjourned, then.  Thank you.

10     (Whereupon at 5:44 p.m. the hearing in this matter was

11     concluded for this date.)

12

13

14

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber for

19     the United States Courts, certify that the foregoing is a

20     correct transcript from the electronic sound recording of the

21     proceedings in the above entitled matter.

22

23      _/s/Jennifer Ryan Enslen_                    _December 1, 2009_
        Jennifer Ryan Enslen
24      43 Bay Boulevard
        Newark, DE 19702
25      (302)836-1905